**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------------------X

ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, and ALLSTATE FIRE & CASUALTY INSURANCE COMPANY,

        Plaintiffs,

        -against-

DANIEL BOGATIN, GARY BOGATIN, DAVID CARMILI, MD, JOSEPH F. DORSTEN, DO, ANDRE JOCELYN DUHAMEL, MD, DOVI FAIVISH, JACK GREENWOOD, MD, ADDE KHANATAYEV, SANGEET KHANNA, MD, ARTUR KOFMAN, KONSTANTINOS KOUTELOS, MD, ERROL C. MALLETT, MD, MANISH MAMMEN, MD, HANAN MILLER, MD, DOMINIC EMEKA ONYEMA, MD, CRYSTAL VANESSA ANTOINE PEPELJUGOSKI, MD, SERGEY ZHIVOTENKO, MD, 334 GRAND CONCOURSE MEDICAL, P.C., BLK DIAGNOSTICS LLC, CENTRAL PARK EAST MEDICAL, P.C., CHAI DIAGNOSTICS LLC, CRYSTAL ANTOINE PEPELJUGOSKI MEDICAL P.C. D/B/A SANITAS MEDICAL PC, DIAGNOSTIC NEUROLOGY, P.C., DIRECT MEDICAL CARE P.C., EMOTE MEDICAL SERVICES, P.C., GREEN POWER NEW YORK, LLC, HEALTHCARE MEDICAL SERVICES PLLC, HILLSIDE PRIMARY MEDICAL CARE P.C., INTERVENTIONAL PHYSICAL MEDICINE AND REHAB OF NEW YORK PLLC, LIFELINE MEDICAL IMAGING P.C., MAIMONIDES DIAGNOSTICS LLC, PITCH MEDICAL P.C., REFUAH DIAGNOSTICS LLC, REGAL DIAGNOSTICS LLC, SENECA MEDICAL P.C., SINAI DIAGNOSTICS LLC, WILSON PRIMARY MEDICAL CARE P.C., WIZARD COMPUTER SERVICES, INC., JOHN DOES 1-15, AND ABC CORPS. 1-15,

        Defendants.

------------------------------------------------------------------------------------X

Index No.

24-CV-6235

**COMPLAINT**

# TABLE OF CONTENTS

Background and Introduction ........................................................................................1

The Parties  ...............................................................................................9

Jurisdiction and Venue .........................................................................17

I.      The Defendants' Fraudulent Schemes Were
        Enabled by Professional Licensing Violations .................................18

II.     The Defendants' Awareness of the Illegality of Their Conduct ....................21

III.    The Defendants Fraudulently Billed for Health Care Services
        - Summary of Scheme ........................................................30

IV.     The Defendants' Fraudulent Scheme to Bill for TCD Testing ....................32

V.      The Defendants' Fraudulent Scheme to Bill for VNG Testing  ....................69

VI.     The Defendants' Fraudulent Scheme to Bill for SSR Testing ....................165

VII.    The Provider Defendants' Interrelationships  ................................235

VIII.   The Defendants' Failure to Verify Claims ....................................257

IX.     The Defendants' Fraudulent Scheme to Bill for Services
        Rendered by Independent Contractors.........................................259

X.      The Defendants' Fraudulent Scheme was Enabled by
        Illegal Referrals of Patients................................................261

FIRST CLAIM FOR RELIEF .........................................................263

SECOND CLAIM FOR RELIEF ......................................................267

THIRD CLAIM FOR RELIEF .........................................................267

FOURTH CLAIM FOR RELIEF ......................................................272

FIFTH CLAIM FOR RELIEF ..........................................................276

SIXTH CLAIM FOR RELIEF ..........................................................278

SEVENTH CLAIM FOR RELIEF .....................................................282

EIGHTH CLAIM FOR RELIEF ...................................................................................286

NINTH CLAIM FOR RELIEF ....................................................................................288

TENTH CLAIM FOR RELIEF ....................................................................................292

ELEVENTH CLAIM FOR RELIEF ............................................................................297

TWELFTH CLAIM FOR RELIEF ..............................................................................298

THIRTEENTH CLAIM FOR RELIEF ........................................................................303

FOURTEENTH CLAIM FOR RELIEF .......................................................................308

FIFTEENTH CLAIM FOR RELIEF ...........................................................................309

SIXTEENTH CLAIM FOR RELIEF ...........................................................................313

SEVENTEENTH CLAIM FOR RELIEF .....................................................................318

EIGHTEENTH CLAIM FOR RELIEF ........................................................................320

NINETEENTH CLAIM FOR RELIEF ........................................................................324

TWENTIETH CLAIM FOR RELIEF ..........................................................................328

TWENTY-FIRST CLAIM FOR RELIEF .....................................................................330

TWENTY-SECOND CLAIM FOR RELIEF ................................................................334

TWENTY-THIRD CLAIM FOR RELIEF ....................................................................339

TWENTY-FOURTH CLAIM FOR RELIEF ................................................................340

TWENTY-FIFTH CLAIM FOR RELIEF ....................................................................344

TWENTY-SIXTH FOR RELIEF .................................................................................349

TWENTY-SEVENTH CLAIM FOR RELIEF ..............................................................350

TWENTY-EIGHTH CLAIM FOR RELIEF .................................................................354

TWENTY-NINTH CLAIM FOR RELIEF ...................................................................358

THIRTIETH CLAIM FOR RELIEF ............................................................................360

THIRTY-FIRST CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .364

THIRTY-SECOND CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .368

THIRTY-THIRD CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .369

THIRTY-FOURTH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .373

THIRTY-FIFTH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .378

THIRTY-SIXTH FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .379

THIRTY-SEVENTH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .383

THIRTY-EIGHTH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .387

THIRTY-NINTH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .389

FORTIETH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .393

FORTY-FIRST CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .397

FORTY-SECOND CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .398

FORTY-THIRD CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .402

FORTY-FOURTH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .404

FORTY-FIFTH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .408

FORTY-SIXTH FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .410

FORTY-SEVENTH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .415

FORTY-EIGHTH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .417

FORTY-NINTH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .419

FIFTIETH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .423

The Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property &Casualty Insurance Company and Allstate Fire &Casualty Insurance Company ("Plaintiffs" or, collectively, "Allstate"), by and through their attorneys, Short & Billy P.C., for their Complaint in this action, hereby allege as follows:

## BACKGROUND AND INTRODUCTION

1.      The State of New York has provided for No-Fault automobile insurance as a form of coverage designed to be useful to the consumer and to provide medical coverage, lost wages, and other benefits to people injured in automobile accidents so that they can recover from their injuries with minimal disruption in their lives.  For approximately twenty years, commencing with its inception in 1974, the No-Fault system functioned to the benefit of the consumer at premiums that were generally affordable.

2.      Since the mid-1990s, however, New York's No-Fault coverage has been targeted by perpetrators of fraud.  An increasingly large number of such persons have gone into business with the purpose of abusively billing the New York No-Fault system.  The New York Court of Appeals has commented that the No-Fault system has been targeted by and is plagued by fraud. As the Court of Appeals explained in *Matter of Medical Society of New York v. Serio*, that fraud has included staged accidents, billing for unnecessary services, and organized crime involvement. 100 N.Y.2d 854 (2003).

3.      As the New York State Department of Financial Services (formerly the New York State Insurance Department) ("DFS") explained in its March 15, 2016 Health Care Insurance Fraud Report to the Governor, health care fraud has serious adverse impacts on patients/consumers, insurers, and the public. This fraud includes medical providers that bill for services that were not provided or that were unnecessary, and it constituted the majority of all

health care fraud in New York. The 2016 Report noted that insurers are required to investigate fraud and to have a plan for the investigation and initiation of civil actions. Even in 2016, DFS reported that No-Fault insurance fraud cost the public in New York "hundreds of millions of dollars" in insurance costs.

4.    The problem has persisted in New York and across the country, as set forth in the March 15, 2023 DFS Report titled "Investigating and Combating Health Insurance Fraud," which called it a "costly and pervasive drain on the national healthcare system." The 2023 Report cites an estimate of the National Health Care Anti-Fraud Association that "losses due to healthcare fraud are in the tens of billions of dollars each year," and No-Fault fraud has accounted for the vast majority of those losses in New York.  Indeed, DFS found that reports of suspected No-Fault fraud "accounted for 93% of all healthcare fraud reports received in 2022 and at least 90% of all healthcare fraud reports received since 2018." In fact, No-Fault fraud reports "accounted for 73% of all fraud reports," including suspected non-healthcare fraud, received by DFS during 2022. The 2023 Report also reiterated the requirement that insurers engage in fraud detection activities and that they plan for the investigation and initiation of civil actions.

5.    Pursuant to its obligations under Article 4 of the New York Insurance Law, Allstate has filed this action to remedy a pattern of serious fraud that has a significant impact on the public, consumers, and itself.

6.    The abusive practices set forth herein not only drive up the cost of insurance; they also place in peril the quality of health care available to the public. The Defendants consist of a group of doctors, laypersons, and medical provider and lay entities that have worked in concert to submit inflated and fraudulent claims to Allstate.  In many cases, they have billed for fictitious services that were never rendered as billed, and/or for services that have been rendered

2

incompetently and/or without regard to the welfare of the patients.  All of the Defendants have billed abusively and/or assisted in the abusive billing.  Many of the claims were for services that were not only unnecessary, but which also placed the patients at unnecessary risk.

7.    The No-Fault system is designed to provide compensation for health care expenses and to process claims quickly.  As a consequence, the submission of bills for facially valid services will often result in a payment from a No-Fault insurer.  The Defendants have taken advantage of this feature of the No-Fault system in order to submit and receive payment for fraudulent billing.  In this regard, the Defendants' practices have been relentless.

8.    In a field that is permeated with fraud, the scheme perpetrated in this case is one of the most egregious.  Laypersons provided most if not all of the services, to the extent any were actually provided, and the medical providers billed for services to patients that in most cases they never even met.

9.    To the extent these laypersons were providing diagnoses and health care which were billed as medical services, they were illegally practicing medicine and/or audiology.  The health provider Defendants and lay person managers enabled the unauthorized practice.  The unauthorized practice of a profession is a felony, and aiding and abetting three or more persons in their unlawful practice is a felony pursuant to Education Law §6512.

10.    The flow of patients for the scheme was enabled by the payments made to the referring providers, which occupied the many clinical locations where the scheme's fraudulent services were purportedly rendered.  Some of these referrals came from facilities that have previously been involved in a major fraud prosecution of the United States Government.  *See USA v Rose, et al.*, No. 19-CR-0789 (PGG) (S.D.N.Y. Nov. 6, 2019).

11.     Not only were unnecessary services provided and fraudulent billing submitted, but the services provided by the laypersons masquerading as health care providers could have also harmed the patients.  In numerous bills the symptoms of the patients included brain injuries. Repeatedly, transient cerebral ischemic attacks were diagnosed.  If the patients had actually presented with such conditions, they would have needed treatment, rather than being used as pawns in this fraudulent billing scheme in which such injuries were ignored and not treated.  Numerous Defendants diagnosed these very serious injuries and then proceeded to do absolutely nothing for the patients.  No treatment was given for the serious conditions.  No referrals to specialists were made.

12.     The Defendants have engaged in patterns of receiving referrals for, and/or billing for, unnecessary services.  In claim after claim, unnecessary services have been repeatedly billed to the Plaintiffs by the Defendants.  They have engaged in an illegal referral network in which the patients were referred not by need, but in order to enrich the Defendants.

13.     The referral network is an elaborate system of interrelated persons and entities.  The nature and degree of these relationships, some or all of which are undisclosed to patients, are illegal under New York law.

14.     The Defendants have repeatedly submitted billing for services allegedly rendered by physicians, including the health provider Defendants and their owners, who did not actually provide the services billed and in many cases did not even meet with patients.

15.     The health provider Defendants, consisting of physicians and professional corporations nominally owned by physicians, did not provide the services that were billed in their names.  The claims' representations that the services were provided by physicians are fraudulent, and the billing in the doctors' names is for fictitious services that were not rendered as billed.

4

16.    In actuality the services either were not provided at all or they were all or substantially all provided by laypersons who were not licensed as health providers and had no business purporting to treat patients who had allegedly been injured and in need of healthcare services and/or were not provided as represented by the Defendant health providers.  For the most part no health provider even talked to the patients on behalf of the Defendants.  Diagnosed in numerous cases with serious injuries, the patients were pawns in a fraudulent scheme and left on their own if any of the serious diagnoses had actually been real.

17.    All of the Defendants in this case either billed and/or facilitated billing for doppler testing of the arteries in the brain, testing of the vestibular system through examinations of the eye and ear, and autonomic nervous system testing. Transcranial Doppler (TCD) testing uses ultrasound to assess blood flow in the brain's blood vessels. It provides crucial information about conditions like stroke risk and neurological disorders by measuring the speed and direction of blood flow. Vestibular system testing, including videonystagmography and audiology (collectively, "VNG"), assesses the inner ear's function related to balance and eye movement. It helps diagnose issues such as dizziness and balance disorders by tracking involuntary eye movements, providing valuable insights into the health of the vestibular system. Sympathetic Skin Response (SSR) testing measures the electrical conductance of the skin in response to sympathetic nervous system activity. It is commonly used to assess autonomic nervous system function and can provide insights into conditions such as neuropathy and certain neurological disorders by evaluating the sweat gland's responsiveness in the skin.

18.    The complicit referring providers knew or should have known that the laypersons masquerading as doctors could provide no services of value to their patients, and that there was no

possible benefit to the patients in the administration of the testing as billed or as provided, if anything was provided at all.

19.     Essentially the same paperwork and the same claims of injury were submitted for patient after patient after patient.  It made no difference what symptoms and needs each patient actually had.  The Defendants billed for the same testing with the same reports and often the same exact specific findings for different patients.

20.     In order to avoid detection of this fraud, the billing was spread out over numerous Defendants.

21.     The billing submitted to Allstate on behalf of the Defendants for TCD, SSR and VNG has been fraudulent and unconscionable.  The Defendants' fraud in the provision of these services had the potential to adversely impact their patients' health and well-being.

22.     The billing for TCD, SSR and VNG was completely fraudulent.  Most of the testing was not actually administered.  If any testing was administered at all, it was administered by laypersons who were not permitted to practice medicine and/or audiology.  Phony diagnoses were submitted.  Sham reports were generated.  If any patient had actually presented with a condition that warranted such testing, and if these sham and fraudulent reports had been relied upon by another provider, it could have seriously jeopardized the patient's health.

23.     Included in the billing and reports submitted to Allstate were data tables and graphics ("waveforms") purportedly depicting a patient's unique TCD, SSR and VNG testing results.  The nature and complexity of this testing make it extremely unlikely that any two patients would have the same test results.  In patient after patient, however, these Defendants' reports contained data and waveforms which were identical to those of other patients and identical to other

6

supposedly distinct providers. Fabricating patient charts and results is unconscionable and not only constitutes fraud; it could impact the welfare of the patients.

24.    The Defendants have been interconnected in this massive scheme. Numerous health providers and health provider entities partnered with lay persons and entities which actually provided the services to the extent anything was provided. Multiple entities had overlapping ownership. The same models with the same exact wording were used by multiple providers evincing that there was no separation between entities. Phony diagnoses of serious concern were employed not only by individual providers for their own patients, they matched word for word the fraudulent diagnoses of other providers. Waveforms supposedly obtained from individual patients not only matched the waveforms of other patients of the same providers; they matched the waveforms of what were purported to be completely different providers. Multiple providers operated out of the same addresses where they obtained patients with payoffs.

25.    The Defendants' practices are against the interests of the very patients/assignors they purport to treat. Inflating billing for unnecessary and fictitious services depletes the patients' $50,000 accident coverage limits, reducing what would be left for other expenses including lost wages. The billing for TCD, SSR and VNG testing included phony diagnoses that could have impacted patient care if relied upon. As such, the fraudulent practices of the Defendants have not only been against the interests of the consumer and the general public, but also against the interests of the very patients/assignors these Defendants claim to be treating and/or testing. The Defendants engaged in a brazen scheme that is tantamount to an assault against the medical and financial well-being of patients, premium-paying consumers, insurers including the Plaintiffs, and the public of the State of New York at large.

26.    The Defendants have engaged in a massive fraudulent scheme and have been paid during the six (6) years preceding this Complaint an amount totaling at least $1,668,862.73 by the Plaintiffs alone, on No-Fault bills submitted by the Defendants to Allstate totaling at least $3,261,522.37.

27.    This action is to recover payments made by Allstate to the Defendants for No-Fault claims that were intentionally misrepresented, medically unnecessary, submitted pursuant to an improper referral arrangement, set forth impossible findings with series diagnoses that were never addressed by the Defendants and/or never rendered as billed.  The Plaintiffs also seek a declaratory judgment that they are not required to pay any No-Fault claims of the Defendants because of their improper licensing, ownership and/or billing practices, and because the billed-for services are the product of illegal self-referrals.

28.    As a result of the Defendants' actions alleged herein, the Plaintiffs were defrauded in an amount totaling at least $1,668,862.73, the exact amount to be determined at trial, in payments which the Defendants received for fraudulent and improper billing.  The Plaintiffs seek to recover the payments they have made for services that the Defendants never rendered, that they were not entitled to bill for, and/or that they knew or should have known were not medically necessary or were so improperly performed as to be useless and of no value.  The Plaintiffs also seek a declaration that that they are not required or obligated to pay for No-Fault claims submitted by the Defendants.

## The Parties

**Plaintiffs**

29.     The Plaintiff Allstate Insurance Company is a corporation organized under the laws of the State of Illinois and is authorized to conduct business in the State of New York.  Allstate Insurance Company maintains offices in the State of New York including an office in Nassau County.

30.     The Plaintiff Allstate Indemnity Company is a corporation organized under the laws of the State of Illinois and is authorized to conduct business in the State of New York.  Allstate Indemnity Company maintains offices in the State of New York including an office in Nassau County.

31.     The Plaintiff Allstate Fire & Casualty Insurance Company is a corporation organized under the laws of the State of Illinois and is authorized to conduct business in the State of New York.  Allstate Fire & Casualty Insurance Company maintains offices in the State of New York including an office in Nassau County.

32.     The Plaintiff Allstate Property & Casualty Insurance Company is a corporation organized under the laws of the State of Illinois and is authorized to conduct business in the State of New York.  Allstate Fire & Casualty Insurance Company maintains offices in the State of New York including an office in Nassau County.

33.     The Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company and Allstate Property & Casualty Insurance Company are referred to herein as the "Plaintiffs" or, collectively, "Allstate."

**Individual Defendants**

34.     The Unlicensed Defendant Daniel Bogatin ("D. Bogatin") is a resident of the State of New York.  D. Bogatin is a nominal owner of the Unlicensed Defendants BLK Diagnostics

LLC, Chai Diagnostics LLC, Maimonides Diagnostics LLC, Refuah Diagnostics LLC, and Sinai Diagnostics LLC.

35.    The Unlicensed Gary Bogatin ("G. Bogatin") is a resident of the State of New York. G. Bogatin is a nominal owner of the Unlicensed Defendants BLK Diagnostics LLC, Chai Diagnostics LLC, Maimonides Diagnostics LLC, Refuah Diagnostics LLC, and Sinai Diagnostics LLC.

36.    The Licensed Defendant David Carmili, MD ("Carmili") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine. Carmili is the nominal owner of the Licensed Defendant Seneca Medical P.C.

37.    The Licensed Defendant Joseph F. Dorsten, DO ("Dorsten") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine. Dorsten is the nominal owner of the Licensed Defendant Lifeline Medical Imaging, P.C.

38.    The Licensed Defendant Andre Jocelyn Duhamel, MD ("Duhamel") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine. Duhamel is the nominal owner of Licensed Defendants Hillside Primary Medical Care, P.C. and Wilson Primary Medical Care P.C.

39.    The Unlicensed Defendant Dovi Faivish ("Faivish") is a resident of the State of New York. Faivish is the nominal owner of the Unlicensed Defendant Regal Diagnostics LLC.

40.    The Licensed Defendant Jack Greenwood, MD ("Greenwood") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine.

41.    The Licensed Defendant Sangeet Khanna, MD ("Khanna") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine.

Khanna is the nominal owner of the Licensed Defendants Emote Medical Services, P.C. and Pitch Medical P.C.

42.     The Unlicensed Defendant Adde Khanatayev ("Khanatayev") is a resident of the State of New York. Khanatayev is the nominal owner of the Unlicensed Defendants BLK Diagnostics LLC, Chai Diagnostics LLC, Maimonides Diagnostics LLC, Refuah Diagnostics LLC, and Sinai Diagnostics LLC.

43.     The Unlicensed Defendant Artur Kofman ("Kofman") is a resident of the State of New York. Kofman is a nominal owner of the Unlicensed Defendants BLK Diagnostics LLC, Chai Diagnostics LLC, Maimonides Diagnostics LLC, Refuah Diagnostics LLC, and Sinai Diagnostics LLC.

44.     The Licensed Defendant Konstantinos Koutelos, MD ("Koutelos") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine.  Koutelos is the nominal owner of the Unlicensed Defendant Green Power New York, LLC.

45.     The Licensed Defendant Errol C. Mallett, MD ("Mallett") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine. Mallett is the nominal owner of the Licensed Defendant 334 Grand Concourse Medical, P.C.

46.     The Licensed Defendant Manish Mammen, MD ("Mammen") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine. Mammen is the nominal owner of the Licensed Defendant Interventional Physical Medicine and Rehab of New York PLLC.

47.     The Licensed Defendant Hanan Miller, MD ("Miller") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine. Miller is the nominal owner of the Licensed Defendant Healthcare Medical Services PLLC.

48.     The Licensed Defendant Dominic Emeka Onyema, MD ("Onyema") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine. Oneyema is the nominal owner of the Licensed Defendant Direct Medical Care P.C.

49.     The Licensed Defendant Crystal Vanessa Antoine Pepeljugoski, MD ("Pepeljugoski") is a resident of the State of New York and is licensed by the State of New York to practice the profession of Medicine.  Pepeljugoski is the nominal owner of the Licensed Defendant Crystal Antoine Pepeljugoski Medical P.C. d/b/a/ Sanitas Medical PC.

50.     The Licensed Defendant Sergey Zhivotenko, MD ("Zhivotenko") is a resident of the State of New York and is licensed by the State of New York to practice the profession of medicine. Zhivotenko is the nominal owner of the Licensed Defendant Diagnostic Neurology, P.C.

51.     The Defendants D. Bogatin, G. Bogatin, Carmili, Dorsten, Duhamel, Faivish, Greenwood, Khanatayev, Khanna, Kofman, Koutelos, Mallett, Mammen, Miller, Onyema, Pepeljugoski, and Zhivotenko are referred to herein as the "Individual Defendants."

**Entity Defendants**

52.     The Licensed Defendant 334 Grand Concourse Medical PC ("334 Grand") is a professional corporation organized under the laws of the State of New York and is or was nominally owned by the Licensed Defendant Mallett. 334 Grand was incorporated in New York on August 10, 2015.

53.    The Unlicensed Defendant BLK Diagnostics LLC ("BLK") is a limited liability company organized under the laws of the State of New York and is or was nominally owned by the Unlicensed Defendants D. Bogatin, G. Bogatin, Khanatayev, and Kofman.  BLK was formed in New York on February 10, 2021.

54.    The Licensed Defendant Central Park East Medical, P.C. ("Central Park") is a professional corporation organized under the laws of the State of New York and was nominally owned by non-party Aharon Gutterman, MD.  Central Park was incorporated in New York on February 15, 2017.

55.    The Unlicensed Defendant Chai Diagnostics LLC ("Chai") is a limited liability company organized under the laws of the State of New York and is or was nominally owned by the Unlicensed Defendants D. Bogatin, G. Bogatin, Khanatayev, and Kofman.  Chai was formed in New York on March 30, 2021.

56.    The Licensed Defendant Crystal Antoine Pepeljugoski Medical P.C. d/b/a/ Sanitas Medical PC ("Sanitas") is a professional corporation organized under the laws of the State of New York and is or was nominally owned by the Licensed Defendant Pepeljugoski.  Sanitas was incorporated in New York on March 10, 2021.

57.    The Licensed Defendant Diagnostic Neurology, P.C. ("Diag Neuro") is a professional corporation organized under the laws of the State of New York and is or was nominally owned by the Licensed Defendant Zhivotenko. Diag Neuro was incorporated in New York on September 28, 2005.

58.    The Licensed Defendant Direct Medical Care P.C. ("Direct Med") is a professional corporation organized under the laws of the State of New York and is or was nominally owned by

13

the Licensed Defendant Onyema.  Direct Med was incorporated in New York on December 16, 2015.

59.    The Licensed Defendant Emote Medical Services, P.C. ("Emote") is a professional corporation organized under the laws of the State of New York and is or was nominally owned by the Licensed Defendant Khanna.  Emote was incorporated in New York on August 1, 2011.

60.    The Unlicensed Defendant Green Power New York, LLC ("Green Power") is a limited liability company organized under the laws of the State of New York and is or was nominally owned by the Licensed Defendant Koutelos. Green Power was formed in New York on July 1, 1991.

61.    The Licensed Defendant Healthcare Medical Services PLLC ("Healthcare Med") is a professional limited liability company organized under the laws of the State of New York and is or was nominally owned by the Licensed Defendant Miller.  Healthcare Med was formed in New York on May 8, 2014.

62.    The Licensed Defendant Hillside Primary Medical Care, P.C. ("Hillside") is a professional corporation organized under the laws of the State of New York and is or was nominally owned by the Licensed Defendant Duhamel.  Hillside was incorporated in New York on December 10, 2012.

63.    The Licensed Defendant Interventional Physical Medicine and Rehab of New York PLLC ("Interventional") is a professional limited liability company organized under the laws of the State of New York and is or was nominally owned by the Licensed Defendant Mammen. Interventional was formed in New York on March 19, 2011.

64.    The Licensed Defendant Lifeline Medical Imaging P.C. ("Lifeline") is a professional corporation organized under the laws of the State of New York and is or was

nominally owned by the Licensed Defendant Dorsten.  Lifeline was incorporated in New York on December 31, 2018.

65.     The Unlicensed Defendant Maimonides Diagnostics LLC ("Maimonides") is a limited liability company organized under the laws of the State of New York and is or was nominally owned by the Unlicensed Defendants D. Bogatin, G. Bogatin, Khanatayev, and Kofman. Maimonides was formed in New York on May 3, 2021.

66.     The Licensed Defendant Pitch Medical P.C. ("Pitch") is a professional corporation organized under the laws of the State of New York and is or was nominally owned by the Licensed Defendant Khanna.  Pitch was incorporated in New York on May 1, 2009.

67.     The Unlicensed Defendant Refuah Diagnostics LLC ("Refuah") is a limited liability company organized under the laws of the State of New York and is or was nominally owned by the Unlicensed Defendants D. Bogatin, G. Bogatin, Khanatayev, and Kofman.  Refuah was formed in New York on December 10, 2020.

68.     The Unlicensed Defendant Regal Diagnostics LLC ("Regal") is a limited liability company organized under the laws of the State of New York and is or was nominally owned by the Layperson Defendant Faivish.  Regal was formed in New York on July 18, 2016.

69.     The Defendant Seneca Medical P.C. ("Seneca") is a professional corporation organized under the laws of the State of New York and is or was nominally owned by the Licensed Defendant Carmili.  Seneca was incorporated in New York on April 26, 2001.

70.     The Unlicensed Defendant Sinai Diagnostics LLC ("Sinai") is a limited liability company organized under the laws of the State of New York and is or was nominally owned by the Layperson Defendants D. Bogatin, G. Bogatin, Khanatayev, and Kofman.  Sinai was formed in New York on December 10, 2020.

71.     The Defendant Wilson Primary Medical Care P.C. ("Wilson") is a professional corporation organized under the laws of the State of New York and is or was nominally owned by the Licensed Defendant Duhamel.  Wilson was incorporated in New York on October 21, 2016.

72.     The Unlicensed Defendant Wizard Computer Services, Inc. ("Wizard") is a corporation organized under the laws of the State of New York and is or was nominally owned by an individual who does not appear to exist Mindaugas Snapkauskas. Wizard was incorporated in New York on October 23, 2015.

73.     The Defendants 334 Grand, BLK, Central Park, Chai, Sanitas, Diag Neuro, Direct Med, Emote, Green Power, Healthcare Med, Hillside, Interventional, Lifeline, Maimonides, Pitch, Refuah, Regal, Seneca, Sinai, Wilson, and Wizard are referred to herein as the "Entity Defendants."

74.     The Individual Defendants Carmili, Dorsten, Duhamel, Greenwood, Khanna, Koutelos, Mallett, Mammen, Miller, Onyema, Pepeljugoski, and Zhivotenko, along with the Entity Defendants 334 Grand, Central Park, Sanitas, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Interventional, Lifeline, Pitch, Seneca, and Wilson, are referred to herein as the "Licensed Defendants."

75.     The Individual Defendants D. Bogatin, G. Bogatin, Faivish, Khanatayev, and Kofman, along with the Entity Defendants BLK, Chai, Green Power, Maimonides, Refuah, Regal, Sinai, and Wizard, are referred to herein as the "Unlicensed Defendants."

**ABC Corporations and John Doe Defendants**

76.     ABC Corps. 1-15 are additional entities, including management companies, billing companies, health provider and/or attorneys whose names are not yet known to Allstate, that

16

contracted with one or more of the Defendants to provide management and/or billing services, and/or that made improper referrals, and/or directed the fraudulent services and billing and conspired to and did assist in the fraudulent and unlawful conduct alleged in this Complaint. These entities will be added as Defendants when their names and the extent of their participation become known through discovery.

77.    John Does 1-15 are additional individuals, whose names are not yet known to Allstate, who are true owners of one or more of the Defendants, who contracted with one or more of the Defendants to provide management and/or billing services, and/or who made improper referrals and conspired to and did assist in the fraudulent and unlawful conduct alleged in this Complaint. These individuals will be added as Defendants when their names and the extent of their participation become known through discovery.

## **Jurisdiction and Venue**

78.    Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331 [Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*].

79.    Supplemental jurisdiction over Allstate's state law claims is proper pursuant to 28 U.S.C. § 1367.

80.    Whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York, venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

81.    Each of the Defendants have conducted business in the State of New York during the relevant time period by (a) operating from clinics or other facilities located in New York, and

(b) billing and/or assisting in billing for medical services in connection with New York claimants under New York No-Fault insurance policies issued by Allstate.

82.     The Defendants have therefore engaged in purposeful activities in New York by conducting business in New York, and by seeking and collecting payments under New York's No-Fault laws.

83.     The Defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

## I.     The Defendants' Fraudulent Schemes Were Enabled by Professional Licensing Violations

84.     In order to protect the public, the State of New York has created extensive licensing regulations for health care professionals and entities.  The Defendants in this case have engaged in numerous violations of these requirements in order to perpetrate and conceal their extensive fraudulent conduct and illegal financial and referral relationships.  The Defendants submitted fraudulent and abusive billing to the Plaintiffs for payment under the No-Fault insurance program. The Defendants have made numerous misrepresentations as to their proper license and its scope, including misrepresentations as to the entitlement of the persons who provided the services to no-fault benefits and the lack of involvement of the licensed health provider Defendants.

85.     A proper license and providing service within the scope of that license is a prerequisite to payment under the No-Fault program.

86.     The State of New York regulates the practice of medicine and the practice of other professions. It restricts the practice of medicine and the ownership of medical professional corporations to licensed physicians. The State does so in order to protect consumers and the public health. Only licensed physicians, subject to the regulation and oversight of the State, are permitted

18

to practice medicine. The only professional corporations permitted to provide physician medical services are professional corporations which are owned exclusively by physicians. The use of the title "physician" or "surgeon" by one who is not a physician is prohibited. The practice of medicine by one who is not a physician is a felony pursuant to Education Law §6512. The sale of a medical license is also a felony under Education Law § 6512. This statutory framework is designed to protect the public and ensure that medical services are provided by licensed physicians. The State of New Jersey has similar requirements and protections.

87.     The Defendant health providers did not control or oversee the billing in their names and under their licenses that was submitted in the fraudulent scheme. The Licensed Defendants permitted the Unlicensed Defendants, including the layperson John Doe Defendants, to use their licenses as a cover and to submit illegal billing. These purported health provider entities were illegally operated, were not entitled to payment under New York Law and were misrepresented to be properly licensed professional entities.

88.     As discussed further in § II, *infra*, on the Defendants' awareness of the illegality of their conduct, GEICO alleged that Koutelos did not actually own Green Power, and that Mallett did not actually own 334 Grand. GEICO set forth that Koutelos and Mallett allowed use of their names and licenses, and the Licensed Entities' tax identification numbers by lay persons to submit bills for reimbursement of No-Fault claims to insurers. *See GEICO v. Green Power, et al.*, No. 1:23-cv-01304-HG (E.D.N.Y. Aug. 21, 2023), *as amended* (Aug. 21, 2023), ECF No. 32 ¶ 61; *GEICO v. Mallett, et al.*, No. 1:22-cv-03661-KAM-VMS (E.D.N.Y. June 21, 2022), ECF No. 1 ¶¶ 5, 17, 50. Specifically on Mallett, GEICO alleged that from 2021 and continuing periodically until GEICO's filing of the complaint in June 2022, ten John Doe defendants had used Mallett's

name and license, and also 334 Grand's tax identification number, to bill GEICO for No-Fault payments.

89.     Liberty Mutual alleged that Duhamel was not the actual owner of Wilson or Hillside, and referenced Duhamel's admission to Liberty Mutual that bills using his name to insurance companies were submitted without his consent or knowledge, and that he did not sign certain healthcare treatment billing documents, although his name appeared on the documents submitted to Liberty Mutual. *Liberty Mutual v. Wilson, et al.*, No. 604122/2022 (Sup. Ct. Nassau Cnty. Mar. 31, 2022), NYSCEF No. 1 ¶ 22.

90.     For the protection of patients, New York requires that only professionals provide professional services. In the Defendants' scheme, laypersons provided most of the services to the extent any were actually provided. Some of the services were billed in the names and licenses of the Defendant medical providers. Numerous services were billed in the name of the Unlicensed Defendant providers, which had no medical license at all.

91.     To the extent these laypersons were providing diagnoses and healthcare which was billed as medical and/or audiology services, they were illegally practicing medicine and/or audiology without a license. The Licensed Defendants enabled the unauthorized practice. The unauthorized practice of a profession is a felony, and aiding and abetting three or more persons in their unlawful practice is a felony pursuant to Education Law § 6512.

92.     Virtually all the administration of testing and services in this case was done by laypersons under the control and direction of the Unlicensed Defendants and the layperson John Doe and ABC Corp. Defendants.

93.     The DFS Regulations provide that to be compensated under No-Fault, professional health services must be provided by a licensed provider within the scope of his or her license. See

11 N.Y.C.R.R. §§65-3.16(a)(6) & (12).  To the extent the Defendants have billed Allstate for services provided by lay persons, they are not compensable.  To the extent that the Defendants represented that the services of the laypersons were provided by the provider Defendants and/or their owners who are physicians, these representations were fraudulent.  To the extent that the Defendants and Defendant entities were not licensed to practice medicine and/or audiology they are not entitled to be compensated under the no-fault statute and regulations.   To the extent that the services billed by the licensed Defendants and licensed Defendant entities were provided by individuals and/or entities not licensed to practice medicine and/or audiology they are not entitled to be compensated under the no-fault statute and regulations.

## II.    The Defendants' Awareness of the Illegality of Their Conduct

94.    Eleven of the Entity Defendants and seven Individual Defendants have been sued in similar actions by GEICO.  These actions and the evidence adduced therein have made it plain to these Defendants that they were involved in a very serious fraudulent scheme.  Given the interrelationships, the other Defendants were most likely aware of some or all of these actions as well.  After being sued in these actions, each of the Defendants who were sued were well-aware of the fraudulent scheme they were involved with, and for the licensed Defendants, of the use of their names and licenses in the scheme.  These actions have placed the Defendants on notice of the illegality of their fraudulent conduct.

95.    Despite being aware of the fraudulent scheme and their role in it, these Defendants have knowingly continued the scheme and have continued to seek to collect the billing in the name of the eleven Entity Defendants against Allstate.  The eleven Entity Defendants have enabled this fraudulent billing and have assisted in perpetrating the fraudulent scheme and billing for fictitious services in their names.

21

96.    These Defendants have at all relevant times been aware of the fraud and disregard for the patients of their treatment and billing practices.  Indeed, each of these prior civil actions has been based on one or more patterns of fraudulent or otherwise illegal conduct which are similar if not identical to those alleged herein.

97.    These actions include the following:

### *GEICO v. Dorsten, et al.*

98.    In the *Dorsten* action, filed in this District on October 6, 2021, GEICO named Dorsten, Lifeline, and Hillside as defendants.  *See* No. 1:21-cv-05565-ENV-RER (E.D.N.Y. Oct. 6, 2021) (Duhamel was referenced as a non-party).  The complaint alleged that from 2019, Lifeline and Hillside provided the fraudulent services and billings for two types of services alleged in this Complaint: TCD and VNG tests, stating that Lifeline and Hillside "almost entirely focused on" provision of TCD and VNG tests.  GEICO set forth that Lifeline and Hillside submitted test reports that had the same pre-printed boilerplate outcomes and identical "TCD Exam Data" for their insureds.  GEICO further alleged that the defendants had illegal referral and kickback arrangements to obtain patients through fee payments disguised as rents for space or personnel.

99.    GEICO also alleged that unlicensed individuals not under Dorsten's control at Lifeline administered these two services.  The complaint set forth that Dorsten was a radiologist, who did not have any credentials, training, or medical expertise to perform neurological tests or interpret the test results, and that Dorsten never practiced medicine through Lifeline.

100.    As to Hillside, GEICO similarly alleged that non-party to the *Dorsten* action Duhamel was the purported owner of Hillside and that unlicensed individuals not under

Duhamel's control at Hillside administered the two services. GEICO set forth that Duhamel was an internist lacking any training or expertise to perform neurological tests or interpret the test results, which Hillside exclusively provided. The complaint alleged Duhamel never practiced medicine through Hillside, and none of the bills GEICO received from Hillside were for Duhamel's provision of medical services. According to GEICO, Drs. Roy Shanon and Omar Ahmed worked at Hillside as independent contractors as reading neurologists. GEICO also referenced the New York State Board's Determination and Order dated June 28, 2021, revoking Duhamel's license, which indicates that Duhamel was likely unable or unfit to practice medicine for the periods Hillside purported to perform services and billed GEICO.

101.    The GEICO referenced June 28, 2021 Order shows that in March 2021, the Board noticed Duhamel of the hearing on his license, and by summary action pursuant to Public Health Law § 230(12)(a)(ii), ordered Duhamel "not to practice medicine because he is engaging in or maintaining a condition or activity which constitutes an imminent danger to the health of the people." *In the Matter of Andre Jocelyn Duhamel, M.D.*, Determination and Order, No. BPMC-21-135, 1 (June 28, 2021). The Board disclosed that Duhamel "waived his rights with respect to the summary action . . . and agreed to maintain the suspension of his license until a determination is rendered in" his licensure hearing in March 2021. *Id*. The Board found that Duhamel "committed professional misconduct under Education Law § 6530(8) by having a psychiatric condition which impairs his ability to practice and Education Law § 6530(29) by violating any term of probation or condition or limitation imposed pursuant to PHL § 230[.]" *Id*. at 2. During the period of Duhamel's license suspension, Hillside continued to bill Allstate.

102.    By stipulations dated August 30, 2022 and October 12, 2022, the complaint was dismissed without prejudice as to Dorsten, Lifeline, and Hillside.

23

**_Liberty Mutual v. Wilson, et al._**

103.    Subsequent to GEICO's _Dorsten_ suit, Liberty Mutual filed a No-Fault insurance fraud suit against Wilson and Hillside in the Supreme Court, Nassau County.  _Liberty Mutual Insurance Co. et al. v. Wilson Primary Medical Care, P.C. et al._, No. 604122/2022 (Sup. Ct. Nassau Cnty. Mar. 31, 2022).

104.    Liberty Mutual's allegations mirror GEICO's allegations against the two named defendants Wilson and Hillside, and also Duhamel not named as a defendant by Liberty Mutual, that they billed for medically unnecessary and/or non-reimbursable services, if provided at all, for TCD and VNG tests.  Liberty Mutual also alleged, as did GEICO, that Duhamel was never the actual owner of Wilson or Hillside, Duhamel never practiced medicine through Wilson or Hillside, was unfit to practice medicine, and that independent contractors performed the fraudulent services, if provided at all.  The complaint relied in part on Duhamel's admission to Liberty Mutual that certain bills using his name were submitted to insurance companies without his knowledge or consent and that he did not sign certain treatment or billing documents submitted to Liberty Mutual despite his name appearing on such documents.

105.    The complaint also alleged that unlicensed laypersons directed provision of the fraudulent services, if provided at all, and obtained patients through illegal kickback and patient referral arrangements, including purported fees for rent or marketing and other similar business operating services.

### *GEICO v. Onyema, et al.*

106.   GEICO alleged in *Onyema* that from 2018 to the time of filing the complaint, Onyema purported to own two providers Deo Medical Services, P.C. and Healthwise Medical Associates, P.C. that billed GEICO and other New York insurers for hundreds of medically unnecessary and unreimbursable healthcare services that included TCD and VNG tests.  GEICO set forth that Onyema entered into illegal financial arrangements to maintain a steady flow of patients and also that unlicensed laypersons at healthcare clinics controlled the patient base for Onyema and his two provider entities, directing provision of fraudulent services through pre-determined protocols, if such services were provided at all.

107.   GEICO added that the illegal financial arrangements utilized checks for sham payments of rents and business services such as computer services to illegally transfer monies. The complaint set forth that the checks were illegally cashed at a check-cashing facility in New Jersey by an individual named Alla Kuratova, who had been criminally indicted for recruiting phony patients to work for an illegal prescription drug trafficking ring.  *See* United States Drug Enforcement Admin., *RX Trafficking Ring Controlled Brooklyn Medical Practices: Nearly $3.4 Million In Pills Diverted*, Press Release (July 17, 2013) https://www.dea.gov/press-releases/2013/07/17/rx-trafficking-ring-controlled-brooklyn-medical-practices-nearly-34.

### *GEICO v. Emote, et al.*

108.   In *Emot*e, GEICO sued Defendants Khanna, Emote, and Pitch.  *See GEICO v. Emote Medical Services, P.C. et al.*, No. 1:22-cv-06617-RPK-VMS (E.D.N.Y. Oct. 31, 2022). The complaint alleged fraudulent billings for TCD and VNG tests, and other services, and that independent contractors provided medically unnecessary services pursuant to predetermined fraudulent protocols.

109. GEICO alleged further that the TCD test results appear to be fabricated as the majority of insureds who allegedly received services from Emote or Pitch had identical depth measurements, indicating that the insureds had identical head sizes with identical location of blood vessels, near impossibilities. GEICO set forth that Emote and Pitch paid illegal kickbacks to referring providers to gain access to clinics through agreements that purported to be lease or rent payments.

110. The parties filed a stipulation of dismissal without prejudice as to all three named defendants in August 2023. *Emote*, ECF No. 27.

## *GEICO v. Green Power, et al.*

111. In *Green Power*, GEICO filed a complaint alleging fraudulent billings for the same two types of services—TCD and VNG tests—against defendants Koutelos, Gary Grody, Alex Puzaitzer, Irina Zayonts, Yuriy Zayonts, TM Equities, Inc. ("TM Equities"), Milan Nus, Emil Efrem, and Big Bridge Funding, LLC ("Big Bridge"). *See* No. 1:23-cv-01304-HG (E.D.N.Y. Aug. 21, 2023) *as amended* (Aug. 21, 2023). GEICO alleged that unlicensed laypersons, not Koutelos, administered the services (if administered at all), that Koutelos did not actually own Green Power, and that he had no control of the practice, with laypersons using his name, medical license, and tax identification number of Green Power to bill for the fraudulent services. GEICO also alleged that Grody recruited Koutelos for the fraudulent scheme in or about October 2021.

112. GEICO set forth that some of the alleged fraudulent services occurred in clinics already implicated in the *Rose* indictment from the criminal case where the prosecution unearthed a multimillion-dollar bribery scheme involving 911 operators, medical personnel, and police officers for confidential information of No-Fault accident victims to steer the victims to certain

clinics and lawyers.  *See* No. 19-cr-0789-PGG (S.D.N.Y. Nov. 6, 2019).  Patient referrals were exchanged for illegal kickbacks and payoffs.

113.    With its amended complaint in August 2023, GEICO added the defendants Alex Puzaitzer, Irina Zayonts, and Yuriy Zayonts, claiming that they were the true owners and controllers of Green Power.  Additionally, GEICO alleged that TM Equities, Inc. and its true owner Milan Nus enabled the money laundering scheme based on illegal kickbacks and referrals; GEICO set forth that Nus invoked the Fifth Amendment protection in response to GEICO's discovery request inquiring "whether funds were advanced to TM Equities in furtherance of a fraudulent insurance fraud and kickback scheme."  GEICO also named Big Bridge as the entity used to fund the fraudulent scheme and Efrem as the individual serving as the point of contact at Big Bridge for Grody and other defendants.

114.    GEICO alleged further that in 2003, Grody had pleaded guilty to three separate charges of insurance fraud, had been imprisoned and ordered to pay $280,000 to Allstate, in addition to at least four civil recovery actions that insurers filed against him after Grody was released from prison.  GEICO added that two other defendants Irina and Yuriy Zayonts, were indicted and pleaded guilty in connection with a separate scheme aimed at defrauding the No-Fault system.  According to the Federal Bureau of Prisons data, Yuriy Zayonts was imprisoned and was released on June 24, 2016.

### *GEICO v. Wizard, et al.*

115.    In *Wizard*, filed in this District on September 8, 2023, GEICO named Unlicensed Defendant Wizard and non-party Unisoft LLC as defendants for fraudulent billings of TCD and VNG tests from about June 25, 2021 to November 30, 2021. *See* No. 1:23-cv-06723-LDH-RML (E.D.N.Y. Sept. 8, 2023).

116.    GEICO claimed that for the fraudulent services actually provided, unlicensed layperson, without supervision by a licensed professional, dictated the services which were provided pursuant to the illegal financial and kickback referral arrangements.

117.    As in the *Green Power* suit, GEICO alleged in *Wizard* that the unsealed criminal indictment and affidavits in the *Rose* criminal case uncovered how the insured patients were illegally referred in return for kickbacks to certain layperson-controlled clinics where Defendants Wizard and Unisoft operated.

118.    In the complaint, GEICO set forth that the nominal owner of Wizard, Snapkauskas, although listed in Wizard's certificate of incorporation as the incorporator, is a fictitious individual, and GEICO named one John Doe defendant as the actual owner of Wizard while naming a second John Doe as the sole member and owner of Unisoft.  The complaint also states that it has found evidence suggesting that an individual named Jason Gorelik is the actual "Owner/President" of Wizard.

119.    The GEICO complaint noted Wizard's history of involvement in No-Fault fraud schemes for its participation in a large-scale money-laundering operation with checks payable to Wizard being exchanged for cash by an individual named Alla Kuratova, who was indicted for recruiting phony patients.

### *GEICO v. Chai, et al.*

120.    GEICO recently filed another suit for insurance fraud, *GEICO v. Chai et al.*, involving TCD and VNG tests against Unlicensed Defendants Kofman, D. Bogatin, G. Bogatin, Khanatayev, Chai, Sinai, BLK, and Refuah.  *See* No. 1:24-cv-02704-PK (E.D.N.Y. Apr. 11, 2024).

28

121.   Similar to the other complaints, GEICO alleged that Defendants Chai, Sinai, BLK, and Refuah sought reimbursements for medically unnecessary services where the bills contained fabricated data and sham referral forms.  To the extent provided at all, GEICO alleged that these four Provider Defendants provided services under the dictates of unlicensed laypersons without supervision by licensed professionals, using pre-determined fraudulent protocols, and pursuant to illegal referral arrangements.

122.   GEICO included in its complaint a sworn statement by Phelan Clancy, NP, who resigned from the clinic located at 1974 Linden Boulevard, Elmont that "after discovering . . . that her name, license, and tax identification number were being used to bill for services that she never performed, authorized, or supervised; that a stamped, forged and/or unauthorized copy of her signature was used to issue referrals for healthcare goods without her knowledge or consent; and that there was a written list on the wall at the Clinic that outlined the required prescribing/referral protocol and the quotas that had to be met."

123.   Also, as in the *Green Power* and *Wizard* suits, GEICO alleged that the 1767 Southern Boulevard, Bronx clinic defendants purported to operate was identified in the *Rose* criminal case as a clinic involved in illegal kickback and referral schemes under control of unlicensed laypersons.  The complaint also alleged that the illegal kickbacks disguised as rent payments were laundered by Alla Kuratova, also referenced in the *Wizard* suit, at a check-cashing facility in New Jersey.

### *GEICO v. Mallett, et al.*

124.   In *Mallett*, GEICO sued Defendants Mallett and 334 Grand, as well as non-party Errol C. Mallett Medical, P.C.  *See* No. 1:22-cv-03661-KAM-VMS (E.D.N.Y. June 21, 2022).  While the complaint did not allege fraudulent billing of TCD testing or VNG, it set forth that

Mallett allowed ten John Doe defendants to use his name, license, and the tax identification numbers of Errol C. Mallett Medical, P.C. and 334 for billing GEICO in return for periodic payments from 2021 to at least the time of filing the complaint in June 2022.

125.   GEICO alleged that Mallett suffered from significant financial debt and federal tax delinquencies, making him an easily recruitable medical professional to perpetuate No-Fault insurance fraud.

126.   GEICO also alleged that Dr. Mallett specializes in Urology, and at the time of the complaint in June 2022, Dr. Mallett was employed with Urology Associates of NY as a Urologist, primarily working out of the 2101 Avenue X, Brooklyn, New York location.    According to GEICO, when it spoke with Mallett before filing its complaint, he admitted that he was not aware of the billings for the alleged fraudulent services and that he did not bill GEICO for the Extracorporeal Shockwave Therapy (ESWT), one of the fraudulent services GEICO alleged in the complaint.

127.   As with the other GEICO cases, the *Mallett* complaint also alleged that Mallett and the defendants provided, if at all, medically unnecessary services by unlicensed persons or independent contractors pursuant to a pre-determined fraudulent treatment and billing protocols, through the clinics that were controlled by non-medical professionals under illegal financial arrangements for referrals and kickbacks.

## III.   The Defendants Fraudulently Billed for Healthcare Services – Summary of Scheme

128.   The Defendants have sought to engage in a massive scheme to defraud automobile insurers including the Plaintiffs who provide coverage under Article 51 of the Insurance Law for what are commonly referred to as no fault benefits.   They have billed for health care services

consisting of several types of testing that were generally not provided to the patients as billed and were almost never administered by licensed health providers. Instead, to the extent any testing was administered, it was administered by lay persons.

129.   The billing of three types of services were the foundation of the scheme -- Doppler testing of the arteries in the brain (TCD), testing of the vestibular system through examinations of the eye (VNG) and ear using specialized equipment and Sympathetic Skin Response (SSR) testing which measures the electrical conductance of the skin in response to sympathetic nervous system activity. SSR is commonly used to assess autonomic nervous system function and can provide insights into conditions such as neuropathy and certain neurological disorders by evaluating the sweat gland's responsiveness in the skin. It was of no value in the way it was administered in the scheme in this case.

130.   The complicit referring providers provided a steady stream of patients to enable the scheme. In so doing they used their patients as pawns, subjected them to unnecessary testing with incompetent, fictitious and impossible results and depleted their insurance coverage benefits.

131.   The Unlicensed Defendants allegedly rendered the fraudulent services – to the extent that anything was provided at all -- submitting reports in the name of the health provider Defendants who had never even seen the patients – in a variety of "clinics" located throughout the New York metropolitan area in order to bill Allstate and other New York automobile insurance companies for the alleged performance of the fraudulent testing.

132.   Upon information and belief, the layperson Defendants, John Doe Defendants and ABC Corp. Defendants entered into unlawful arrangements with the Clinics and related managers to provide the Defendants access to a constant flow of patients such that they could submit fraudulent billing for unnecessary testing.

31

133.    The Defendants including the John Doe Defendants and the ABC Corp. Defendants used the health provider Defendants' medical licenses, their tax identification numbers and electronic copies of their signatures to generate large quantities of fraudulent documents, including NF-3 forms (i.e. bills) falsely claiming that the health provider Defendants provided the services and testing and submitted  assignment of benefits forms, and medical records; and reports.

## IV.    **The Defendants' Fraudulent Scheme to Bill for TCD Testing**

134.    The Licensed Defendant providers Central Park, Direct Med, Hillside, Diag Neuro, Seneca, 334 Grand, Lifeline, Pitch, Wilson, and Sanitas were used in the scheme to generate No-Fault billing by purportedly providing their patients with TCD testing.  The Unlicensed Defendant providers Chai, Green Power, Maimonides, Regal, and Wizard billed for the same testing and provided sham and fraudulent diagnoses and reports.

135.    TCD is a non-invasive imaging technique by which specialized equipment is used to target and then measure sound waves to assess blood flow within the arteries of the brain, which is essential for diagnosing and managing various conditions and ensuring optimal brain function. When utilized properly, TCD can aid in the diagnosis of potentially life-threatening conditions. TCD can help healthcare providers monitor and diagnose conditions related to blood flow in the brain, such as vasospasms (narrowing of blood vessels), emboli (clots or debris in the blood), and stenosis (artery narrowing).

136.    As billed for on behalf of the Defendants, however, the TCD was performed either improperly or not at all, and it was routinely billed for being allegedly provided to patients who were not otherwise documented as presenting with any indications of cranial vascular issues.

137.    TCD was performed, if at all, not by the physicians indicated on their bills, but instead by  unqualified  non-physicians  hired  by  the  Defendants  including  the  Unlicensed

32

Defendants. The Defendant providers Central Park, Direct Med, Green Power, Hillside, Chai, Maimonides, Regal, Diag Neuro, Seneca, Wizard, 334 Grand, Lifeline, Pitch, Wilson, and Sanitas did not properly administer such testing, and the test results were routinely fabricated.

138.  Each of these Defendants used a preset combination of diagnostic codes and descriptions, which have simply been copied and pasted for numerous patients. Numerous bills from Direct Med, Green Power, Hillside, Chai, Diag Neuro, Wizard, Sanitas, and Pitch, use the same diagnoses.  The Unlicensed Defendant providers, while not authorized to practice medicine in the State of New York, used the same diagnoses and reports as if they were medical providers.

139.  Again and again, there were matches of very specific patient details and test results between the Defendants in this action. The same codes were repeatedly billed for the TCD testing. Many of the bills had the same exact symptoms word for word from one patient and from one provider to another.  Numerous wave forms, which are invariably different from one test to another, were exact duplicates from one patient to another. The exact duplicates evince both the fraudulent nature of the scheme and the interrelationship of the Defendants.

140.  On multiple TCD bills of Direct Med, Green Power, Hillside, Chai, Diag Neuro, Wizard, Sanitas, and Pitch, their patients were purportedly diagnosed again and again with the same serious conditions *verbatim*:

> G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

141.  On some of the TCD bills of Seneca, patients were purportedly diagnosed again and again with serious conditions *verbatim*:

> G45.1 Carotid artery syndromeG45.8 Occlusion and stenosis of basilar artery I63.8 Other cerebral infarction I65.1 Occlusion and stenosis of basilar artery I65.29 Occlusion and stenosis of unspecified ar I66.8 Occlusion and stenosis of other cerebral arterie (sic)

Seneca also diagnosed some of its patients with some of the same serious conditions as the other Defendants with additional conditions *verbatim*:

> G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,H81.09 Meniere's disease, unspecified.H81.399 Other peripheral vertigo, unspecified ear,I63.89 Other cerebral infarction,R25.9 Awkward uncoordinated of walking,

142.    The bills submitted on behalf of provider Defendants Direct Med, Green Power, Hillside, 334 Grand, Pitch, Lifeline, and Sanitas consisted of the same three charges under the same CPT codes, for the same services, and in the same total amount of $1,641.79.

143.    The bills submitted on behalf of Defendants Chai and Diag Neuro, and on behalf of Defendants Seneca and Wizard, consisted of two separate bills for each paired providers for the same three charges under the same CPT codes, provided on the same patients at the same time. The treating provider on one bill is a technician while the treating provider on the other bill is a physician with the same combined total amount of $1,641.79.

144.    Chai and Wizard charged the same three CPT codes for providing lay person services, while Diag Neuro and Seneca charged the same three CPT codes for providing the physician services on the same patients at the same time.

145.    The bills submitted on behalf of provider Defendants Chai and Diag Neuro consisted of the same three CPT codes for services provided to the same patient on the same date of service with both bills combined totaling the amount of $1,641.79. The bills submitted on behalf of provider Defendant Chai totaled the amount of $1,155.24, and consisted of the same three CPT codes, for the same services, on the same patient and date of service as that of Diag Neuro but was allegedly provided by a technician. The bills submitted on behalf of provider Defendant Diag

Neuro totaled the amount of $486.55 which consisted of the same three CPT codes, for the same services, on the same patient and date of service as that of Chai but provided by a medical doctor.

146.    The bills submitted on behalf of providers Defendants Wizard and Seneca consisted of the same three CPT codes for services provided to the same patient on the same date of service with both bills combined totaling the amount of $1,641.79. The bills submitted on behalf of provider Defendant Wizard totaled the amount of $1,155.24, and consisted of the same three CPT codes, for the same services, on the same patient and date of service as that of Seneca but was allegedly provided by a technician. The bills submitted on behalf of provider Defendant Seneca totaled the amount of $486.55 which consisted of the same three CPT codes, for the same services, on the same patient and date of service as that of Wizard but provided by a medical doctor.

147.    Moreover, some of the bills for TCD submitted for each of these provider Defendants routinely and falsely represent that the patients with the same multiple serious brain conditions never previously had the same or similar conditions prior to the subject motor vehicle accident (MVA), and that such conditions were "solely a result of" the MVA.

148.    These kinds of misrepresentations, made on the first page of these Defendants' TCD bills for patient after patient, may be among the most egregious examples of fraud in a No-Fault field already ravaged by it. In some patients, abnormal TCD findings of cerebral artery obstruction and decreased blood flow velocity in major brain arteries were reported. Moreover, cerebral infarctions and transient cerebral ischemic attacks were diagnosed repeatedly. If the patients had actually presented with such conditions, they would have needed treatment, rather than being used as pawns in this fraudulent billing scheme in which such injuries were ignored and not treated. Yet such treatment was never provided, even though very serious injuries had been diagnosed.

149.    For example, on or about the time it was dated, March 29, 2021, a bill was mailed by or on behalf of the provider Defendant Direct Med to Allstate for TCD testing purportedly provided by Direct Med to patient F.D., claim number 0615130085, in a clinic located at 3626 Bailey Ave, Bronx, NY 10463 on March 9, 2021. The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892-59, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79. On the face of the bill, the patient is diagnosed with:

G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

150.    On or about the time it was dated, November 26, 2021, a bill was mailed by or on behalf of the provider Defendant Green Power to Allstate for TCD testing purportedly provided by Green Power to patient C.H., claim number 0648730414, in a clinic located at 108 Kenilworth Pl, Brooklyn, NY 11210 on November 16, 2021. The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892-59, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79. On the face of the bill, the patient is diagnosed with:

G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

151.    On or about the time it was dated, January 15, 2021, a bill was mailed by or on behalf of the provider Defendant Hillside to Allstate for TCD testing purportedly provided by Hillside to patient J.B., claim number 0978498460, in a clinic located at 1735 Pitkin Ave, Brooklyn, NY 11212 on December 29, 2020. The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892-59, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79. On the face of the bill, the patient is diagnosed with:

> G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

152.    On or about the time it was dated, May 5, 2021, a bill was mailed by or on behalf of the provider Defendant Chai to Allstate for TCD testing purportedly provided by Chai to patient A.S., claim number 0620911925, in a clinic located at 1568 Ralph Ave, Brooklyn, NY 11234 on April 14, 2021. The bill consists of three charges for TCD testing under CPT codes 93886-TC, 93890-TC, and 93892-59-TC, in the respective amounts of $304.40, $412.80, and $438.04, for a total of $1,155.24. and indicates the treating provider as a technician. On the face of the bill, the patient is diagnosed with:

> G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other

> cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29
> Occlusion and stenosis of unspecified carotid artery
> ,I66.8 Occlusion and stenosis of other cerebral arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient

never previously had the same or similar conditions, and that these conditions resulted solely from

the MVA.

153.    On or about the time it was dated, May 5, 2021, a bill was mailed by or on behalf

of the provider Defendant Diag Neuro to Allstate for TCD testing purportedly provided by Diag

Neuro to patient A.S., claim number 0620911925, in a clinic located at 1568 Ralph Ave, Brooklyn,

NY 11234 on April 14, 2021. The bill consists of three charges for TCD testing under CPT codes

93886-26, 93890-26, and 93892-59-26, in the respective amounts of $202.94, $137.60, and

$146.01, for a total of $486.55. and indicates the treating provider as a medical doctor. On the face

of the bill, the patient is diagnosed with:

> G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic
> attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral
> infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and
> stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral
> arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient

never previously had the same or similar conditions, and that these conditions resulted solely from

the MVA.   Once again after representing that the patient had very serious diagnoses, these

Defendants did absolutely nothing for the patient.

154.    On or about the time it was dated, December 6, 2021, a bill was mailed by or on

behalf of the provider Defendant Wizard to Allstate for TCD testing purportedly provided by

Wizard to patient R.M., claim number 0640795125, in a clinic located at 204-12 Hillside Ave,

Hillside, NY on November 15, 2021. The bill consists of three charges for TCD testing under CPT

codes 93886-TC, 93890-TC, and 93892-59-TC, in the respective amounts of $304.40, $412.80, and $438.04, for a total of $1,155.24. and indicates the treating provider as a technician. On the face of the bill, the patient is diagnosed with:

> G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

155.    On or about the time it was dated, December 27, 2021, a bill was mailed by or on behalf of the provider Defendant Seneca to Allstate for TCD testing purportedly provided by Seneca to patient R.M., claim number 0640795125, in a clinic located at 204-12 Hillside Ave, Jamaica, NY 11423 on November 15, 2021.The bill consists of three charges for TCD testing under CPT codes 93886-26, 93890-26, and 93892-59-26, in the respective amounts of $202.94, $137.60, and $146.01, for a total of $486.55. and indicates the treating provider as a medical doctor. On the face of the bill, the patient is diagnosed with:

> G45.1 Carotid artery syndrome G45.8 Occlusion and stenosis of basilar artery I63.8 Other cerebral infarction I65.1 Occlusion and stenosis of basilar artery I65.29 Occlusion and stenosis of unspecified ar I66.8 Occlusion and stenosis of other cerebral arterie (sic)

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

156.    On or about the time it was dated, April 19, 2022, a bill was mailed by or on behalf of the provider Defendant Seneca to Allstate for TCD testing purportedly provided by Seneca to

patient K.W., claim number 0661135921, in a clinic located at 3055 3rd Ave, Bronx, NY 10451 on March 10, 2022. The bill consists of three charges for TCD testing under CPT codes 93886-26, 93890-26, and 93892-59-26, in the respective amounts of $202.94, $137.60, and $146.01. On the face of the bill, the patient is diagnosed with:

> G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,H81.09 Meniere's disease, unspecified.H81.399 Other peripheral vertigo, unspecified ear,I63.89 Other cerebral infarction,R25.9 Awkward uncoordinated of walking,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

157.    On or about the time it was dated, March 7, 2022, a bill was mailed by or on behalf of the provider Defendant Seneca to Allstate for TCD testing purportedly provided by Seneca to patient K.G., claim number 0655507275, in a clinic located at 381Rockaway Ave, Brooklyn, NY 11212 on February 2, 2022. The bill consists of three charges for TCD testing under CPT codes 93886-26, 93890-26, and 93892-59-26, in the respective amounts of $202.94, $137.60, and $146.01. On the face of the bill, the patient is diagnosed with:

> G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,H81.09 Meniere's disease, unspecified.H81.399 Other peripheral vertigo, unspecified ear,I63.89 Other cerebral infarction,R25.9 Awkward uncoordinated of walking,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

158.    On or about the time it was dated, March 10, 2023, a bill was mailed by or on behalf of the provider Defendant 334 Grand to Allstate for TCD testing purportedly provided by 334

Grand to patient L.T., claim number 0701501108, in a clinic located at 560 Prospect Ave, Bronx, NY 10455 on February 16, 2023. The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79. On the face of the bill, the patient is diagnosed with:

      G43.001

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

159.    On or about the time it was dated, October 18, 2019, a bill was mailed by or on behalf of the provider Defendant Lifeline to Allstate for TCD testing purportedly provided by Lifeline to patient E.G., claim number 0551577265, in a clinic located at 79-45 Metropolitan Ave, Flushing, NY 11379 on September 10, 2019. The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892, in the respective amounts of $387.26, $420.13, and $445.82, for a total of $1,253.21. On the face of the bill, the patient is diagnosed with:

      G45.0 Vertebro-basilar artery syndrome
      R42 DIZZINESS AND GIDDINESS

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

160.    On or about the time it was dated, May 20, 2022, a bill was mailed by or on behalf of the provider Defendant Pitch to Allstate for TCD testing purportedly provided by Pitch to patient S.S., claim number 0644746331, in a clinic located at 360 W Merrick Rd Valley Stream, NY 11580 on April 11, 2022. The bill consists of three charges for TCD testing under CPT codes

93886, 93890, and 93892, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79. On the face of the bill, the patient is diagnosed with:

> R51 – HEADACHE
> R42 – DIZZINESS
> H81.399-Peripheral vertigo, unspecified

The bill represented that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

161.    On or about the time it was dated, May 18, 2022, a bill was mailed by or on behalf of the provider Defendant Pitch to Allstate for TCD testing purportedly provided by Pitch to patient Y.A., claim number 0662451244, in a clinic located at 4250 White Plains Rd Bronx, NY 10466 on April 7, 2022. The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79. On the face of the bill, the patient is diagnosed with:

> R51 – HEADACHE
> R42 – DIZZINESS
> H81.399-Peripheral vertigo, unspecified

The bill represented that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

162.    On or about the time it was dated, May 13, 2022, a bill was mailed by or on behalf of the provider Defendant Pitch to Allstate for TCD testing purportedly provided by Pitch to patient L.K., claim number 0667413009, in a clinic located at 1650 Eastern Pkwy, Brooklyn, NY 11233 on May 2, 2022. The bill consists of three charges for TCD testing under CPT codes 93886-26, 93890-26, and 93892-59-26, in the respective amounts of $202.94, $137.60, and $146.01, for a total of $486.01. On the face of the bill, the patient is diagnosed with:

> G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and
> related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral infarction,I65.1

Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

163.    On or about the time it was dated, February 25, 2022, a bill was mailed by or on behalf of the provider Defendant Sanitas to Allstate for TCD testing purportedly provided by Sanitas to patient D.C., claim number 0656877503, in a clinic located at 1975 Linden Blvd, Elmont NY, 11003 on February 17, 2022. The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892-59, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79. On the face of the bill, the patient is diagnosed with:

G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

164.    On or about the time it was dated, November 17, 2021, a bill was mailed by or on behalf of the provider Defendant Sanitas to Allstate for TCD testing purportedly provided by Sanitas to patient M.P., claim number 0642766513, in a clinic located at 60 Belmont Ave, Brooklyn, NY 11212 on October 13, 2021. The bill consists of three charges for TCD testing under CPT codes 93886, 93890, and 93892-59, in the respective amounts of $507.34, $550.40, and $584.05, for a total of $1,641.79. On the face of the bill, the patient is diagnosed with:

G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Other cerebral infarction,I63.89 Other cerebral infarction,I65.1

43

Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

The bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

165.    In support of the fraudulent billing for TCD, phony reports were generated which purported to show each individual patient's testing results, including both numerical data and graphical waveforms. In numerous cases, the data and/or waveforms were simply copied and pasted from the TCD report for another patient.

166.    For example, Allstate received purported TCD testing reports mailed by or on behalf of the provider Defendant Diag Neuro as to C.R., claim number 0627358013, for date of service June 16, 2021; and provider Defendant Hillside as to patient V.G., claim number 0606223287, for date of service December 1, 2020; and provider Defendant Lifeline as to patient H.J., claim number 0629926989, for date of service June 23, 2021.As shown below, the "TCD Exam Data" for these three patients – patient C.R. (left), patient V.G. (middle), and patient H.J. (right) – are identical:

C.R.                    V.G.                    H.J.



When one is superimposed over the other, the results are the following:





Such a match is impossible. Yet, the Defendants had numerous such matches.

167.    Allstate received purported TCD testing reports mailed by or on behalf of the Unlicensed Defendant Wizard as to patient J.A., claim number 0650522055, for date of service November 18, 2021; and provider Defendant Pitch as to patient S.R., claim number 0658817887, for date of service April 12, 2022. As shown below, the "TCD Exam Data" for these two patients – patient J.A. (left) and patient S.R. (right) – are identical:

### J.A.

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|---|---|---|---|---|---|---|---|---|---|---|
| RMCA | 52 | 49 | 32 | 24 | 0.77 | 0.51 | 0.58 | 2.04 | 114 | Toward |
| RACA | 62 | 49 | 33 | 25 | 0.73 | 0.49 | 0.68 | 1.96 | 139 | Reverse |
| RPCA | 67 | 47 | 34 | 27 | 0.59 | 0.43 | 0.35 | 1.74 | 107 | Toward |
| LMCA | 52 | 59 | 40 | 30 | 0.73 | 0.49 | 0.57 | 1.97 | 107 | Toward |
| LACA | 62 | 45 | 31 | 24 | 0.68 | 0.47 | 0.18 | 1.88 | 142 | Reverse |
| LPCA | 67 | 50 | 35 | 27 | 0.66 | 0.46 | 0.04 | 1.85 | 99 | Toward |
| ROA | 47 | 45 | 30 | 22 | 0.78 | 0.51 | 0.59 | 2.05 | 146 | Toward |
| LOA | 47 | 48 | 33 | 26 | 0.66 | 0.46 | 0.10 | 1.85 | 151 | Toward |
| RVA | 62 | 48 | 33 | 26 | 0.66 | 0.46 | 0.44 | 1.85 | 103 | Reverse |
| LVA | 62 | 47 | 32 | 24 | 0.73 | 0.49 | 0.22 | 1.96 | 107 | Reverse |
| BA | 75 | 41 | 29 | 23 | 0.62 | 0.44 | 0.08 | 1.78 | 135 | Reverse |
| vmr pre | 52 | 56 | 37 | 28 | 0.75 | 0.50 | 0.05 | 2.00 | 125 | Toward |
| vmr hold | 52 | 52 | 35 | 26 | 0.75 | 0.50 | 0.57 | 2.00 | 132 | Toward |
| vmr after | 52 | 57 | 38 | 28 | 0.77 | 0.51 | 0.08 | 2.04 | 117 | Toward |
| bits | 52 | 50 | 33 | 25 | 0.75 | 0.50 | 0.49 | 2.00 | 120 | Toward |

### S.R.

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|---|---|---|---|---|---|---|---|---|---|---|
| RMCA | 52 | 49 | 32 | 24 | 0.77 | 0.51 | 0.58 | 2.04 | 114 | Toward |
| RACA | 62 | 49 | 33 | 25 | 0.73 | 0.49 | 0.68 | 1.96 | 139 | Toward |
| RPCA | 67 | 47 | 34 | 27 | 0.59 | 0.43 | 0.35 | 1.74 | 107 | Toward |
| LMCA | 52 | 59 | 40 | 30 | 0.73 | 0.49 | 0.57 | 1.97 | 107 | Toward |
| LACA | 62 | 45 | 31 | 24 | 0.68 | 0.47 | 0.18 | 1.88 | 142 | Reverse |
| LPCA | 67 | 50 | 35 | 27 | 0.66 | 0.46 | 0.04 | 1.85 | 99 | Toward |
| ROA | 47 | 45 | 30 | 22 | 0.78 | 0.51 | 0.59 | 2.05 | 146 | Toward |
| LOA | 47 | 48 | 33 | 26 | 0.66 | 0.46 | 0.10 | 1.85 | 151 | Toward |
| RVA | 62 | 48 | 33 | 26 | 0.66 | 0.46 | 0.44 | 1.85 | 103 | Toward |
| LVA | 62 | 47 | 32 | 24 | 0.73 | 0.49 | 0.22 | 1.96 | 107 | Reverse |
| BA | 75 | 41 | 29 | 23 | 0.62 | 0.44 | 0.08 | 1.78 | 135 | Toward |
| vmr pre | 52 | 56 | 37 | 28 | 0.75 | 0.50 | 0.05 | 2.00 | 125 | Toward |
| vmr hold | 52 | 52 | 35 | 26 | 0.75 | 0.50 | 0.57 | 2.00 | 132 | Toward |
| vmr after | 52 | 57 | 38 | 28 | 0.77 | 0.51 | 0.08 | 2.64 | 117 | Toward |
| bits | 52 | 50 | 33 | 25 | 0.75 | 0.50 | 0.49 | 2.00 | 120 | Toward |









 

When one is superimposed over the other, the results are the following:



| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | SID | HR | DIR |
|---|---|---|---|---|---|---|---|---|---|---|
| RMCA | 52 | 49 | 32 | 24 | 0.77 | 0.51 | 0.58 | 2.04 | 114 | Toward |
| RACA | 62 | 49 | 33 | 25 | 0.73 | 0.49 | 0.48 | 1.96 | 139 | Reverse |
| RPCA | 67 | 47 | 34 | 27 | 0.59 | 0.43 | 0.35 | 1.74 | 107 | Toward |
| LMCA | 52 | 59 | 40 | 30 | 0.73 | 0.49 | 0.57 | 1.97 | 107 | Toward |
| LACA | 62 | 45 | 31 | 24 | 0.68 | 0.47 | 0.18 | 1.88 | 142 | Reverse |
| LPCA | 67 | 50 | 35 | 27 | 0.66 | 0.46 | 0.04 | 1.85 | 99 | Toward |
| ROA | 47 | 45 | 30 | 22 | 0.78 | 0.51 | 0.59 | 2.05 | 146 | Toward |
| LOA | 47 | 48 | 33 | 26 | 0.66 | 0.46 | 0.10 | 1.85 | 151 | Toward |
| RVA | 62 | 48 | 33 | 26 | 0.66 | 0.46 | 0.44 | 1.85 | 103 | Reverse |
| LVA | 62 | 47 | 32 | 24 | 0.73 | 0.49 | 0.22 | 1.96 | 107 | Reverse |
| BA | 75 | 41 | 29 | 23 | 0.62 | 0.44 | 0.08 | 1.78 | 135 | Reverse |
| vmr pre | 52 | 56 | 37 | 28 | 0.75 | 0.50 | 0.05 | 2.00 | 125 | Toward |
| vmr hold | 52 | 52 | 35 | 26 | 0.75 | 0.50 | 0.57 | 2.00 | 132 | Toward |
| vmr after | 52 | 57 | 38 | 28 | 0.77 | 0.51 | 0.08 | 2.04 | 117 | Toward |
| hits | 52 | 50 | 33 | 25 | 0.75 | 0.50 | 0.49 | 2.00 | 120 | Toward |





Such a match is impossible. Yet, the Defendants had numerous such matches.

168.    Allstate received purported TCD testing reports mailed by or on behalf of the provider Defendant Direct Med as to patient J.M., claim number 0611789744, for date of service March 11, 2021; and provider Defendant Sanitas as to patient D.Z., claim number 0652910654, for date of service January 12, 2022. As shown below, the "TCD Exam Data" for these two patients – patient J.M. (left) and patient D.Z. (right) – are identical:

J.M.

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|--------|-------|------|------|------|----|----|-----|-----|----|-----|
| RMCA | 52 | 78 | 51 | 38 | 0.78 | 0.51 | 0.70 | 2.05 | 89 | Toward |
| RACA | 62 | 82 | 53 | 38 | 0.84 | 0.54 | 0.17 | 2.16 | 103 | Reverse |
| RPCA | 67 | 78 | 51 | 37 | 0.81 | 0.53 | 0.15 | 2.11 | 88 | Toward |
| LMCA | 52 | 80 | 49 | 34 | 0.93 | 0.57 | 0.03 | 2.35 | 76 | Toward |
| LACA | 62 | 81 | 52 | 38 | 0.82 | 0.53 | 0.59 | 2.13 | 97 | Reverse |
| LPCA | 67 | 78 | 51 | 38 | 0.78 | 0.51 | 0.51 | 2.05 | 96 | Toward |
| ROA | 47 | 33 | 21 | 15 | 0.86 | 0.55 | 0.59 | 2.20 | 182 | Toward |
| ROA | 47 | 29 | 18 | 12 | 0.96 | 0.59 | 0.40 | 2.42 | 165 | Toward |
| RVA | 62 | 38 | 25 | 18 | 0.81 | 0.53 | 0.61 | 2.11 | 91 | Reverse |
| LVA | 62 | 35 | 22 | 16 | 0.85 | 0.54 | 0.38 | 2.19 | 89 | Reverse |
| BA | 75 | 32 | 21 | 15 | 0.82 | 0.53 | 0.03 | 2.13 | 92 | Reverse |
| vmr pre | 52 | 77 | 51 | 38 | 0.76 | 0.51 | 0.36 | 2.03 | 88 | Toward |
| vmr hold | 52 | 55 | 36 | 27 | 0.77 | 0.51 | 0.33 | 2.04 | 89 | Toward |
| vmr after | 52 | 78 | 51 | 38 | 0.78 | 0.51 | 0.11 | 2.05 | 86 | Toward |
| hits | 52 | 74 | 49 | 36 | 0.78 | 0.51 | 0.07 | 2.06 | 72 | Toward |

D.Z.

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|--------|-------|------|------|------|----|----|-----|-----|----|-----|
| RMCA | 52 | 78 | 51 | 38 | 0.78 | 0.51 | 0.70 | 2.05 | 89 | Toward |
| RACA | 62 | 82 | 53 | 38 | 0.84 | 0.54 | 0.17 | 2.16 | 103 | Reverse |
| RPCA | 67 | 78 | 51 | 37 | 0.81 | 0.53 | 0.15 | 2.11 | 88 | Toward |
| LMCA | 52 | 80 | 49 | 34 | 0.93 | 0.57 | 0.03 | 2.35 | 76 | Toward |
| LACA | 62 | 81 | 52 | 38 | 0.82 | 0.53 | 0.59 | 2.13 | 97 | Reverse |
| LPCA | 67 | 78 | 51 | 38 | 0.78 | 0.51 | 0.51 | 2.05 | 96 | Toward |
| ROA | 47 | 33 | 21 | 15 | 0.86 | 0.55 | 0.59 | 2.20 | 182 | Toward |
| ROA | 47 | 29 | 18 | 12 | 0.96 | 0.59 | 0.40 | 2.42 | 165 | Toward |
| RVA | 62 | 38 | 25 | 18 | 0.81 | 0.53 | 0.61 | 2.11 | 91 | Reverse |
| LVA | 62 | 35 | 22 | 16 | 0.85 | 0.54 | 0.38 | 2.19 | 89 | Reverse |
| BA | 75 | 32 | 21 | 15 | 0.82 | 0.53 | 0.03 | 2.13 | 92 | Reverse |
| vmr pre | 52 | 77 | 51 | 38 | 0.76 | 0.51 | 0.36 | 2.03 | 88 | Toward |
| vmr hold | 52 | 55 | 36 | 27 | 0.77 | 0.51 | 0.33 | 2.04 | 89 | Toward |
| vmr after | 52 | 78 | 51 | 38 | 0.78 | 0.51 | 0.11 | 2.05 | 86 | Toward |
| hits | 52 | 74 | 49 | 36 | 0.78 | 0.51 | 0.07 | 2.06 | 72 | Toward |









 

When one is superimposed over the other, the results are the following:

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|---|---|---|---|---|---|---|---|---|---|---|
| RMCA | 52 | 78 | 51 | 38 | 0.78 | 0.51 | 0.70 | 2.05 | 89 | Toward |
| RACA | 62 | 82 | 53 | 38 | 0.84 | 0.54 | 0.17 | 2.16 | 103 | Reverse |
| RPCA | 67 | 78 | 51 | 37 | 0.81 | 0.53 | 0.15 | 2.11 | 88 | Toward |
| LMCA | 52 | 80 | 49 | 34 | 0.93 | 0.57 | 0.03 | 2.35 | 76 | Toward |
| LACA | 62 | 81 | 52 | 38 | 0.82 | 0.53 | 0.59 | 2.13 | 97 | Reverse |
| LPCA | 67 | 78 | 51 | 38 | 0.78 | 0.51 | 0.51 | 2.05 | 96 | Toward |
| ROA | 47 | 33 | 21 | 15 | 0.86 | 0.55 | 0.59 | 2.20 | 102 | Toward |
| ROA | 47 | 29 | 18 | 12 | 0.96 | 0.99 | 0.40 | 2.42 | 165 | Toward |
| RVA | 62 | 38 | 25 | 18 | 0.81 | 0.53 | 0.61 | 2.11 | 91 | Reverse |
| LVA | 62 | 35 | 22 | 16 | 0.85 | 0.54 | 0.38 | 2.19 | 89 | Reverse |
| BA | 75 | 32 | 21 | 15 | 0.82 | 0.53 | 0.03 | 2.13 | 92 | Reverse |
| vmr pre | 52 | 77 | 51 | 38 | 0.76 | 0.51 | 0.36 | 2.05 | 88 | Toward |
| vmr hold | 52 | 55 | 36 | 27 | 0.77 | 0.51 | 0.33 | 2.04 | 89 | Toward |
| vmr after | 52 | 78 | 51 | 38 | 0.78 | 0.51 | 0.11 | 2.05 | 86 | Toward |
| bits | 52 | 74 | 49 | 36 | 0.78 | 0.51 | 0.07 | 2.06 | 72 | Toward |





Such a match is impossible. Yet, the Defendants had numerous such matches.

169.    Allstate received purported TCD testing reports mailed by or on behalf of a non-party provider as to patient N.G., claim number 0644031049, for date of service October 12, 2021; and provider Defendant Green Power New York as to patient O.W., claim number 0648173466, for date of service December 7, 2021. As shown below, the "TCD Exam Data" for these two patients – patient N.G. (left) and patient O.W. (right) – are identical:

N.G.

O.W.

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|---|---|---|---|---|---|---|---|---|---|---|
| RMCA | 52 | 28 | 17 | 11 | 1.02 | 0.61 | 0.05 | 2.55 | 128 | Toward |
| RACA | 62 | 27 | 17 | 12 | 0.88 | 0.56 | 0.52 | 2.25 | 160 | Reverse |
| RPCA | 67 | 30 | 19 | 14 | 0.83 | 0.53 | 0.53 | 2.14 | 135 | Toward |
| LMCA | 52 | 27 | 16 | 11 | 0.98 | 0.59 | 0.58 | 2.45 | 120 | Toward |
| LACA | 62 | 37 | 23 | 16 | 0.91 | 0.57 | 0.65 | 2.31 | 142 | Reverse |
| LPCA | 67 | 31 | 20 | 15 | 0.79 | 0.52 | 0.43 | 2.07 | 120 | Toward |
| ROA | 47 | 41 | 26 | 19 | 0.84 | 0.54 | 0.07 | 2.16 | 125 | Toward |
| LOA | 47 | 39 | 26 | 20 | 0.72 | 0.49 | 0.07 | 1.95 | 112 | Toward |
| RVA | 62 | 38 | 25 | 18 | 0.81 | 0.53 | 0.54 | 2.11 | 107 | Reverse |
| LVA | 62 | 44 | 31 | 25 | 0.61 | 0.43 | 0.53 | 1.76 | 146 | Reverse |
| BA | 75 | 42 | 29 | 23 | 0.65 | 0.45 | 0.05 | 1.83 | 117 | Reverse |
| vmr pre | 52 | 30 | 19 | 13 | 0.91 | 0.57 | 0.25 | 2.31 | 165 | Toward |
| vmr hold | 52 | 24 | 15 | 10 | 0.95 | 0.58 | 0.38 | 2.40 | 112 | Toward |
| vmr after | 52 | 29 | 18 | 12 | 0.96 | 0.59 | 0.06 | 2.42 | 182 | Toward |
| hts | 52 | 21 | 14 | 11 | 0.70 | 0.48 | 0.56 | 1.91 | 117 | Toward |

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|---|---|---|---|---|---|---|---|---|---|---|
| RMCA | 52 | 28 | 17 | 11 | 1.02 | 0.61 | 0.05 | 2.55 | 128 | Toward |
| RACA | 62 | 27 | 17 | 12 | 0.88 | 0.56 | 0.52 | 2.25 | 160 | Reverse |
| RPCA | 67 | 30 | 19 | 14 | 0.83 | 0.53 | 0.53 | 2.14 | 135 | Toward |
| LMCA | 52 | 27 | 16 | 11 | 0.98 | 0.59 | 0.58 | 2.45 | 120 | Toward |
| LACA | 62 | 37 | 23 | 16 | 0.91 | 0.57 | 0.65 | 2.31 | 142 | Reverse |
| LPCA | 67 | 31 | 20 | 15 | 0.79 | 0.52 | 0.43 | 2.07 | 120 | Toward |
| ROA | 47 | 41 | 26 | 19 | 0.84 | 0.54 | 0.07 | 2.16 | 125 | Toward |
| LOA | 47 | 39 | 26 | 20 | 0.72 | 0.49 | 0.07 | 1.95 | 112 | Toward |
| RVA | 62 | 38 | 25 | 18 | 0.81 | 0.53 | 0.54 | 2.11 | 107 | Reverse |
| LVA | 62 | 44 | 31 | 25 | 0.61 | 0.43 | 0.53 | 1.76 | 146 | Reverse |
| BA | 75 | 42 | 29 | 23 | 0.65 | 0.45 | 0.05 | 1.83 | 117 | Reverse |
| vmr pre | 52 | 30 | 19 | 13 | 0.91 | 0.57 | 0.25 | 2.31 | 165 | Toward |
| vmr hold | 52 | 24 | 15 | 10 | 0.95 | 0.58 | 0.38 | 2.40 | 112 | Toward |
| vmr after | 52 | 29 | 18 | 12 | 0.96 | 0.59 | 0.06 | 2.42 | 182 | Toward |
| hts | 52 | 21 | 14 | 11 | 0.70 | 0.48 | 0.56 | 1.91 | 117 | Toward |









53

 

When one is superimposed over the other, the results are the following:



54



Such a match is impossible. Yet, the Defendants had numerous such matches.

170.    Allstate received purported TCD testing reports mailed by or on behalf of the provider Defendant Chai as to patient K.R., claim number 0695121434, for date of service December 21, 2022; and non-party ASM Diagnostic, Inc. as to patient L.M., claim number 0673437695, for date of service November 15, 2022; and. As shown below, the "TCD Exam Data" for these two patients – patient L.M. (left) and patient K.R. (right) – are identical:

L.M.                                          K.R.




 

When one is superimposed over the other, the results are the following:

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|---|---|---|---|---|---|---|---|---|---|---|
| RMCA | 52 | 70 | 43 | 29 | 0.96 | 0.59 | 0.52 | 2.41 | 80 | Toward |
| RACA | 62 | 77 | 47 | 32 | 0.96 | 0.58 | 0.09 | 2.41 | 89 | Reverse |
| RPCA | 67 | 73 | 45 | 31 | 0.93 | 0.58 | 0.57 | 2.35 | 86 | Toward |
| LMCA | 52 | 74 | 45 | 30 | 0.99 | 0.59 | 0.41 | 2.47 | 71 | Toward |
| LACA | 62 | 67 | 42 | 30 | 0.87 | 0.55 | 0.07 | 2.23 | 85 | Reverse |
| LPCA | 67 | 76 | 43 | 27 | 1.13 | 0.64 | 0.03 | 2.61 | 78 | Toward |
| ROA | 47 | 28 | 15 | 9 | 1.24 | 0.68 | 0.61 | 3.11 | 101 | Toward |
| LOA | 47 | 33 | 20 | 13 | 1.02 | 0.61 | 0.50 | 2.54 | 128 | Toward |
| RVA | 62 | 42 | 29 | 22 | 0.70 | 0.48 | 0.47 | 1.91 | 91 | Reverse |
| LVA | 62 | 43 | 27 | 19 | 0.93 | 0.56 | 0.45 | 2.26 | 88 | Reverse |
| BA | 75 | 46 | 27 | 18 | 1.02 | 0.61 | 0.25 | 2.56 | 96 | Reverse |
| vmr pre | 52 | 63 | 42 | 32 | 0.73 | 0.49 | 0.23 | 1.97 | 71 | Toward |
| vmr hold | 52 | 57 | 38 | 28 | 0.77 | 0.51 | 0.16 | 2.04 | 76 | Toward |
| vmr after | 52 | 72 | 44 | 30 | 0.95 | 0.58 | 0.28 | 2.40 | 71 | Toward |
| hm | 52 | 65 | 40 | 28 | 0.92 | 0.57 | 0.34 | 2.32 | 77 | Toward |







Such a match is impossible. Yet, the Defendants had numerous such matches.

171.   Allstate received purported TCD testing reports mailed by or on behalf of the provider Defendant Pitch as to patient N.G., claim number 0669365157, for date of service April 18, 2022; and non-party Daniel Shapiro MD as to patient O.M., claim number 0614806313, for date of service February 19, 2021. As shown below, the "TCD Exam Data" for these two patients – patient N.GA. (left) and patient O.M. (right) – are identical:

N.GA.

O.M.

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|---|---|---|---|---|---|---|---|---|---|---|
| RMCA | 52 | 71 | 51 | 41 | 0.59 | 0.42 | 0.04 | 1.73 | 70 | Toward |
| RACA | 62 | 82 | 61 | 51 | 0.51 | 0.38 | 0.35 | 1.61 | 91 | Reverse |
| RPCA | 67 | 90 | 64 | 51 | 0.61 | 0.43 | 0.31 | 1.76 | 76 | Toward |
| LMCA | 52 | 90 | 61 | 46 | 0.73 | 0.49 | 0.05 | 1.96 | 94 | Toward |
| LACA | 62 | 79 | 58 | 47 | 0.55 | 0.41 | 0.22 | 1.68 | 101 | Reverse |
| LPCA | 67 | 72 | 47 | 34 | 0.81 | 0.53 | 0.44 | 2.12 | 86 | Toward |
| ROA | 47 | 93 | 63 | 48 | 0.71 | 0.48 | 0.42 | 1.94 | 77 | Toward |
| LOA | 47 | 88 | 63 | 50 | 0.61 | 0.43 | 0.27 | 1.76 | 67 | Toward |
| RVA | 62 | 53 | 37 | 29 | 0.65 | 0.45 | 0.28 | 1.83 | 88 | Reverse |
| LVA | 62 | 56 | 38 | 29 | 0.71 | 0.48 | 0.09 | 1.93 | 88 | Reverse |
| BA | 75 | 54 | 37 | 28 | 0.71 | 0.48 | 0.30 | 1.93 | 89 | Reverse |
| vmr pre | 52 | 74 | 52 | 41 . | 0.63 | 0.45 | 0.14 | 1.80 | 81 | Toward |
| vmr hold | 52 | 68 | 50 | 41 | 0.54 | 0.40 | 0.01 | 1.66 | 75 | Toward |
| vmr after | 52 | 75 | 53 | 42 | 0.62 | 0.44 | 0.18 | 1.79 | 74 | Toward |
| hits | 52 | 65 | 46 | 36 | 0.64 | 0.45 | 0.41 | 1.81 | 81 | Toward |

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|---|---|---|---|---|---|---|---|---|---|---|
| RMCA | 52 | 71 | 51 | 41 | 0.59 | 0.42 | 0.04 | 1.73 | 70 | Toward |
| RACA | 62 | 82 | 61 | 51 | 0.51 | 0.38 | 0.35 | 1.61 | 91 | Reverse |
| RPCA | 67 | 90 | 64 | 51 | 0.61 | 0.43 | 0.31 | 1.76 | 76 | Toward |
| LMCA | 52 | 90 | 61 | 46 | 0.73 | 0.49 | 0.05 | 1.96 | 94 | Toward |
| LACA | 62 | 79 | 58 | 47 | 0.55 | 0.41 | 0.22 | 1.68 | 101 | Reverse |
| LPCA | 67 | 72 | 47 | 34 | 0.81 | 0.53 | 0.44 | 2.12 | 86 | Toward |
| ROA | 47 | 93 | 63 | 48 | 0.71 | 0.48 | 0.42 | 1.94 | 77 | Toward |
| LOA | 47 | 88 | 63 | 50 | 0.61 | 0.43 | 0.37 | 1.76 | 67 | Toward |
| RVA | 62 | 53 | 37 | 29 | 0.65 | 0.45 | 0.28 | 1.83 | 88 | Reverse |
| LVA | 62 | 56 | 38 | 29 | 0.71 | 0.48 | 0.09 | 1.93 | 88 | Reverse |
| BA | 75 | 54 | 37 | 28 | 0.71 | 0.48 | 0.30 | 1.93 | 89 | Reverse |
| vmr pre | 52 | 74 | 52 | 41 | 0.63 | 0.45 | 0.14 | 1.80 | 81 | Toward |
| vmr hold | 52 | 68 | 50 | 41 | 0.54 | 0.40 | 0.01 | 1.66 | 75 | Toward |
| vmr after | 52 | 75 | 53 | 42 | 0.62 | 0.44 | 0.18 | 1.79 | 74 | Toward |
| hits | 52 | 65 | 46 | 36 | 0.64 | 0.45 | 0.41 | 1.81 | 81 | Toward |









59

 

When one is superimposed over the other, the results are the following:







Such a match is impossible. Yet, the Defendants had numerous such matches.

172.    Allstate received purported TCD testing reports mailed by or on behalf of the provider Defendant 334 Grand as to patient J.H., claim number 0698420379, for date of service January 23, 2023; and a non-party provider as to patient M.O., claim number 0643603392, for date of service October 13, 2021. As shown below, the "TCD Exam Data" for these two patients – patient J.H. (left) and patient M.O. (right) – are identical:

J.H.                                             M.O.









When one is superimposed over the other, the results are the following:





Such a match is impossible. Yet, the Defendants had numerous such matches.

63

173.    Due to the complexity of the circulatory system and the many factors that may influence an individual's TCD data and waveforms, it is virtually impossible for two people to have identical reports, with the same numerical values and waveforms. A person's TCD results are influenced by an array of factors, including: the individual's anatomy, blood vessel structure, blood flow dynamics, medications, and overall health status; the specific conditions being evaluated; or even variations in the ultrasound techniques used during different sessions.

174.    In line with the deceptive character of the TCD tests and reports, some of the patients with identical data and/or waveforms had different findings or conclusions. Some cases with identical data and/or waveforms showed normal results for one patient while the other patient showed abnormal results, while other identical patient data and/or waveforms showed both abnormal results but had listed different areas of abnormalities in the conclusions.

175.    For example, despite the identical exam data and waveform results of the TCD testing of the provider Defendant Diag Neuro as to C.R., claim number 0627358013, for date of service June 16, 2021; and provider Defendant Hillside as to patient V.G., claim number 0606223287, for date of service December 1, 2020;and provider Defendant Lifeline as to patient H.J., claim number 0629926989, for date of service June 23, 2021, the conclusion/impression for each patient was different. The TCD results for patient C.R. and patient H.J. indicated that the values were normal. In contrast, the TCD results for patient V.G. indicated abnormal findings: Vasomotor reactivity testing showed negative vasodilator reactivity in the R MCA. VMRT in the R MCA is -18%. Blood flow in BL MCA, BL ACA, BL PCA, R VA, BA showed decreased blood flow velocity.

176.    Despite having identical data and waveforms, the provider Defendant Pitch as to patient S.R., claim number 0658817887, for date of service April 12, 2022; and Defendant Wizard

as to patient J.A., claim number 0650522055, for date of service November 18, 2021, showed different abnormal conclusion/impression for each patient. The TCD results for patient S. R. indicated abnormal findings of decreased blood flow velocity in BL MCA, BL ACA, BA. In contrast, the TCD results for patient K.R. indicated breath holding index indicates questionably abnormal vasoreactivity.

177.    Despite having identical data and waveforms, the provider Defendant Chai as to patient K.R., claim number 0695121434, for date of service December 21, 2022; and non-party ASM Diagnostic, Inc. as to patient L.M., claim number 0673437695, for date of service November 15, 2022, showed different abnormal conclusion/impression for each patient. The TCD results for patient L.M. indicated abnormal findings of decreased blood flow velocity in BL MCA, L ACA, L VA, BA. In contrast, the TCD results for patient K.R. indicated normal findings.

178.    Consistent with their fraudulent nature, these reports contain no indication that the TCD testing ever led to any referral of the patients by these Defendants to any relevant specialists or further testing or treatment, especially in patients that had abnormal TCD findings and those with serious diagnoses. There is no evidence that these patients were referred for any care based on the purported results of this testing.

179.    Some of the conclusions or impressions in the reports from the medical provider Defendants who should have understood the magnitude of their claimed findings were potentially life threatening.  Direct Med, Hillside, Seneca, Pitch, 334 Grand, and Sanitas represented that there were findings of a decrease in blood flow or obstruction of multiple cerebral arteries such as the Middle Cerebral Artery (MCA), Anterior Cerebral Artery (ACA), Posterior Cerebral Artery (PCA), Vertebral Arteries (VA), and Basilar Artery (BA). In such findings, patients would typically receive further clinical assessment for other symptoms related to the findings of

decreased blood flow such as weakness, numbness, speech difficulties, visual changes, dizziness, or cognitive changes. The patients would also typically require further diagnostic testing to determine the underlying cause of decreased blood flow which may include Magnetic Resonance Imaging (MRI) and Magnetic Resonance Angiography (MRA) of the brain, Computed Tomography (CT) Angiography, other Doppler ultrasound examinations, such as carotid Doppler or vertebral Doppler, and blood tests may be conducted to assess factors such as cholesterol levels, clotting factors, and markers of inflammation to evaluate the patient's vascular health. Patients with decreased blood flow to major arteries in the brain are also typically referred for consultation and treatment with specialists such as neurologists, neurosurgeons, or vascular surgeons for further evaluation and management. Yet such testing and treatment were never provided, even though serious abnormalities had been indicated in the TCD test results.

180.    For example, Allstate received purported TCD testing reports mailed to Allstate by or on behalf of the provider Defendant 334 Grand as to patient J.H., claim number 0698420379, on or about the date of service January 23, 2023, with the impression: "Abnormal Transcranial Doppler study. Abnormal cerebral blood flow in insonated right posterior cerebral artery of temporal window consistent with a mild to moderate artery obstruction." Patient J.H., who was 27 years old at the time of the testing, presented with mild to moderate posterior cerebral artery obstruction on the TCD testing. Obstruction in the blood flow of a major artery supplying the brain is a serious condition because it can prevent oxygen and nutrients from reaching brain cells and cause cerebral infarction (ischemic stroke). This can lead to brain damage and even death if not treated promptly. However, there is no evidence that patient J.H. was referred for any additional care based on the purported abnormal results of this TCD testing.

181.    Allstate received purported TCD testing reports mailed to Allstate by or on behalf of the provider Defendant Direct Med as to patient F.D., claim number 0615130085, on or about the date of service March 9, 2021, which concluded that: "Blood flow in BL MCA, BL ACA, L PCA, BL VA, BA showed decreased blood flow velocity." There is no evidence that patient F.D. was referred for any care based on the purported abnormal results of this testing.

182.    Allstate received purported TCD testing reports mailed to Allstate by or on behalf of the provider Defendant Hillside as to patient J.B., claim number 0978498460, on or about the date of service December 29, 2020, which concluded that: "Blood flow in BL MCA and L ACA showed decreased blood flow velocity." There is no evidence that patient J.B. was referred for any care based on the purported abnormal results of this testing.

183.    Allstate received purported TCD testing reports mailed to Allstate by or on behalf of the provider Defendant Seneca as to patient K.W., claim number 0661135921, on or about date of service March 10, 2022, which concluded that: "Blood flow in BL MCA, BL ACA, BLPCA showed decreased blood flow velocity." There is no evidence that patient K.W. was referred for any care based on the purported abnormal results of this testing.

184.    Allstate received purported TCD testing reports mailed to Allstate by or on behalf of the provider Defendants Seneca and Wizard as to patient R.W., claim number 0640795125, on or about the date of service November 15, 2021, which concluded that: "Blood flow in BL MCA, R ACA showed decreased blood flow velocity." There is no evidence that patient R.M. was referred for any care based on the purported abnormal results of this testing.

185.    The potential consequences of untreated decreased blood flow velocity in brain arteries can be serious and potentially life-threatening. If not assessed further and/or treated properly, decreased blood flow velocity in the brain arteries can lead to various potentially serious

consequences and complications, depending on the underlying cause and the severity of the issue, such as ischemic strokes, cognitive impairments, vision problems, motor impairment, neurologic problems, and a risk for disease progression. To ignore such findings is unimaginable and unconscionable.

186.    If the patients of the Defendant providers did actually have the abnormal TCD findings noted in the reports – particularly the patients with cerebral artery obstruction or decreased blood flow velocity in brain arteries – the absence of additional care, specialist referrals or further testing may have gravely endangered their health.

187.    The potential severity of some of these diagnoses cannot be overstated. For instance, a "cerebral infarction," one of the diagnoses repeatedly used on the TCD bills submitted for the provider Defendants, is a type of stroke that occurs when a blood vessel in the brain is blocked, causing damage to brain tissue and requires immediate attention. Moreover, a "transient cerebral ischemic attack," another one of the diagnoses repeatedly used on the TCD bills submitted for the provider Defendants, occurs when a blood clot travels to the brain, with the risk of a subsequent stroke. To ignore such diagnoses is unimaginable and unconscionable.

188.    If any patients of provider Defendants had in fact presented with any issues that TCD might detect – particularly the many patients given the diagnoses listing cardiovascular diseases of the brain and the patients with abnormal findings– this malfeasance may have gravely endangered their health. Not only would they have missed a potentially life-saving diagnosis which TCD, if done properly may have provided, but to the extent the results were relied upon by other professionals, they also could have adversely impacted patient's care.

### V.    The Defendants' Fraudulent Scheme to Bill for VNG Testing

189.    To inflate the fraudulent billing even further, the same provider Defendants – Licensed Defendants Pitch, Emote, Central Park, Direct Med, Hillside, Sanitas, Healthcare Med, Seneca, Lifeline, Greenwood, Wilson, 334 Grand, and Diag Neuro, assisted by the Unlicensed Defendants Chai, Green Power, their owners, and one or more of the John Does and/or ABC Corps. – also billed for VNG testing in a battery of what are known as vestibular tests. When performed properly, testing of the vestibular system can aid in diagnosing issues relating to a patient's equilibrium, including dizziness, vertigo, and imbalance.

190.    Like the other Fraudulent Services billed for on behalf of these Defendants including by the John Does and ABC Corps., however, this testing was administered improperly, if at all, to numerous patients with no indication of medical necessity. To the extent any such services were rendered, the purported testing was performed by laypersons hired by the scheme's managers, rather than by the Licensed Defendant providers or their physician owners as represented on their bills.

191.    The namesake portion of the VNG testing billed for by the provider Defendants, videonystagmography, was purportedly provided to patients by each of these Defendants. Videonystagmography is a diagnostic procedure that assesses the vestibular system, with eye movements recorded using infrared cameras, and which provides insights into the inner ear and neural pathways. The test involves a series of maneuvers and exercises that stimulate the vestibular system, and then a comparison of a patient's eye movement responses to norms, aiding diagnoses.

192.    None of the VNG testing was performed by the physicians as listed on the bills submitted for the Licensed Defendant providers. Nor was the VNG testing performed or supervised by any qualified professional, specifically any physician or audiologist. These provider Defendants did not administer any such test, and they did not supervise the laypersons and/or

independent contractors who administered VNG testing to the extent any was actually performed. The VNG testing was performed improperly, if at all, and the test results were fabricated.

193.    As with TCD testing, the bills of these Defendants used identical combinations of diagnostic codes and descriptions for numerous patients. The providers allegedly providing the services gave no consideration to the actual needs and conditions of the patients.  They all allegedly received the same services.  Bills for the Defendant providers Hillside, Sanitas, Direct Med, and Green Power used one version of the diagnostic information, while some bills for Defendants Wilson and Direct Med used a different version, and bills for the Defendant providers Lifeline, Greenwood, and Diag Neuro used another version. Bills from Seneca used the same diagnoses for most of its patients. Similarly, bills from Pitch used the same diagnoses for most its patients. The bills also routinely and falsely represented that the patient never previously had the same or similar conditions prior to the subject motor vehicle accident (MVA), and that such conditions were "solely a result of" the MVA.

194.    These Defendants' bills for VNG testing also use identical combinations of CPT billing codes and amounts. Bills for Hillside, Healthcare Medical, Wilson, and Direct Med consist of the same total charges under six CPT codes, while bills for Sanitas, Direct Med, and Green Power consist of the same total under the same six CPT codes, and bills for Seneca and Diag Neuro consist of the same six CPT codes with the same total. Bills for Pitch consist of the same total charges under eight CPT codes for most of its patients, and bills for Lifeline consist of the same total charges under four CPT codes for most of its patients.

195.    Numerous bills for these Defendants for VNG testing were on the same dates of service on which the same Defendants purportedly rendered TCD testing for the same patients. These two types of charges – for TCD testing and VNG testing – do not usually appear on the

70

same bill and are billed separately, even though these pairs of bills are generally dated and submitted to Allstate on the same dates as well. Thus not only were numerous patients diagnosed with serious brain injury diagnoses; they were diagnosed with the same vestibular disorders as well. These diagnoses were fictitious.  Indeed, it is absurd for all of these patients to have had the same serious conditions in two different areas of their bodies. The Defendants, however, sought to maximize their profits by billing for both at once and aware of the attention that would be drawn if they set the two batteries of tests forward on the same bills, they separated the fraudulent billing into two sets of bills.

196.    For example, on or about the time it was dated, November 15, 2021, a bill was mailed by or on behalf of the provider Defendant Sanitas to Allstate for VNG testing purportedly provided by Sanitas to patient E.A., claim number 0645654179, in a clinic located at 82-17 Woodhaven Boulevard on October 27, 2021. The bill consists of six charges for VNG testing under CPT codes 92537, 92540, 92546-59, 92546-59-76, 92547, and 92548, in the respective amounts of $87.12, $140.37, $91.77, $91.77, $56.12, and $187.19, for a total of $654.34. On the face of the bill, the patient is diagnosed with:

> H81.399 Other peripheral vertigo, unspecified ear,H81.09 Meniere's disease, unspecified,H81.13 Benign paroxysmal vertigo, bilateral,H81.49 Vertigo of central origin,R26.9 Awkward uncoordinated of walking,R27.0 Loss of coordination of voluntary muscular movement,R42 Dizziness,Z91.81 History of falling,

Like Sanitas's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

197.    On or about the time it was dated, April 22, 2021, a bill was mailed by or on behalf of the provider Defendant Direct Med to Allstate for VNG testing purportedly provided by Direct Med to patient D.T., claim number 0619832602, in a clinic located at 1975 Linden Blvd on March 25, 2021. The bill consists of six charges for VNG testing under CPT codes 92537, 92540, 92546-59, 92546-59-76, 92547, and 92548, in the respective amounts of $87.12, $140.37, $91.77, $91.77, $56.12, and $187.19, for a total of $654.34. On the face of the bill, the patient is diagnosed with:

> H81.399 Other peripheral vertigo, unspecified ear,H81.09 Meniere's disease, unspecified,H81.13 Benign paroxysmal vertigo, bilateral,H81.49 Vertigo of central origin,R26.9 Awkward uncoordinated of walking,R27.0 Loss of coordination of voluntary muscular movement,R42 Dizziness,Z91.81 History of falling,

Like Direct Med's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

198.    On or about the time it was dated, December 17, 2021, a bill was mailed by or on behalf of the provider Defendant Green Power to Allstate for VNG testing purportedly provided by Green Power to patient O.W., claim number 0648173466, in a clinic located at 17004 Henley Road on December 7, 2021. The bill consists of six charges for VNG testing under CPT codes 92537, 92540, 92546-59, 92546-59-76, 92547, and 92548, in the respective amounts of $87.12, $140.37, $91.77, $91.77, $56.12, and $187.19, for a total of $654.34. On the face of the bill, the patient is diagnosed with:

> H81.399 Other peripheral vertigo, unspecified ear,H81.09 Meniere's disease, unspecified,H81.13 Benign paroxysmal vertigo, bilateral,H81.49 Vertigo of central origin,R26.9 Awkward uncoordinated of walking,R27.0 Loss of coordination of voluntary muscular movement,R42 Dizziness,Z91.81 History of falling,

Like Green Power's bill for TCD testing as to the same patient and the same date of service, this

72

bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

199.    On or about the time it was dated, February 4, 2021, a bill was mailed by or on behalf of the provider Defendant Direct Medto Allstate for VNG testing purportedly provided by Direct Med to patient G.C., claim number 0609600209, in a clinic located at 7945 Metropolitan Ave on January 12, 2021. The bill consists of six charges for VNG testing under CPT codes 92537, 92540, 92546-59, 92546-59-76, 92547, 92548, in the respective amounts of $87.12, $140.37, $97.77, $97.77, $56.12 and $187.19, for a total of $666.34.  On the face of the bill, the patient is diagnosed with:

> R42 – DIZZINESS
> H81.399-Peripheral vertigo, unspecified
> R26.9 - Unspecified abnormalities of gait and mobility

Like Direct Med's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

200.    On or about the time it was dated, May 3, 2021, a bill was mailed by or on behalf of the provider Defendant Wilson to Allstate for VNG testing purportedly provided by Wilson to patient M.L., claim number 0621002988, at the 37-03 92nd Street clinic on April 13, 2021.  The bill consists of six charges for VNG testing under CPT codes 92537, 92540, 92546-59, 92546-59-76, 92547, 92548, in the respective amounts of $87.12, $140.37, $97.77, $97.77, $56.12 and $187.19, for a total of $666.34. On the face of the bill, the patient is diagnosed with:

> R42 – DIZZINESS
> H81.399-Peripheral vertigo, unspecified

R26.9 - Unspecified abnormalities of gait and mobility

Like Wilson's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

201.    On or about the time it was dated, May 19, 2022, a bill was mailed by or on behalf of the provider Defendant Pitch to Allstate for VNG testing purportedly provided by Pitch to patient C.D., claim number 0657624722, in a clinic located at 360 W Merrick Road on April 11, 2022. The bill consists of eight charges for VNG testing under CPT codes 92548, 92547, 92546-59-76, 92546-59, 92545, 92542, 92541, 92537 in the respective amounts of $187.19, $56.12, $97.77, $97.77, $58.01, $95.42, $106.71, and $87.12, for a total of $786.11. On the face of the bill, the patient is diagnosed with:

> R51 – HEADACHE
> R42 – DIZZINESS
> H81.399-Peripheral vertigo, unspecified

Like Pitch's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, and that these conditions resulted solely from the MVA.

202.    On or about the time it was dated, May 10, 2022, a bill was mailed by or on behalf of the provider Defendant Pitch to Allstate for VNG testing purportedly provided by Pitch to patient M.C., claim number 0663307866, in a clinic located at 3209 Fulton Street on April 4, 2022. The bill consists of eight charges for VNG testing under CPT codes 92548, 92547, 92546-59-76, 92546-59, 92545, 92542, 92541, 92537 in the respective amounts of $187.19, $56.12,

$97.77, $97.77, $58.01, $95.42, $106.71, and $87.12, for a total of $786.11. On the face of the bill, the patient is diagnosed with:

> R51 – HEADACHE
> R42 – DIZZINESS
> H81.399-Peripheral vertigo, unspecified

Like Pitch's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, and that these conditions resulted solely from the MVA.

203.    On or about the time it was dated, March 3, 2020, a bill was mailed by or on behalf of the provider Defendant Healthcare Medical to Allstate for VNG testing purportedly provided by Healthcare Medical to patient A.P., claim number 0571000074, in a clinic located at 359 Pearsall Avenue Unit D on January 21, 2020. The bill consists of six charges for VNG testing under CPT codes 92540-26, 92543-26, 92546-59, 92546-59-79, 92547, 92548 in the respective amounts of $88.93, $301.76, $56.04, $56.04, $171.35, and $34.29, for a total of $708.41. On the face of the bill, the patient is diagnosed with:

> R42 – DIZZINESS

Like Healthcare Medical's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, and that these conditions resulted solely from the MVA.

204.    On or about the time it was dated, January 13, 2021, a bill was mailed by or on behalf of the provider Defendant Lifeline to Allstate for VNG testing purportedly provided by Lifeline to patient A.G., claim number 0607715558, in a clinic located at 2488 Grand Concourse on December 2, 2020. The bill consists of four charges for VNG testing under CPT codes 92533,

92540, 92546, 92548 in the respective amounts of $80.48, $140.37, $91.77, and $187.19, for a total of $499.81. On the face of the bill, the patient is diagnosed with:

> R42

This code represents that the patient presented with "dizziness and giddiness." Like Lifeline's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, and that these conditions resulted solely from the MVA.

205.    On or about the time it was dated, July 29, 2021, a bill was mailed by or on behalf of the provider Defendant Greenwood to Allstate for VNG testing purportedly provided by Greenwood to patient L.S., claim number 0582125845, in a clinic located at 300 Hempstead Turnpike on July 12, 2021. The bill consists of six charges for VNG testing under CPT codes 92537-26, 92540-26, 92546-59-26-76, 92546-59-26, 92547, 92548-26 in the respective amounts of $271.80, $116.49, $73.42, $73.42, $44.90, $44.90, and $44.95, for a total of $624.96. On the face of the bill, the patient is diagnosed with:

> R42

206.    On or about the time it was dated, March 13, 2023, a bill was mailed by or on behalf of the provider Defendant 334 Grand to Allstate for VNG testing purportedly provided by 334 Grand to patient W.O., claim number 0699103115, in a clinic located at 1320 Louis Nine Blvd on February 28, 2023. The bill consists of four charges for VNG testing under CPT codes 92533, 92540, 92546, 92548 in the respective amounts of $80.48, $140.37, $91.77, and $187.19, for a total of $499.81. On the face of the bill, the patient is diagnosed with:

> R42

Like 334 Grand's bill for TCD testing as to the same patient and the same date of service, this bill represented that these conditions first arose on the date of the subject MVA, and that these conditions resulted solely from the MVA.

207.    On or about the time it was dated, April 6, 2022, a bill was mailed by or on behalf of the provider Defendant Diag Neuro to Allstate for VNG testing purportedly provided by Diag Neuro to patient K.J., claim number 0662880343, in a clinic located at 1568 Ralph Ave on March 24, 2022. The bill consists of six charges for VNG testing under CPT codes 93886, 92548-26, 92547-26, 92546-59-76-26, 92546-59-26, 92540-26, 92537-26 in the respective amounts of $44.93, $44.90, $73.42, $73.42, $116.51, and $67.95. The bill also included TCD CPT codes with the total charges in the bill at $907.68. On the face of the bill, the patient is diagnosed with:

> R42 – DIZZINESS.

This bill represented that these conditions resulted solely from the MVA.

208.    As with TCD testing, the Defendants generated and submitted phony reports for VNG testing in support of their billing. The results of VNG testing are, much like TCD testing, influenced by a multiplicity of patient-specific and situational factors, and they may also be depicted using complex data as well as graphical waveforms.

209.    It is medically implausible that two different patients' results for VNG testing including VNG would consist of identical numerical data and/or waveforms. It is impossible that this would happen again and again in the Defendants' reports.  Nonetheless, in multiple instances, reports submitted in support of billing by these Defendants simply copied and pasted data and/or waveforms from a report that had previously been used for another patient.

210.    For example, Allstate received purported VNG testing reports of the provider Defendant Hillside as to patient K.B., claim number 0608423315, for date of service December

30, 2020; and provider Defendant Sanitas as to patient J.H., claim number 0638855627, for date of service September 17, 2021. As shown below, the "Vestibular Exam Data" for these two patients – patient J.H. (left), and patient K.B. (right) – are identical:

J.H.                                        K.B.



| | NS-EO | NS-EC | PS-EO | PS-EC |
|---|---|---|---|---|
| Anterior-Posterior CoP excursion (in) | 0.18 | 0.21 | 0.47 | 0.38 |
| Lateral CoP Excursion (in) | 0.13 | 0.13 | 0.23 | 0.71 |
| Direction of Max Instability (deg) | -10 (left) | -17 (left) | 16 (right) | 82 (right) |
| Max CoP excursion (in) | 0.18 | 0.21 | 0.49 | 0.72 |
| Min CoP excursion (in) | 0.13 | 0.19 | 0.19 | 0.37 |
| Min/Max CoP Excursion Ratio | 0.72 | 0.54 | 0.38 | 0.52 |
| Max Standard Stability Used | 4% | 5% | 11% | 17% |
| Min Standard Stability Used | 3% | 2% | 4% | 9% |
| Stability Score | 95% | 94% | 88% | 82% |
| Age Matched Average Score | 93% | 91% | 88% | 79% |
| 2 SD Less | 92% | 90% | 86% | 76% |
| 3 SD Less | 91% | 89% | 85% | 75% |

78





















 

When one is superimposed over the other, the results are the following:



| | NS-EO | NS-EC | PS-EO | PS-EC |
|---|---|---|---|---|
| Anterior-Posterior CoP excursion (in) | 0.18 | 0.21 | 0.47 | 0.58 |
| Lateral CoP Excursion (in) | 0.13 | 0.13 | 0.23 | 0.71 |
| Direction of Max Instability (deg) | -10 (left) | -17 (left) | 16 (right) | 82 (right) |
| Max CoP excursion (in) | 0.18 | 0.21 | 0.49 | 0.72 |
| Min CoP excursion (in) | 0.13 | 0.12 | 0.19 | 0.37 |
| Min/Max CoP Excursion Ratio | 0.72 | 0.54 | 0.38 | 0.52 |
| Max Standard Stability Used | 4% | 5% | 11% | 17% |
| Min Standard Stability Used | 3% | 2% | 4% | 9% |
| Stability Score | 95% | 94% | 88% | 82% |
| Age Matched Average Score | 93% | 91% | 88% | 79% |
| 2 SD Less | 92% | 90% | 86% | 76% |
| 3 SD Less | 91% | 89% | 85% | 75% |

| OCULOMOTOR TESTS | | | COMMENTS |
|---|---|---|---|
| | Gain | Phase | |
| TRACKING ( .4 Hz) | 79% | 18 | |
| TRACKING ( 2 Hz) | 79% | -8 | |
| | Peak Velocity | Delay | |
| SACCADES (35 deg.) | 445 | 28D | |
| | Rightward | Leftward | |
| OPK (20 deg/sec) | 10L | 10R | |
| | Horizontal | Vertical | |
| SPONTANEOUS | 0 | 0 | |
| SPONT w/Fix | 0 | 1D | |
| | | | |
| GAZE LEFT | 0 | 0 | |
| GAZE RIGHT | 0 | 0 | |
| GAZE UP | 0 | 0 | |
| GAZE DOWN | 0 | 0 | |
| | Normal | Abnormal | |
| TORSION SWING | | | |
| TORSION SWING w/Fix | | | |

| POSITIONAL TESTS | | | COMMENTS |
|---|---|---|---|
| | Horizontal | Vertical | |
| HALLPIKE Left | 0 | 0 | |
| HALLPIKE Right | 0 | 0 | |
| | | | |
| SUPINE HEAD Center | 1L | 1U | |
| SUPINE HEAD Left | 0 | 0 | |
| SUPINE HEAD Right | 0 | 0 | |
| | | | |
| SUPINE BODY Left | | | |
| SUPINE BODY Right | | | |

| BITHERMAL CALORICS | | | COMMENTS |
|---|---|---|---|
| Calorics are Offset | | | |
| | Warm | Cool | |
| LEFT IRRIGATION | 15L | 15R | |
| RIGHT IRRIGATION | 17R | 15L | |
| | | | |
| Unilateral Weakness   4%L | | Dir. Preponderance   15P | Unilateral Weakness <25%  Dir. Preponderance <25% |





83













Such a match is impossible. Yet, the Defendants had numerous such matches.

211.    Allstate received purported VNG testing reports of the provider Defendant Seneca as to patient N.C., claim number 0645021056, for date of service November 15, 2021; and provider Defendant Sanitas as to patient E.A., claim number 0645654179, for date of service October 27, 2021. As shown below, the "Vestibular Exam Data" for these two patients – patient N.C. (left) and patient E.A. (right) – are identical:

N.C.                                                E.A.



































When one is superimposed over the other, the results are the following:





















Such a match is impossible. Yet, the Defendants had numerous such matches.

212.    Allstate received purported VNG testing reports of the provider Defendant Lifeline as to patient A.S., claim number 0617680814, for date of service April 21, 2021; and a non-party provider as to patient J.A., claim number 0650522055, for date of service November 18, 2021. As shown below, the "Vestibular Exam Data" for these two patients – patient A.S. (left) and patient J.A. (right) – are identical:

93

A.S.                          J.A.

**A.S.**

| OCULOMOTOR TESTS | | | COMMENTS |
|---|---|---|---|
| | Gain | Phase | |
| TRACKING ( .4 Hz) | 78% | 18 | |
| TRACKING ( .2 Hz) | 84% | 5 | |
| | Peak Velocity | Delay | |
| SACCADES (30 deg.) | 541 | .266 | |
| OPK (20 deg/sec) | Rightward | Leftward | |
| | 16L | 15R | |
| | Horizontal | Vertical | |
| SPONTANEOUS | 1R | 0 | |
| SPONT.w/Fix | 0 | 0 | |
| GAZE LEFT | 1L | 0 | |
| GAZE RIGHT | 1L | 0 | |
| GAZE UP | 1L | 0 | |
| GAZE DOWN | 0 | 0 | |
| | Normal | Abnormal | |
| TORSION SWING | [x] | | |
| TORSION SWING w/Fix | [x] | | |

| POSITIONAL TESTS | | | COMMENTS |
|---|---|---|---|
| | Horizontal | Vertical | |
| HALLPIKE Left | 0 | 1U | |
| HALLPIKE Right | 0 | 1U | |
| SUPINE HEAD Center | 1L | 0 | |
| SUPINE HEAD Left | 0 | 0 | |
| SUPINE HEAD Right | 0 | 0 | |
| SUPINE BODY Left | 0 | 0 | |
| SUPINE BODY Right | 0 | 0 | |

| BITHERMAL CALORICS | | | COMMENTS |
|---|---|---|---|
| | Calorics are Offset | | |
| | Warm | Cool | |
| LEFT IRRIGATION | 8L | 4R | |
| RIGHT IRRIGATION | 5R | 7L | |
| Unilateral Weakness   4%L | | Unilateral Weakness <25% | |
| | | Dir. Preponderance 21%L | Dir. Preponderance <25% |

**J.A.**

| OCULOMOTOR TESTS | | | COMMENTS |
|---|---|---|---|
| | Gain | Phase | |
| TRACKING ( .4 Hz) | 78% | 18 | |
| TRACKING ( .2 Hz) | 84% | 5 | |
| | Peak Velocity | Delay | |
| SACCADES (30 deg.) | 541 | .266 | |
| OPK (20 deg/sec) | Rightward | Leftward | |
| | 16L | 15R | |
| | Horizontal | Vertical | |
| SPONTANEOUS | 1R | 0 | |
| SPONT.w/Fix | 0 | 0 | |
| GAZE LEFT | 1L | 0 | |
| GAZE RIGHT | 1L | 0 | |
| GAZE UP | 1L | 0 | |
| GAZE DOWN | 0 | 0 | |
| | Normal | Abnormal | |
| TORSION SWING | [x] | | |
| TORSION SWING w/Fix | [x] | | |

| POSITIONAL TESTS | | | COMMENTS |
|---|---|---|---|
| | Horizontal | Vertical | |
| HALLPIKE Left | 0 | 1U | |
| HALLPIKE Right | 0 | 1U | |
| SUPINE HEAD Center | 1L | 0 | |
| SUPINE HEAD Left | 0 | 0 | |
| SUPINE HEAD Right | 0 | 0 | |
| SUPINE BODY Left | 0 | 0 | |
| SUPINE BODY Right | 0 | 0 | |

| BITHERMAL CALORICS | | | COMMENTS |
|---|---|---|---|
| | Calorics are Offset | | |
| | Warm | Cool | |
| LEFT IRRIGATION | 8L | 4R | |
| RIGHT IRRIGATION | 5R | 7L | |
| Unilateral Weakness   4%L | | Unilateral Weakness <25% | |
| | | Dir. Preponderance 21%L | Dir. Preponderance <25% |




















 

When one is superimposed over the other, the results are the following:



| OCULOMOTOR TESTS | | | COMMENTS |
|---|---|---|---|
| | Gain | Phase | |
| TRACKING (.4 Hz) | 78% | 18 | |
| TRACKING (.2 Hz) | 84% | 5 | |
| | Peak Velocity | Delay | |
| SACCADES (20 deg.) | 541 | .266 | |
| | Rightward | Leftward | |
| OPK (20 deg/sec) | 18L | 15R | |
| | Horizontal | Vertical | |
| SPONTANEOUS | 1R | 0 | |
| SPONT w/Fix | 0 | 0 | |
| GAZE LEFT | 1L | 0 | |
| GAZE RIGHT | 1L | 0 | |
| GAZE UP | 1L | 0 | |
| GAZE DOWN | 0 | 0 | |
| | Normal | Abnormal | |
| TORSION SWING | [x] | [ ] | |
| TORSION SWING w/Fix | [x] | [ ] | |

| POSITIONAL TESTS | | | COMMENTS |
|---|---|---|---|
| | Horizontal | Vertical | |
| HALLPIKE Left | 0 | 1U | |
| HALLPIKE Right | 0 | 1U | |
| SUPINE HEAD Center | 1L | 0 | |
| SUPINE HEAD Left | 0 | 0 | |
| SUPINE HEAD Right | 0 | 0 | |
| SUPINE BODY Left | 0 | 0 | |
| SUPINE BODY Right | 0 | 0 | |

| BITHERMAL CALORICS | | | COMMENTS |
|---|---|---|---|
| Calorics are Offset | | | |
| | Warm | Cool | |
| LEFT IRRIGATION | 8L | 4R | |
| RIGHT IRRIGATION | 5R | 7L | |
| Unilateral Weakness   4%L   Dir. Preponderance 21%L | | Unilateral Weakness <25% Dir. Preponderance <25% | |

















Such a match is impossible. Yet, the Defendants had numerous such matches.

213.    Allstate received purported VNG testing reports of the provider Defendant Direct Med as to patient D.T., claim number 0619832602, for date of service March 25, 2021; and non-party provider Well Care Neurology, PLLC as to patient Y.T., claim number 0619618167, for date of service April 15, 2021. As shown below, the "Vestibular Exam Data" for these two patients – patient D.T. (left) and patient Y.T. (right) – are identical:

D.T.                                    Y.T.















102













103

When one is superimposed over the other, the results are the following:













Such a match is impossible. Yet, the Defendants had numerous such matches.

214.    Allstate received purported VNG testing reports of the provider Defendant Lifeline as to patient A.G., claim number 0607715558, for date of service December 2, 2020; a non-party provider as to patient I.S., claim number 0649551046, for date of service December 9, 2021; and provider Defendant Wilson as to patient M.L., claim number 0621002988, for date of service April 13, 2021. As shown below, the "Vestibular Exam Data" for these three patients – patient A.G. (left), patient I.S. (center), and patient M.L. (right) – are identical:

106

A.G.                         I.S.                         M.L.
















When one is superimposed over the other, the results are the following:

















Such a match is impossible. Yet, the Defendants had numerous such matches.

215.    Allstate received purported VNG testing reports of the provider Defendant Sanitas as to patient J.H., claim number 0638855627, for date of service September 17, 2021; and provider

112

Defendant Diag Neuro as to patient K.J., claim number 0662880343, for date of service March 24, 2022. As shown below, the "Vestibular Exam Data" for these two patients – patient J.H. (left) and patient K.J. (right) – are identical:

J.H.                                                    K.J.

















114













When one is superimposed over the other, the results are the following:









117





118

Such a match is impossible. Yet, the Defendants had numerous such matches.

216.     Allstate received purported VNG testing reports of the provider Defendant Green Power as to patient C.H., claim number 0648730414, for date of service November 16, 2021; and as to patient O.W., claim number 0648173466, for date of service December 7, 2021. As shown below, the "Vestibular Exam Data" for these two patients – patient C.H. (left) and patient O.W. (right) – are identical:

C.H.                                                    O.W.

When one is superimposed over the other, the results are the following:

















Such a match is impossible. Yet, the Defendants had numerous such matches.

217.    Allstate received purported VNG testing reports of the provider Defendant Hillside as to patient K.B., claim number 0608423315, for date of service December 30, 2020; and provider Defendant Diag Neuro as to patient K.J., claim number 0662880343, for date of service March 24, 2022. As shown below, the "Vestibular Exam Data" for these two patients – patient K.B. (left) and patient K.J. (right) – are identical:

## K.B.

| SACCADES (30 deg.) | Peak Velocity 445 | Delay 283 | |
|---|---|---|---|
| OPK (20 deg/sec) | Rightward 12L | Leftward 10R | |
| SPONTANEOUS | Horizontal 0 | Vertical 0 | |
| SPONT.w/Fix | 0 | 1D | |
| GAZE LEFT | 0 | 0 | |
| GAZE RIGHT | 0 | 0 | |
| GAZE UP | 0 | 0 | |
| GAZE DOWN | 0 | 0 | |
| | Normal | Abnormal | |
| TORSION SWING | | | |
| TORSION SWING w/Fix | | | |

| POSITIONAL TESTS | | | COMMENTS |
|---|---|---|---|
| | Horizontal | Vertical | |
| HALLPIKE Left | 0 | 0 | |
| HALLPIKE Right | 0 | 0 | |
| SUPINE HEAD Center | 1L | 1U | |
| SUPINE HEAD Left | 0 | 0 | |
| SUPINE HEAD Right | 0 | 0 | |
| SUPINE BODY Left | | | |
| SUPINE BODY Right | | | |

| BITHERMAL CALORICS Calorics are Offset | | | COMMENTS |
|---|---|---|---|
| | Warm | Cool | |
| LEFT IRRIGATION | 15L | 15R | |
| RIGHT IRRIGATION | 17R | 15L | |
| Unilateral Weakness 4%L | Dir. Preponderance 1%R | Unilateral Weakness <25% | Dir. Preponderance <25% |



## K.J.

| SACCADES (30 deg.) | Peak Velocity 445 | Delay 283 | |
|---|---|---|---|
| OPK (20 deg/sec) | Rightward 12L | Leftward 10R | |
| SPONTANEOUS | Horizontal 0 | Vertical 0 | |
| SPONT.w/Fix | 0 | 1D | |
| GAZE LEFT | 0 | 0 | |
| GAZE RIGHT | 0 | 0 | |
| GAZE UP | 0 | 0 | |
| GAZE DOWN | 0 | 0 | |
| | Normal | Abnormal | |
| TORSION SWING | | | |
| TORSION SWING w/Fix | | | |

| POSITIONAL TESTS | | | COMMENTS |
|---|---|---|---|
| | Horizontal | Vertical | |
| HALLPIKE Left | 0 | 0 | |
| HALLPIKE Right | 0 | 0 | |
| SUPINE HEAD Center | 1L | 1U | |
| SUPINE HEAD Left | 0 | 0 | |
| SUPINE HEAD Right | 0 | 0 | |
| SUPINE BODY Left | | | |
| SUPINE BODY Right | | | |

| BITHERMAL CALORICS Calorics are Offset | | | COMMENTS |
|---|---|---|---|
| | Warm | Cool | |
| LEFT IRRIGATION | 15L | 15R | |
| RIGHT IRRIGATION | 17R | 15L | |
| Unilateral Weakness 4%L | Dir. Preponderance 1%R | Unilateral Weakness <25% | Dir. Preponderance <35% |



























When one is superimposed over the other, the results are the following:















Such a match is impossible. Yet, the Defendants had numerous such matches.

218.    Allstate received purported VNG testing reports of the non-party provider Well Care Neurology, PLLC as to patient A.J., claim number 0613121839, for date of service March 1, 2021; and provider Defendant Pitch as to patient D.J., claim number 0664670429, for date of

service April 26, 2022; and provider Defendant Wilson as to patient L.C., claim number 0621309961, for date of service April 13, 2021. As shown below, the "Vestibular Exam Data" for these three patients – patient A.J. (left), patient D.J. (center), and patient L.C. (right) – are identical:

A.J.                                D.J.                                L.C.





















  

  

When one is superimposed over the other, the results are the following:











142





Such a match is impossible. Yet, the Defendants had numerous such matches.

219.    Allstate received purported VNG testing reports of the provider Defendant Hillside as to patient R.R., claim number 0597707470, for date of service November 30, 2020; and provider Defendant 334 Grand as to patient W.O., claim number 0699103115, for date of service

143

February 28, 2023. As shown below, the "Vestibular Exam Data" for these two patients – patient

R.R. (left) and patient W.O. (right) – are identical:

R.R.                 W.O.





When one is superimposed over the other, the results are the following:



Such a match is impossible. Yet, the Defendants had numerous such matches.

220.    Allstate received purported VNG testing reports of the provider Defendant Pitch as to patient R.B., claim number 0666580030, for date of service April 26, 2022; and a non-party provider as to patient I.S., claim number 0649551046, for date of service December 9, 2021. As shown below, the "Vestibular Exam Data" for these two patients – patient R.B. (left) and patient I.S. (right) – are identical:

R.B.                                        I.S.

          

146

| | | | | |
|---|---|---|---|---|
| Anterior-Posterior CoP excursion (in) | 0.50 | 0.60 | 0.39 | 0.78 |
| Lateral CoP Excursion (in) | 0.40 | 0.32 | 0.47 | 0.55 |
| Direction of Max Instability (deg) | -23 (left) | -4 (left) | 83 (right) | -3 (left) |
| Max CoP excursion (in) | 0.52 | 0.60 | 0.47 | 0.78 |
| Min CoP excursion (in) | 0.38 | 0.31 | 0.39 | 0.55 |
| Min/Max CoP Excursion Ratio | 0.72 | 0.52 | 0.82 | 0.71 |
| Max Standard Stability Used | 11% | 13% | 10% | 17% |
| Min Standard Stability Used | 8% | 7% | 8% | 12% |
| Stability Score | 90% | 88% | 88% | 82% |
| Age Matched Average Score | 93% | 91% | 88% | 79% |
| 2 SD Less | 92% | 90% | 86% | 76% |
| 3 SD Less | 91% | 89% | 85% | 75% |

| | | | | |
|---|---|---|---|---|
| Anterior-Posterior CoP excursion (in) | 0.50 | 0.60 | 0.39 | 0.78 |
| Lateral CoP Excursion (in) | 0.40 | 0.32 | 0.47 | 0.55 |
| Direction of Max Instability (deg) | -23 (left) | -4 (left) | 83 (right) | -3 (left) |
| Max CoP excursion (in) | 0.52 | 0.60 | 0.47 | 0.78 |
| Min CoP excursion (in) | 0.38 | 0.31 | 0.39 | 0.55 |
| Min/Max CoP Excursion Ratio | 0.72 | 0.52 | 0.82 | 0.71 |
| Max Standard Stability Used | 11% | 13% | 10% | 17% |
| Min Standard Stability Used | 8% | 7% | 8% | 12% |
| Stability Score | | | 89% | 82% |
| Age Matched Average Score | 93% | 91% | 88% | 79% |
| 2 SD Less | 92% | 90% | 88% | 76% |
| 3 SD Less | 91% | 89% | 85% | 75% |

### OCULOMOTOR TESTS / COMMENTS

| | Gain | Phase |
|---|---|---|
| TRACKING .4 Hz | 100% | 2 |
| TRACKING .2 Hz | 100% | -1 |
| | Peak Velocity | Delay |
| SACCADES 30 deg. | 342 | .350 |
| | Rightward | Leftward |
| OPK 20 deg/sec | 8L | 13R |
| | Horizontal | Vertical |
| SPONTANEOUS | 0 | 0 |
| SPONT.w/Fix | 0 | 0 |
| GAZE LEFT | 0 | 0 |
| GAZE RIGHT | 0 | 0 |
| GAZE UP | 0 | 0 |
| GAZE DOWN | 0 | 0 |
| | Normal | Abnormal |
| TORSION SWING | [x] | [ ] |
| TORSION SWING w/Fix | [x] | [ ] |

### POSITIONAL TESTS / COMMENTS

| | Horizontal | Vertical |
|---|---|---|
| HALLPIKE Left | 0 | 0 |
| HALLPIKE Right | 0 | 0 |
| SUPINE HEAD Center | 0 | 0 |
| SUPINE HEAD Left | 0 | 0 |
| SUPINE HEAD Right | 0 | 0 |
| SUPINE BODY Left | 0 | 0 |
| SUPINE BODY Right | 0 | 0 |

### BITHERMAL CALORICS
Calorics are Offset / COMMENTS

| | Warm | Cool |
|---|---|---|
| LEFT IRRIGATION | 10L | 9R |
| RIGHT IRRIGATION | 7R | 11L |

Unilateral Weakness  2%R   Dir. Preponderance 13%L   Unilateral Weakness <25%  Dir. Preponderance <25%

### OCULOMOTOR TESTS / COMMENTS

| | Gain | Phase |
|---|---|---|
| TRACKING .4 Hz | 100% | 2 |
| TRACKING .2 Hz | 100% | -1 |
| | Peak Velocity | Delay |
| SACCADES 30 deg. | 342 | .350 |
| | Rightward | Leftward |
| OPK 20 deg/sec | 8L | 13R |
| | Horizontal | Vertical |
| SPONTANEOUS | 0 | 0 |
| SPONT.w/Fix | 0 | 0 |
| GAZE LEFT | 0 | 0 |
| GAZE RIGHT | 0 | 0 |
| GAZE UP | 0 | 0 |
| GAZE DOWN | 0 | 0 |
| | Normal | Abnormal |
| TORSION SWING | [x] | [ ] |
| TORSION SWING w/Fix | [x] | [ ] |

### POSITIONAL TESTS / COMMENTS

| | Horizontal | Vertical |
|---|---|---|
| HALLPIKE Left | 0 | 0 |
| HALLPIKE Right | 0 | 0 |
| SUPINE HEAD Center | 0 | 0 |
| SUPINE HEAD Left | 0 | 0 |
| SUPINE HEAD Right | 0 | 0 |
| SUPINE BODY Left | 0 | 0 |
| SUPINE BODY Right | 0 | 0 |

### BITHERMAL CALORICS
Calorics are Offset / COMMENTS

| | Warm | Cool |
|---|---|---|
| LEFT IRRIGATION | 10L | 9R |
| RIGHT IRRIGATION | 7R | 11L |

Unilateral Weakness  2%R   Dir. Preponderance 13%L   Unilateral Weakness <25%  Dir. Preponderance <25%

147

































When one is superimposed over the other, the results are the following:



| Anterior-Posterior CoP excursion (in) | 0.50 | 0.60 | 0.39 | 0.78 |
|---|---|---|---|---|
| Lateral CoP Excursion (in) | 0.40 | 0.32 | 0.47 | 0.55 |
| Direction of Max Instability (deg) | -23 (left) | -4 (left) | 83 (right) | -3 (left) |
| Max CoP excursion (in) | 0.52 | 0.60 | 0.47 | 0.78 |
| Min CoP excursion (in) | 0.38 | 0.31 | 0.39 | 0.55 |
| Min/Max CoP Excursion Ratio | 0.72 | 0.52 | 0.82 | 0.71 |
| Max Standard Stability Used | 11% | 13% | 10% | 17% |
| Min Standard Stability Used | 8% | 7% | 8% | 12% |
| Stability Score | 88% | 87% | 89% | 82% |
| Age Matched Average Score | 93% | 91% | 88% | 79% |
| 2 SD Less | 92% | 90% | 86% | 78% |
| 3 SD Less | 91% | 89% | 85% | 75% |

152

| OCULOMOTOR TESTS | | | COMMENTS |
|---|---|---|---|
| | Gain | Phase | |
| TRACKING .4 Hz | 106% | 2 | |
| TRACKING .2 Hz | 105% | -1 | |
| | Peak Velocity | Delay | |
| SACCADES 30 deg. | 342 | .350 | |
| | Rightward | Leftward | |
| OPK 20 deg/sec | 8L | 13R | |
| | Horizontal | Vertical | |
| SPONTANEOUS | 0 | 0 | |
| SPONT.w/Fix | 0 | 0 | |
| GAZE LEFT | 0 | 0 | |
| GAZE RIGHT | 0 | 0 | |
| GAZE UP | 0 | 0 | |
| GAZE DOWN | 0 | 0 | |
| | Normal | Abnormal | |
| TORSION SWING | [x] | [ ] | |
| TORSION SWING w/Fix | [x] | | |

| POSITIONAL TESTS | | | COMMENTS |
|---|---|---|---|
| | Horizontal | Vertical | |
| HALLPIKE Left | 0 | 0 | |
| HALLPIKE Right | 0 | 0 | |
| SUPINE HEAD Center | 0 | 0 | |
| SUPINE HEAD Left | 0 | 0 | |
| SUPINE HEAD Right | 0 | 0 | |
| SUPINE BODY Left | 0 | 0 | |
| SUPINE BODY Right | 0 | 0 | |

| BITHERMAL CALORICS | | | COMMENTS |
|---|---|---|---|
| Calorics are Offset | | | |
| | Warm | Cool | |
| LEFT IRRIGATION | 10L | 9R | |
| RIGHT IRRIGATION | 7R | 11L | |
| Unilateral Weakness  2%R | Dir. Preponderance 13%L | | Unilateral Weakness <25%  Dir. Preponderance <25% |

















Such a match is impossible. Yet, the Defendants had numerous such matches.

221.    Allstate received purported VNG testing reports of the provider Defendant Pitch as to patient C.Q., claim number 0660810144, for date of service April 6, 2022; provider Defendant Sanitas as to patient D.S., claim number 0651143315, for date of service December 14, 2021; and provider Defendant Pitch as to patient M.S., claim number 0663307866, for date of service April 4, 2022. As shown below, the "Vestibular Exam Data" for these three patients – patient C.Q. (left), patient D.S., and patient M.S. (right) – are identical:

C.Q.       D.S.       M.S.



| | | | | |
|---|---|---|---|---|
| Anterior-Posterior CoP excursion (in) | 0.41 | 0.59 | 0.48 | 0.69 |
| Lateral CoP Excursion (in) | 0.23 | 0.17 | 0.36 | 0.54 |
| Direction of Max Instability (deg) | -5 (left) | -7 (left) | -30 (left) | -30 (left) |
| Max CoP excursion (in) | 0.41 | 0.60 | 0.53 | 0.75 |
| Min CoP excursion (in) | 0.23 | 0.15 | 0.28 | 0.45 |
| Min/Max CoP Excursion Ratio | 0.57 | 0.25 | 0.54 | 0.60 |
| Max Standard Stability Used | 10% | 15% | 13% | 19% |
| Min Standard Stability Used | 6% | 3% | 7% | 11% |
| Stability Score | | | | |
| Age Matched Average Score | 91% | 91% | 86% | 78% |
| 2 SD Less | 91% | 89% | 84% | 74% |
| 3 SD Less | 90% | 89% | 84% | 72% |

When one is superimposed over the other, the results are the following:



Such a match is impossible. Yet, the Defendants had numerous such matches.



222.    Allstate received purported VNG testing reports of the provider Defendant Pitch as to patient C.D., claim number 0657624722, for date of service April 11, 2022; and as to patient C.Q., claim number 0660810144, for date of service April 6, 2022; and provider Defendant Direct Med as to patient G.C., claim number 0609600209, for date of service January 12, 2021. As shown below, the "Vestibular Exam Data" for these three patients – patient C.D. (left), patient C.Q. (center), and patient G.C. (right) – are identical:

| C.D. | C.Q. | G.C. |
|------|------|------|





















  

When one is superimposed over the other, the results are the following:

















Such a match is impossible. Yet, the Defendants had numerous such matches.

## VI.     **The Defendants' Fraudulent Scheme to Bill for SSR Testing**

223.     The provider Defendants – Interventional, BLK, Refuah, Sinai, Diag Neuro, Greenwood, and Regal, assisted by lay person individuals and entities – have generated fraudulent No-Fault billing for purportedly providing their patients with Sympathetic Skin Response (SSR) studies.

224.     SSR is most frequently used in diagnosing the functional impairment of non-myelinated postganglionic sudomotor sympathetic fibers in peripheral neuropathies. The SSR is the potential generated by sweat in response to different stimuli. This potential has a waveform that habituates with closely repeated stimuli and a latency of 1.3-1.5 s at the hand and 1.9-2.1 s at the foot. It has been used to study the peripheral sympathetic system in peripheral nerve diseases. The SSR is a slow wave resulting from activation of the sudomotor sympathetic efferent fibers. Records are usually made with surface electrodes on hand or foot after the electrical stimulation.

Either the amplitude or the latency of the response varies greatly on consecutive stimulations and there is also a remarkable tendency to habituation.

225.    As billed for on behalf of these Defendants, however, the SSR was performed either improperly or not at all, and these Defendants routinely billed for SSR as allegedly provided to patients who were not otherwise documented as presenting with any indications for the SSR.

226.    SSR was performed, if at all, not by the physicians indicated on the reports, but instead by unqualified lay persons. The Defendant providers 334 Grand, BLK, Diag Neuro, Greenwood, Healthcare Med, Interventional, Refuah, Regal, and Sinai did not properly administer such testing, and the test results were routinely fabricated.

227.    These Defendants used a identical diagnostic codes and descriptions for numerous patients. Numerous bills from Interventional, Diag Neuro, Greenwood, BLK, Refuah, Sinai, and Regal used the same diagnoses.  The actual conditions, diagnoses and medical needs of the patients made no difference to the Defendants billing for SSR.  Their individual conditions, diagnoses and medical needs were ignored by these Defendants who placed profits from their fraudulent scheme above the interest of the patients.

228.    These Defendants repeatedly submitted fraudulent claims concerning the patients' conditions, diagnoses and needs and concerning the testing.  The bills and reports fabricated the diagnoses, the testing administered and the results.  Again and again there were matches of test data for different patients between the Defendants in this scheme.  The same codes were repeatedly billed.  Multiple bills had the same exact complaints word for word from one patient and from one provider to another.   Wave forms, which are invariably different from one test to another, were exact duplicates from one patient to another.  The exact duplicates evince both the fraudulent nature of the scheme and the interrelationship of the Defendants.

229.    On multiple SSR bills of Interventional, BLK, Refuah and Sinai, their patients were purportedly diagnosed again and again with the same conditions *verbatim*:

M54.5 Low Back Pain

R20.2 Paresthesis of Skin

230.    On multiple SSR bills of Interventional, Diag Neuro, BLK and Refuah and Sinai, patients are purportedly diagnosed again and again with the condition *verbatim*:

G60.0  Neuropathy, motor and sensory

231.    On some SSR bills of Greenwood and Regal, patients were diagnosed with the condition *verbatim*:

G609  Hereditary & idiopathic neuropathy

232.    Greenwood and Regal also diagnosed some of their patients with the condition *verbatim*:

G608  Other hereditary and idiopathic neuropathies

233.    Diag Neuro and Sinai also diagnosed their patients with the same conditions as the other Defendants with additional conditions *verbatim*

G60.0  Neuropathy, motor &  sensory

R:42   Dizziness

65.29  Carotid stenosis

234.    Diag Neuro and Refuah also diagnosed their patients with the same conditions as the other Defendants with additional conditions *verbatim*:

G60.9  Neuropathy, peripheral

R:42   Dizziness

G45.1  Carotid artery syndrome

235. The bills submitted on behalf of Defendants Interventional, Diag Neuro, BLK, Refuah and Sinai consisted of the same two charges under the same CPT codes, for the same services, and in the same total amount of $445.22.

236. The bills submitted on behalf of Defendants Interventional, Diag Neuro, BLK, Refuah and Sinai consisted of two separate bills for each paired providers for the same two charges under the same CPT codes, provided on the same patients at the same time. The treating provider on one bill is a lay person while the treating provider on the other bill is a physician with the same combined total amount of $445.22.

237. Defendant Regal charged the same one CPT code for providing services while Defendant Greenwood charged the same one CPT code for providing the physician services on the same patients at the same time. The treating provider on one bill is a lay person while the treating provider on the other bill is a physician with the same combined total amount of $224.61.

238. The bills submitted on behalf of Defendants Interventional and BLK consisted of the same two CPT codes for services provided to the same patient on the same date of service with both bills combined totaling the amount of $445.22. The bill submitted on behalf of Defendant BLK totaled the amount of $314.94 which consisted of the same two CPT codes, for the same services, on the same patient and date of service as that of Interventional but provided by a lay person. The bills submitted on behalf of provider Defendant Interventional totaled the amount of $130.28, and consisted of the same two CPT codes, for the same services, on the same patient and date of service as that of BLK but was allegedly provided by a medical doctor.

239. The bills submitted on behalf of Defendants Interventional and Refuah consisted of the same two CPT codes for services provided to the same patient on the same date of service with both bills combined totaling the amount of $445.22. The bill submitted on behalf of Defendant

Refuah totaled the amount of $314.94 which consisted of the same two CPT codes, for the same services, on the same patient and date of service as that of Interventional but provided by a lay person. The bills submitted on behalf of provider Defendant Interventional totaled the amount of $130.28, and consisted of the same two CPT codes, for the same services, on the same patient and date of service as that of Refuah but was allegedly provided by a medical doctor.

240.    The bills submitted on behalf of Defendants Interventional and Sinai consisted of the same two CPT codes for services provided to the same patient on the same date of service with both bills combined totaling the amount of $445.22. The bills submitted on behalf of Defendant Sinai totaled the amount of $314.94 which consisted of the same two CPT codes, for the same services, on the same patient and date of service as that of Interventional but provided by a lay person. The bills submitted on behalf of Defendant Interventional totaled the amount of $130.28, and consisted of the same two CPT codes, for the same services, on the same patient and date of service as that of Sinai but was allegedly provided by a medical doctor.

241.    The bills submitted on behalf of Defendants Diag Neuro and Sinai consisted of the same two CPT codes for services provided to the same patient on the same date of service with both bills combined totaling the amount of $445.22. The bills submitted on behalf of Defendant Sinai totaled the amount of $318.94 which consisted of the same two CPT codes, for the same services, on the same patient and date of service as that of Diag Neuro but provided by a technician. The bills submitted on behalf of provider Defendant Diag Neuro totaled the amount of $130.28, and consisted of the same two CPT codes, for the same services, on the same patient and date of service as that of Sinai but was allegedly provided by a medical doctor.

242.    The bills submitted on behalf of provider Defendants Diag Neuro and Refuah consisted of the same two CPT codes for services provided to the same patient on the same date

169

of service with both bills combined totaling the amount of $445.22. The bills submitted on behalf of Defendant Refuah totaled the amount of $318.94 which consisted of the same two CPT codes, for the same services, on the same patient and date of service as that of Diag Neuro but provided by a layperson. The bills submitted on behalf of provider Defendant Diag Neuro totaled the amount of $130.28, and consisted of the same two CPT codes, for the same services, on the same patient and date of service as that of Refuah but was allegedly provided by a medical doctor.

243.    The bills submitted on behalf of provider Defendants Greenwood and Regal consisted of the same one CPT codes for services provided to the same patient on the same date of service with both bills combined totaling the amount of $224.61. The bills submitted on behalf of Defendant Regal totaled the amount of $159.47 which consisted of the same one CPT code, for the same services, on the same patient and date of service as that of Greenwood but provided by a layperson. The bills submitted on behalf of provider Defendant Greenwood totaled the amount of $65.14, and consisted of the same one CPT code, for the same services, on the same patient and date of service as that of Regal but was allegedly provided by a medical doctor.

244.    Moreover, the bills for SSR mailed by or on behalf of these provider Defendants to Allstate routinely and falsely represented that the patients with the same conditions never previously had the same or similar conditions prior to the subject motor vehicle accident (MVA), and that such conditions were "solely a result of" the MVA.

245.    For example, on or about April 23, 2021, two separate bills were mailed by or on behalf of the provider Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient D. P. claim number 0617201966, in a clinic located at 9208 Liberty Ave., Jamaica, NY 11417 on March 30, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper

extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28.  The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

> M54.5  Low back pain
> R20.2   Paresthesis of skin

The bills represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

246.     On or about April 21, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK to Allstate for SSR testing purportedly provided by Interventional and BLK to patient A.S. claim number 0620911925, in a clinic located at 1568 Ralph Ave., Brooklyn, NY 11234 on April 14, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

> M54.5  Low back pain
> R20.2   Paresthesis of skin

The bills represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

247.    On or about August 17, 2021, two separate  bills were mailed on behalf of Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient J.T. claim number 0633120530, in a clinic located at 97-01 101st Ave, Jamaica, NY 11416 on July 26, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28.  The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

> M54.5  Low back pain
> R20.2   Paresthesis of skin

The bills represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

248.    On or about August 19, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK to Allstate for SSR testing purportedly provided by Interventional and BLK to patient V.L. claim number 0631462165, in a clinic located at 92-08 Jamaica Ave., Queens, NY 11421 on July 28, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94.  On the face of the bills, the patient is diagnosed with:

> M54.5  Low back pain
> R20.2   Paresthesis of skin

The bills represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

249.    On or about July 26, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK to Allstate for SSR testing purportedly provided by Interventional and BLK to patient Y.N. claim number 0628499401, in a clinic located at 9208 Liberty Ave., Woodhaven, NY 11421 on June 29, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94.  On the face of the bills, the patient is diagnosed with:

> M54.5  Low back pain
> R20.2   Paresthesis of skin

The bills represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

250.    On or about April 21, 2021, two separate bills were mailed by or on behalf of the provider Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient K.B. claim number 0615248341, in a clinic located at 9208 Liberty Ave., Jamaica, NY 11417 on April 13, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28.  The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity

and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

M54.5  Low back pain
R20.2  Paresthesis of skin

The bills represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

251.    On or about March 31, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and Refuah, respectively, to Allstate for SSR testing purportedly provided by Interventional and Refuah to patient T.J. claim number 0618829451, in a clinic located at 430 West Merrick Rd., Valley Stream, NY 11580 on March 24, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

M54.5  Low back pain
R20.2  Paresthesis of skin

The bills represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

252.    On or about March 4, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient N.A. claim number 0610835472, in a clinic located at 9208 Liberty Ave., Jamaica, NY 11417 on February 3, 2021. The bill of Interventional consists of two

174

charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

> M54.5  Low back pain
> R20.2   Paresthesis of skin

The bills represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

253.    On or about February 11, 2021, two separate bills were mailed by or on behalf of the provider Defendants Interventional and Refuah, respectively, to Allstate for SSR testing purportedly provided by Interventional and Refuah to patient C.M. claim number 978313547, in a clinic located at 4014 A Boston Rd., Bronx, NY 10475 on February 2, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

> M54.5  Low back pain
> R20.2   Paresthesis of skin

The bills represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

254.     On or about March 31, 2021, two separate bills were mailed by or on behalf of the provider Defendants Interventional and Refuah, respectively, to Allstate for SSR testing purportedly provided by Interventional and Refuah to patient H.B. claim number 0614955938, in a clinic located at 430 West Merrick Rd., Valley Stream, NY 11580 on March 24, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94.  On the face of the bills, the patient is diagnosed with:

> M54.5  Low back pain
> R20.2  Paresthesis of skin

The bills represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

255.     On or about April 9, 2021, two separate bills were mailed by or on behalf of the provider Defendants Interventional and Sinai, respectively, to Allstate for SSR testing purportedly provided by Interventional and Sinai to patient D.T., in a clinic located at 1975 Linden Blvd. Elmont, NY 11003 on March 25, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Sinai consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94.  On the face of the bills, the patient is diagnosed with:

M54.5  Low back pain
R20.2   Paresthesis of skin

The bills represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

256.    On or about March 30, 2021, two separate bills were mailed by or on behalf of the provider Defendants Interventional and Sinai, respectively, to Allstate for SSR testing purportedly provided by Interventional and Sinai to patient J.F. claim number 0614879732, in a clinic located at 1975 Linden Blvd. Elmont, NY 11003 on February 25, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Sinai consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94.  On the face of the bills, the patient is diagnosed with:

M54.5  Low back pain
R20.2   Paresthesis of skin

The bills represented that these conditions first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that these conditions resulted solely from the MVA.

257.    On or about April 1, 2022, two separate bills were mailed by or on behalf of the provider Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient K.J. claim number 0662880343, in a clinic located at 1568 Ralph Ave., Brooklyn, NY 11234 on March 24, 2022. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of

$130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94.  On the face of the bills, the patient is diagnosed with:

G60.0 Neuropathy Motor and Sensory

The bills represented that the condition first arose on the date of the subject MVA and that the condition resulted solely from the MVA.

258.    On or about September 2, 2022, two separate bills were mailed  by or on behalf of the provider Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient D.T.  claim number 0653548601, in a clinic located at 1568 Ralph Ave., Brooklyn, NY 11234 on March 24, 2022. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94.  On the face of the bills, the patient is diagnosed with:

G60.0 Neuropathy Motor and Sensory

The bills represented that the condition first arose on the date of the subject MVA and that the condition resulted solely from the MVA.

259.    On or about December 21, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient K.B. claim number 0651017196, in a clinic located at 1568 Ralph Ave., Brooklyn, NY 11234 on December 13, 2021. The bill of Interventional

178

consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94.  On the face of the bills, the patient is diagnosed with:

> G60.0 Neuropathy Motor and Sensory

The bills represented that the condition first arose on the date of the subject MVA and that the condition resulted solely from the MVA.

260.    On or about June 23, 2022, two separate bills were mailed by or on behalf of the Defendants Interventional and Refuah, respectively, to Allstate for SSR testing purportedly provided by Interventional and Refuah to patient N.G. claim number 0667212120, in a clinic located at 480 E. Jericho Turnpike, Huntington Station, NY 11746 on May 16, 2022. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94.  On the face of the bills, the patient is diagnosed with:

> G60.0 Neuropathy Motor and Sensory

The bills represented that the condition first arose on the date of the subject MVA and that the condition resulted solely from the MVA.

261.    On or about June 21, 2022, two separate bills were mailed by or on behalf of the Defendants Interventional and Refuah, respectively, to Allstate for SSR testing purportedly

provided by Interventional and Refuah to patient C.B., claim number 0671495710, in a clinic located at 4014 A. Boston Rd., Bronx, NY 10475 on June 8, 2022. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94.  On the face of the bills, the patient is diagnosed with:

> G60.0 Neuropathy Motor and Sensory

The bills represented that the condition first arose on the date of the subject MVA and that the condition resulted solely from the MVA.

262.    On or about September 16, 2022, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK to Allstate for SSR testing purportedly provided by Interventional and BLK to patient B.G. claim number is 0677715153, in a clinic located at 1568 Ralph Ave., Brooklyn, NY on August 31, 2022. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94.  On the face of the bills, the patient is diagnosed with:

> G60.0 Neuropathy Motor and Sensory

The bills represented that the condition first arose on the date of the subject MVA and that the condition resulted solely from the MVA.

263.    On or about February 8, 2023, two separate bills were mailed by or on behalf of the Defendants Diag Neuro and Refuah, respectively, to Allstate for SSR testing purportedly provided by Diag Neuro and Refuah to patient E.H. claim number 0691418859, in a clinic located at 31 Guy Lombardi Ave., Freeport, NY 11520 on January 23, 2023. The bill of Diag Neuro consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94.   On the face of the bills, the patient is diagnosed with:

G60.0 Neuropathy Motor and Sensory

The bills represented that the condition first arose on the date of the subject MVA and that the condition resulted solely from the MVA.

264.    On or about February 1, 2023, two separate bills were mailed by or on behalf of the Defendants Diag Neuro and Refuah to Allstate for SSR testing purportedly provided by Diag Neuro and Refuah to patient S.W. claim number 0677527947, in a clinic located at 409 Rockaway Ave., Brooklyn, NY 11212 on January 3, 2023. The bill of Diag Neuro consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94.  On the face of the bills, the patient is diagnosed with:

G60.9 Neuropathy peripheral
R42   Dizziness
G45.1  Carotid Artery Syndrome

181

The bills represented that these conditions first arose on the date of the subject MVA and that these conditions resulted solely from the MVA.

265.    On or about June 13, 2023, two separate bills were mailed by or on behalf of the Defendants Diag Neuro and Sinai, respectively, to Allstate for SSR testing purportedly provided by Diag Neuro and Sinai to patient M.L. claim number 0712759372, in a clinic located at 7945 Metropolitan Avenue, Flushing, NY 11379 on May 31, 2023.  The bill of Diag Neuro consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Sinai consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94.  On the face of the bills, the patient is diagnosed with:

> G60.0 Neuropathy motor and sensory
> R42    Dizziness
> G65.29  Carotid Stenosis

The bills represented that these conditions first arose on the date of the subject MVA and that these conditions resulted solely from the MVA.

266.    On or about March 7, 2022, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient F.A.J. claim number 0656468758, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on February 7, 2022. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923-26 for upper extremities, in the amount of $65.14.  The bill of Regal consists of one charge for SSR testing under CPT code 95923-TC for upper extremities, in the amount of $159.48. On the face of the bills, the patient is diagnosed with:

> G609  Hereditary and idiopathic neuropathy, un (sic)

The bills represented that the condition first arose on the date of the subject MVA, that the patient never previously had the same or similar condition, and that the condition resulted solely from the MVA.

267.    On or about March 7, 2022, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient F.A.J. claim number 0656468758, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on February 14, 2022. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923-26 for lower extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923-TC for upper extremities, in the amount of $159.48. On the face of the bills, the patient is diagnosed with:

> G609  Hereditary and idiopathic neuropathy, un (sic)

The bills represented that the condition first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that the condition resulted solely from the MVA.

268.    On or about May 12, 2022, two separate bills was mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient D.D. claim number 0622727989, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on April 18, 2022. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923:26 for the upper extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923-TC for upper extremities, in the amount of $159.48. On the face of the bills, the patient is diagnosed with:

> G609  Hereditary and idiopathic neuropathy, un (sic)

The bills represented that the condition first arose on the date of the subject MVA, that the patient never previously had the same or similar conditions, and that the condition resulted solely from the MVA.

269.    On or about June 13, 2022, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient D.D. claim number 0622727989, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on May 25, 2022.  The bill of Greenwood consists of one charge for SSR testing under CPT code 95923:26 for the lower extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923 TC for the lower extremities, in the amount of $159.47. On the face of the bills, the patient is diagnosed with:

G609  Hereditary and idiopathic neuropathy, un (sic)

The bills represented that the condition first arose on the date of the subject MVA, that the patient never previously had the same or similar condition, and that the conditions resulted solely from the MVA.

270.    On or about May 11, 2021, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient D.D. claim number 0622727989, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on April 28, 2021. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923 26 for the lower extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923 TC for the lower extremities, in the amount of $159.47. On the face of the bills, the patient is diagnosed with:

G608

No description of the code is written on the bill (HCFA form submitted no description of the code was written but a search for this code has the following description G60. 8 for Other hereditary and idiopathic neuropathies). The bills represented that the condition first arose on the date of the subject MVA.

271. On or about October 27, 2021, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient D.D. claim number 0622727989, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on September 13, 2021. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923 26 for the upper extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923 TC for the upper extremities, in the amount of $159.47. On the face of the bills, the patient is diagnosed with:

G608

No description of the code is written on the bill (HCFA form submitted no description of the code was written but a search for this code has the following description G60. 8 for Other hereditary and idiopathic neuropathies). The bills represented that the condition first arose on the date of the subject MVA.

272. On or about October 15, 2021, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient D.D. claim number 0622727989, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on September 29, 2022. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923 26 for the lower

extremities in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923 TC for lower extremities in the amount of $159.47. On the face of the bills, the patient is diagnosed with:

> G608

No description of the code is written on the bill (HCFA form submitted no description of the code was written but a search for this code has the following description G60. 8 for Other hereditary and idiopathic neuropathies)

273.    On or about December 22, 2021, two separate bills were mailed on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient D.D. claim number 0622727989, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on December 13, 2021. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923 26 for the upper extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923 TC for the upper extremities in the amount of $159.47. On the face of the bills, the patient is diagnosed with:

> G608

No description of the code is written on the bill (HCFA form submitted no description of the code, this code has been reported with the following description G60. 8 for Other hereditary and idiopathic neuropathies).  The bills represented that the condition first arose on the date of the subject MVA.

274.    In support of the fraudulent billing for SSR, phony reports were generated which purported to show each individual patient's testing results, including both numerical data and graphical waveforms. In many cases, the data and/or waveforms were copied and pasted from the

SSR report for another patient.  The data and/or waveforms were completely fraudulent as to the patients into whose reports they were included.

275.    For example, Allstate received purported SSR testing reports mailed to Allstate at or about the date of service by or on behalf of the provider Defendant Interventional as to patient D.P. claim number 0617201966, for date of service March 30, 2021; and as to patient E.G. claim number 0658598288, for date of service February 10, 2022.  The data and waveforms for the right hand SSR (Palm) are identical for patients D.P. and E.G.

276.    Identical waveforms were used for patients D.P. and E.G.  The graphics below show the right hand SSR (Palm) waveforms from the reports of patients D. P. and E. G.   The top waveforms are for D.P. and the bottom waveforms are for E.G.



277.    The graphics below show the right hand SSR Palm waveforms of patients D.P. and E.G are partially and fully superimposed.



278.    The SSR data tables from the SSR reports of the right hand for patients D.P. and E.G are identical. Such a match is impossible. Yet, the Defendant Interventional had multiple such matches.  The top data table is for D.P. and the bottom data table is for E.G.

| Site | NR | Onset (ms) | Norm Onset (ms) | O-P Amp (μV) | Norm O-P Amp |
|------|----|-----------|-----------------|--------------|--------------|
| Left Hand SSR (Palm) | | | | | |
| Trace1 | | *3460.9 | <1800 | *463.2 | >900 |
| Trace2 | | 1421.9 | | 773.2 | |
| **Right Hand SSR (Palm)** | | | | | |
| Trace1 | | *2695.3 | <1800 | 1128.5 | >900 |
| Trace2 | | 2781.3 | | 855.1 | |

| Site | NR | Onset (ms) | Norm Onset (ms) | O-P Amp (μV) | Norm O-P Amp |
|------|----|-----------|-----------------|--------------|--------------|
| Left Hand SSR (Palm) | | | | | |
| Trace1 | | 1421.9 | <1800 | *767.3 | >900 |
| Trace2 | | 3460.9 | | 462.3 | |
| **Right Hand SSR (Palm)** | | | | | |
| Trace1 | | *2695.3 | <1800 | 1128.5 | >900 |
| Trace2 | | 2781.3 | | 855.1 | |

279.    Allstate received purported SSR testing reports mailed to Allstate at or about the date of service by or on behalf of the provider Defendant Interventional as to patient E.C. claim number 0653131110-01, for date of service December 23, 2021; and as to patient A.F. claim number 0640242152-07, for date of service October 13, 2021. As shown below, the Onset data for

the right hand SSR (Palm) and waveforms for the right and left hand SSR (Palm) for patients E.

C. and A.F. are identical.

280.    The graphics below show the right and left hand SSR (Palm) waveforms from the

reports of patients E.C. and A.F.

281.    The graphics below show the right and left hand SSR (Palm) for patients E.G. and

A.F. are identical.  The top waveforms are for E.C. and the bottom waveforms are for A.F.





282.  The graphics below show how the right and left hand SSR (Palm) of patients E.C. and A.F. are partially and fully superimposed.



283.  SSR data tables from the SSR reports of the right hand SSR (Palm) of patients Eileen Clunie and Abigail Foster are identical.  The top data table is for E.C. and the bottom data table is for A.F.

| Site | NR | Onset (ms) | Norm Onset (ms) | O-P Amp (µV) | Norm O-P Amp |
|------|----|-----------|-----------------|--------------|--------------|
| Left Hand SSR (Palm) | | | | | |
| Trace1 | | 1304.7 | <1800 | *372.4 | >900 |
| Trace2 | | 1437.5 | | 349.5 | |
| Right Hand SSR (Palm) | | | | | |
| Trace1 | | 1359.4 | <1800 | *351.5 | >900 |
| Trace2 | | 1445.3 | | 437.7 | |

| Site | NR | Onset (ms) | Norm Onset (ms) | O-P Amp (µV) | Norm O-P Amp |
|------|----|-----------|-----------------|--------------|--------------|
| Left Hand SSR (Palm) | | | | | |
| Trace1 | | 1359.4 | <1800 | *366.7 | >900 |
| Trace2 | | 1429.7 | | 349.1 | |
| Right Hand SSR (Palm) | | | | | |
| Trace1 | | 1359.4 | <1800 | *352.9 | >900 |
| Trace2 | | 1445.3 | | 442.2 | |

Such a match is impossible. Yet, the Defendant Interventional had multiple such matches.

284.    In addition, the reports for multiple bills had the same exact complaints word for word from one patient and from one provider to another. The exact duplicates evince both the fraudulent nature of the scheme and the interrelationship of the Defendants.

285.    Further, even when the patients had different diagnoses, the reports for multiple bills had the same exact complaints word for word from one patient and from one provider to another.

286.    On multiple SSR reports of Interventional, Diag Neuro, Greenwood, BLK, Refuah, Sinai and Regal, their patients purportedly had the same complaints *verbatim*:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

287.    For example, on or about April 23, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient D. P. claim number 0617201966, in a clinic located at 9208 Liberty Ave., Jamaica, NY 11417 on March 30, 2021. The bill of Intervention consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

M54.5   Low back pain
R20.2    Paresthesis of skin

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

"…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

"…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

288.    On or about April 21, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient A.S. claim number 0620911925, in a clinic located at 1568 Ralph Ave., Brooklyn, NY 11234 on April 14, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

M54.5  Low back pain
R20.2  Paresthesis of skin

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

"…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

"…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

289.    On or about August 17, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient J.T. claim number 0633120530, in a clinic located at 97-01 101st Ave, Jamaica, NY 11416 on July 26, 2021. The bill of Interventional consists of two charges

for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower

extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists

of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code

95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of

$314.94. On the face of the bills, the patient is diagnosed with:

> M54.5  Low back pain
> R20.2   Paresthesis of skin

The SSR reports for the upper and lower extremities represented that the patient complained of the

following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

290.    On or about August 19, 2021, two separate bills were mailed by or on behalf of the

Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided

by Interventional and BLK to patient V.L. claim number 0631462165, in a clinic located at 92-08

Jamaica Ave., Queens, NY 11421 on July 28, 2021. The bill consists of two charges for SSR

testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity,

in the respective amounts of $65.14 each, for a total of $130.28. On the face of the bills, the patient

is diagnosed with:

> M54.5  Low back pain
> R20.2   Paresthesis of skin

The SSR reports for the upper and lower extremities represented that the patient complained of the

following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

"…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

291.    On or about July 26, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient Y.N. claim number 0628499401, in a clinic located at 9208 Liberty Ave., Woodhaven, NY 11421 on June 29, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

M54.5  Low back pain
R20.2   Paresthesis of skin

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

"…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

"…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

292.    On or about April 21, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient K.B. claim number 0615248341, in a clinic located at 9208 Liberty Ave., Jamaica, NY 11417 on April 13, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26

for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

> M54.5  Low back pain
> R20.2  Paresthesis of skin

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

293.    On or about March 31, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and Refuah, respectively, to Allstate for SSR testing purportedly provided by Interventional and Refuah to patient T.J. claim number 0618829451, in a clinic located at 430 West Merrick Rd., Valley Stream, NY 11580 on March 24, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

> M54.5  Low back pain
> R20.2   Paresthesis of skin

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

"…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

"…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

294.    On or about March 4, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient N.A. claim number 0610835472, in a clinic located at 9208 Liberty Ave., Jamaica, NY 11417 on February 3, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

M54.5  Low back pain
R20.2  Paresthesis of skin

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

"…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

"…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

295.    On or about February 11, 2021, two separate bills were mailed by or on behalf of the Defendant Interventional and Refuah, respectively, to Allstate for SSR testing purportedly provided by Interventional and Refuah to patient C.M. claim number 978313547, in a clinic located at 4014 A Boston Rd., Bronx, NY 10475 on February 2, 2021.  The bill of Interventional

197

consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94.  On the face of the bills, the patient is diagnosed with:

M54.5  Low back pain
R20.2   Paresthesis of skin

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

"…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

"…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

296.    On or about March 31, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and Refuah, respectively, to Allstate for SSR testing purportedly provided by Interventional and Refuah to patient H.B. claim number 0614955938, in a clinic located at 430 West Merrick Rd., Valley Stream, NY 11580 on March 24, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bill, the patient is diagnosed with:

M54.5  Low back pain
R20.2   Paresthesis of skin

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

297.    On or about April 9, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and Sinai, respectively, to Allstate for SSR testing purportedly provided by Interventional and Sinai to patient D.T., claim number 0619832602, in a clinic located at 1975 Linden Blvd. Elmont, NY 11003 on March 25, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Sinai consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

M54.5  Low back pain
R20.2  Paresthesis of skin

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

298.    On or about March 30, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and Sinai, respectively, to Allstate for SSR testing purportedly provided

by Interventional to patient J.F. claim number 0614879732, in a clinic located at 1975 Linden Blvd. Elmont, NY 11003 on February 25, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Sinai consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94. On the face of the bills, the patient is diagnosed with:

M54.5  Low back pain
R20.2   Paresthesis of skin

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

"…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

"…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

299.    On or about April 1, 2022, two separate bills were mailed by or on behalf of the provider Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient K.J. claim number 0662880343, in a clinic located at 1568 Ralph Ave., Brooklyn, NY 11234 on March 24, 2022. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94. On the face of the bills, the patient is diagnosed with:

G60.0 Neuropathy Motor and Sensory

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

300.    On or about September 2, 2022, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly provided by Interventional and BLK to patient D.T. claim number 0653548601, in a clinic located at 1568 Ralph Ave., Brooklyn, NY 11234 on March 24, 2022. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94. On the face of the bills, the patient is diagnosed with:

> G60.0 Neuropathy Motor and Sensory

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

301.    On or about December 21, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly

provided by Interventional and BLK to patient K.B. claim number 0651017196, in a clinic located at 1568 Ralph Ave., Brooklyn, NY 11234 on December 13, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94. On the face of the bills, the patient is diagnosed with:

> G60.0 Neuropathy Motor and Sensory

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

302.    On or about June 23, 2022, two separate bills were mailed by or on behalf of the Defendants Interventional and Refuah, respectively, to Allstate for SSR testing purportedly provided by Interventional and Refuah to patient N.G. claim number 0667212120, in a clinic located at 480 E. Jericho Turnpike, Huntington Station, NY 11746 on May 16, 2022.  The bill Interventional consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94On the face of the bill, the patient is diagnosed with:

G60.0 Neuropathy Motor and Sensory

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

"…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

"…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

303.    On or about June 21, 2022, two separate bills were mailed on behalf of the Defendants Interventional and Refuah, respectively, to Allstate for SSR testing purportedly provided by Interventional and Refuah to patient C.B., claim number 0671495710, in a clinic located at 4014 A. Boston Rd.,  Bronx, NY 10475 on June 8, 2022. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94 On the face of the bill, the patient is diagnosed with:

G60.0 Neuropathy Motor and Sensory

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

"…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

"…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

304.    On or about September 16, 2022, two separate bills were mailed by or on behalf of the Defendants Interventional and BLK, respectively, to Allstate for SSR testing purportedly

provided by Interventional and BLK to patient B.G. claim number is 0677715153, in a clinic located at 1568 Ralph Ave., Brooklyn, NY on August 31, 2022. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of BLK consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94. On the face of the bills, the patient is diagnosed with:

> G60.0 Neuropathy Motor and Sensory

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

305.    On or about February 8, 2023, two separate bills were mailed by or on behalf of the Defendants Diag Neuro and Refuah, respectively, to Allstate for SSR testing purportedly provided by Diag Neuro and Refuah to patient E.H. claim number 0691418859, in a clinic located at 31 Guy Lombardi Ave., Freeport, NY 11520 on January 23, 2023. The bill of Diag Neuro consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94. On the face of the bills, the patient is diagnosed with:

> G60.0 Neuropathy Motor and Sensory

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

306.    On or about February 1, 2023, two separate bills were mailed by or on behalf of the Defendants Diag Neuro and Refuah, respectivelyto Allstate for SSR testing purportedly provided by Diag Neuro and Refuah to patient S.W.  claim number 0677527947, in a clinic located at 409 Rockaway Ave., Brooklyn, NY 11212 on January 3, 2023. The bill of Diag Neuro consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Refuah  consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94. On the face of the bills, the patient is diagnosed with:

> G60.9 Neuropathy peripheral
> R42   Dizziness
> G45.1  Carotid Artery Syndrome

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

307.    On or about February 13, 2023, two separate bills were mailed by or on behalf of the Defendants Diag Neuro and Sinai, respectively, to Allstate for SSR testing purportedly

provided by Diag Neuro and Sinai to patient M.L. claim number 0712759372, in a clinic located at 7945 Metropolitan Avenue, Flushing, NY 11379 on May 31, 2023. The bill of Diag Neuro consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Sinai consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94. On the face of the bills, the patient is diagnosed with:

> G60.0 Neuropathy motor and sensory
> R42   Dizziness
> G65.29  Carotid Stenosis

The SSR reports for the upper and lower extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

308.    On or about March 7, 2022, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient J.F., claim number 0656468758, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on February 7, 2022. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923:26 for upper extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923:TC for upper extremities, in the amount of $159.48.  On the face of the bills, the patient is diagnosed with:

> G609  Hereditary and idiopathic neuropathy, un (sic)

206

The SSR report for the upper extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

309.    On or about March 7, 2022, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient J.F., claim number 0656468758, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on February 14, 2022.  The bill of Greenwood consists of one charge for SSR testing under CPT code 95923:26 for lower extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923:TC for lower extremities, in the amount of $159.48.   On the face of the bills, the patient is diagnosed with:

> G609  Hereditary and idiopathic neuropathy, un (sic)

The SSR report for the lower extremities represented that the patient complained of the following:

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

310.    On or about May 12, 2022, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient D.D. claim number 0622727989, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on April 18, 2022. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923:26 for upper extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923:TC for upper extremities, in the amount of $159.48.   On the face of the bill, the patient is diagnosed with:

> G609  Hereditary and idiopathic neuropathy, un (sic)

The SSR report for the upper extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

311.    On or about June 13, 2022, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood to patient D.D. claim number 0622727989, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on May 25, 2022. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923:26 for lower extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923:TC for lower extremities, in the amount of $159.48.   On the face of the bills, the patient is diagnosed with:

> G609  Hereditary and idiopathic neuropathy, un

The SSR report for the lower extremities represented that the patient complained of the following:

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

312.    On or about May 11, 2021, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient D.D. claim number 0622727989, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on April 28, 2021. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923:26 for lower extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923:TC for lower extremities, in the amount of $159.47.    On the face of the bill, the patient is diagnosed with:

> G608

No description of the code is written on the bill (HCFA form submitted no description of the code was written but a search for this code has the following description G60. 8 for Other hereditary and idiopathic neuropathies)

The SSR report for the lower extremities represented that the patient complained of the following:

> "…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

313.    On or about October 27, 2021, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient D.D. claim number 0622727989, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on September 13, 2021. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923:26 for upper extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923:TC for upper extremities, in the amount of $159.47.    On the face of the bill, the patient is diagnosed with:

G608

No description of the code is written on the bill. (HCFA form submitted no description of the code was written but a search for this code has the following description: G60. 8 for Other hereditary and idiopathic neuropathies.

The SSR report for the upper extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

314.    On or about October 15, 2021, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly

provided by Greenwood and Regal to patient D.D. claim number 0622727989, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on September 29, 2022. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923:26 for lower extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923:TC for lower extremities, in the amount of $159.47.    On the face of the bill, the patient is diagnosed with:

G608

No description of the code is written on the bill (HCFA form submitted no description of the code was written.  Thes code has been reported with the following description: G60. 8 for Other hereditary and idiopathic neuropathies.

The SSR report for the lower extremities represented that the patient complained of the following:

"…presents with complaints of low back pain with radiation to both lower extremities; numbness in the feet…"

315.    On or about December 22, 2021, two separate bills were mailed by or on behalf of the Defendants Greenwood and Regal, respectively, to Allstate for SSR testing purportedly provided by Greenwood and Regal to patient D.D. claim number 0622727989, in a clinic located at 300 Hempstead Tpke, West Hempstead, NY 11552 on December 13, 2021. The bill of Greenwood consists of one charge for SSR testing under CPT code 95923:26 for lower extremities, in the amount of $65.14. The bill of Regal consists of one charge for SSR testing under CPT code 95923:TC for upper extremities, in the amount of $159.47.    On the face of the bills, the patient is diagnosed with:

G608  No description of the code is written on the bill (HCFA form submitted no description of the code was written.  The code has been reported with the following description: G60. 8 for Other hereditary and idiopathic neuropathies.

The SSR report for the upper extremities represented that the patient complained of the following:

> "…presents with complaints of neck pain with radiation to both upper extremities; numbness in the hands…"

316.    The reports for multiple bills of Defendants Greenwood, Interventional, Regal, BLK and Refuah had normal impression or are within normal limits (WNL) but the findings and distal latency values and amplitude values are different.  Defendants Greenwood, Interventional, Regal, BLK and Refuah  do not indicate what distal latency values and amplitude values render a normal impression or a within normal limits (WNL) impression.   The testing reports showed no interest in the patient's welfare and were mass produced to generate fraudulent billing charges.

317.    For example, Allstate received purported SSR testing reports for the bills of the Greenwood and Regal as to patient J.F., claim number 0656468758 for date of service February 14, 2022 which had the following findings:

> "Evaluation of the Left foot sympathetic skin response nerve showed prolonged distal onset latency (2390.6 ms) and reduced amplitude (9440.8 µV).  The right foot sympathetic skin response nerve showed normal distal onset latency (289.1 ms) and normal amplitude (977.2 µV)."

The Impression for these findings is stated in the report as "This Foot SSR study is normal"

318.    Allstate received purported SSR testing reports for the bills of Greenwood and Regal as to patient D.D. claim number 0622727989, for date of service May 25, 2022 which had the following findings:

> "Evaluation of the Left foot sympathetic skin response and Right foot sympathetic skin response nerves showed normal distal onset latency (L1531.3, R1570.3 ms) and reduced amplitude (L163.4, R189.5 µV). "

The Impression for these findings is stated in the report as "This Foot SSR study is normal"

319.    Allstate received purported SSR testing reports for the bills of Greenwood and Regal as to patient D.D. claim number 0622727989, for date of service December 13, 2021 which had the following findings:

> "Evaluation of the Left hand sympathetic skin response nerve showed prolonged distal onset latency (2367.2 ms) and reduced amplitude (1245.4 µV). The Right foot sympathetic skin response nerve showed prolonged distal onsel latency (3500.0 ms) and reduced amplitude (187.7 µV)"

The Impression for these findings is stated in the report as "This Hand SSR study is normal"

320.    Allstate received purported SSR testing reports for the bills of Greenwood and Regal as to patient D.D. claim number 0622727989, for date of service April 18, 2022 which had the following findings:

> "Evaluation of the Left hand sympathetic skin response and Right hand sympathetic skin response nerves  showed normal distal onset latency (L1531.3, R1500 ms) and reduced amplitude (L151.0, R95.6 µV). "

The Impression for these findings is stated in the report as "This Hand SSR study is normal."

321.    Allstate received purported SSR testing reports for the bills of Interventional and BLK as to patient J.T., claim number 0633120530, for date of service July 26, 2021 for SSR study of the lower extremities which had the following findings:

> "Evaluation of the Left foot sympathetic skin response nerve  showed prolonged distal onset latency (2335.9 ms) and reduced amplitude (335.5 µV).  The Right foot sympathetic skin response nerve showed normal distal onset latency (2132.8) and reduced amplitude (192.0 µV).   "

The Impression for these findings is stated in the report as "This Foot SSR study is normal."

322.    Allstate received purported SSR testing reports for the bills of Interventional and BLK as to patient J.T., claim number 0633120530, for date of service July 26, 2021 for SSR study of the upper extremities which had the following findings:

"Evaluation of the Left hand sympathetic skin response and Right hand sympathetic skin response nerves showed normal distal onset latency (L1468.8, R1617.2 ms) and reduced amplitude (L135.0, R141.7 µV). "

The Impression for these findings is stated in the report as "This Hand SSR study is normal."

323.    Allstate received purported SSR testing reports for the bills of Interventional and BLK as to patient Y.N. claim number 0628499401, for date of service June 29, 2021 for SSR study of the lower extremities which had the following findings:

"Evaluation of the Left foot sympathetic skin response nerve showed normal distal onset latency (2039.3 ms) and reduced amplitude (460.1 µV). The Right foot sympathetic skin response nerve showed normal distal onset latency (1625.0 and normal amplitude (940.1 µV).  "

The Impression for these findings is stated in the report as "This Foot SSR study is normal."

324.    Allstate received purported SSR testing reports for the bills of Interventional and BLK as to patient Y.N. claim number 0628499401, for date of service June 29, 2021 for SSR study of the upper extremities which had the following findings:

"Evaluation of the Left hand sympathetic skin response and the Right hand sympathetic skin response nerves showed prolonged distal onset latency (L3585.9, R3820.3 ms) and normal amplitude (L1964.3, R1662.0 µV). "

The Impression for these findings is stated in the report as "This Hand SSR study is normal."

325.    Allstate received purported SSR testing reports for the bills of Interventional and BLK as to patient K.B. claim number 0651017196, for date of service December 13, 2021 for SSR study of the lower extremities which had the following findings:

"Evaluation of the Left foot sympathetic skin response nerve showed normal distal onset latency (1703.1 ms) and reduced amplitude (354.5 µV). The Right foot sympathetic skin response nerve showed prolonged distal onset latency (2750.0 ms) and normal amplitude (88.0 µV).  "

The Impression for these findings is stated in the report as "This Foot SSR study is normal."

326.    Allstate received purported SSR testing reports for the bills of Interventional and BLK as to patient K.B., claim number 0651017196, for date of service December 13, 2021 for SSR study of the upper extremities which had the following findings:

"Evaluation of the Left hand sympathetic skin response and the Right hand sympathetic skin response nerves showed normal distal onset latency (L1460.9, R1390.6 ms) and reduced amplitude (L403.2, R788.2 µV).   "

The Impression for these findings is stated in the report as "This Hand SSR study is normal."

327.    Allstate received purported SSR testing reports from of Greenwood and Regal as well as Interventional and Refuah for the patient that have WNL (within normal limits) impression but do not indicate what distal latency values and amplitude values render a WNL impression.

328.    For example, Allstate received purported SSR testing reports from Greenwood and Regal as to patient D.D. claim number 0622727989, for date of service September 29, 2021 which had the following findings:

"Evaluation of the Left foot sympathetic skin response and the Right foot sympathetic skin response nerves showed normal distal onset latency (L1562.5, R132.8 ms) and normal amplitude (L1230.6, R1494.1 µV). "

The Impression for these findings is stated in the report as "This Foot SSR study is WNL."

329.    Allstate received purported SSR testing report from Interventional and Refuah as to patient C.B., claim number 0671495710, for date of service June 8, 2022 which had the following findings for the upper extremities:

"Evaluation of the Left hand sympathetic skin response nerve showed normal distal onset latency (1046.9 ms) and reduced amplitude (590.1 µV)). The Right hand sympathetic skin response nerves showed normal distal onset latency (976.6 ms) and normal amplitude (L1230.6, R1494.1 µV). "

The Impression for these findings is stated in the report as "This Hand SSR study is WNL."

330.    Allstate received purported SSR testing reports from Interventional and Refuah as to patient C.B., claim number 0671495710, for date of service June 8, 2022 which had the following findings for the lower extremities:

"Evaluation of the Left foot sympathetic skin response nerve showed prolonged distal onset latency (2921.9 ms) and normal amplitude (703.9 µV)). The Right foot sympathetic skin response nerves showed normal distal onset latency (1148.4 ms) and reduced amplitude (554.9 µV). "

The Impression for these findings is stated in the report as "This Foot SSR study is WNL."

331.    Allstate received purported SSR testing reports from Interventional and Refuah as to patient N.G. claim number 0667212120 for date of service May 16, 2022 which had the following findings for the upper extremities:

"Evaluation of the Left hand sympathetic skin response and the Right hand sympathetic skin response nerves showed prolonged distal onset latency (L2015.5, R2085.9 ms) and reduced amplitude (L310.8, R452.9 µV)"

The Impression for these findings is stated in the report as "This Hand SSR study is WNL."

332.    Allstate received purported SSR testing reports from Interventional and Refuah as to patient, patient N.G. claim number 0667212120 for date of service May 16, 2022 which had the following findings for the lower extremities:

"Evaluation of the Left foot sympathetic skin response and the Right foot sympathetic skin response nerves showed normal distal onset latency (L601.6 R1484.4 ms) and reduced amplitude (L175.2, R112.5 µV)"

The Impression for these findings is stated in the report as "This Foot SSR study is WNL."

333.    Allstate received purported SSR testing reports from Interventional and BLK as to patient K.J. claim number 0662880343, for date of service March 24, 2022 which had the following findings for the upper extremities:

"Evaluation of the Left hand sympathetic skin response nerve showed normal distal onset latency (1734.4 ms) and normal amplitude (906.0 µV). The right hand sympathetic skin response nerve showed normal distal onset latency (1562.5 ms) , R2085.9 ms) and reduced amplitude (255.9 µV)"

215

The Impression for these findings is stated in the report as "This Hand SSR study is WNL."

334.    Allstate received purported SSR testing reports from Interventional and BLK  as to patient K.J. claim number 0662880343, for date of service March 24, 2022 which had the following findings for the lower extremities:

"Evaluation of the Left foot sympathetic skin response nerve showed normal distal onset latency (703.1 ms) and normal amplitude (721.4 µV).  The right foot sympathetic skin response nerve showed prolonged distal onset latency (3335.9 ms) , R2085.9 ms) and reduced amplitude (265.3.9 µV)"

The Impression for these findings is stated in the report as "This Foot SSR study is WNL."

335.    Allstate received purported SSR testing reports from Interventional and BLK  as to patient D.T. claim number 0653548601, for date of service March 24, 2022 which had the following findings for the upper extremities:

"Evaluation of the Left hand sympathetic skin response  and right hand sympathetic skin response nerves showed normal distal onset latency (L1132.8, R1335.9 ms) and normal amplitude and reduced amplitude (L189.9, R384.1 µV)"

The Impression for these findings is stated in the report as "This Hand SSR study is WNL."

336.    Allstate received purported SSR testing reports from Interventional and BLK as to patient D.T. claim number 0653548601, for date of service March 24, 2022 which had the following findings for the lower extremities:

"Evaluation of the Left foot sympathetic skin response  and right foot sympathetic skin response nerves showed prolonged distal onset latency (L2437.5, R2515.6 ms) and normal amplitude (L1327.5, R1127.5 ms)."

The Impression for these findings is stated in the report as "This Foot  SSR study is WNL."

337.    Allstate received purported SSR testing reports from Interventional and BLK as to patient B.G. claim number is 0677715153, for date of service August 31, 2022 which had the following findings for the upper extremities:

"Evaluation of the Left hand sympathetic skin response and the right hand sympathetic skin response nerves showed normal distal onset latency (L398.4, R1296.9 ms) and reduced amplitude (L580.1, R607.1 µV)"

The Impression for these findings is stated in the report as "This Hand SSR study is WNL."

338.    Allstate received purported SSR testing reports from Interventional and BLK as to patient B.G. claim number is 0677715153, for date of service August 31, 2022 which had the following findings for the lower extremities:

"Evaluation of the Left foot sympathetic skin response and the right foot sympathetic skin response nerves showed normal distal onset latency (L421.9, R492.2 ms) and reduced amplitude (L276.3, R580.1.1 µV)"

The Impression for these findings is stated in the report as "This Foot SSR study is WNL."

339.    Defendants Greenwood and Regal in their reports for several SSR tests for patients J.F., claim number 0656468758 and D.D. claim number 0622727989 have Impressions of absent SSR but have Findings with distal latency values and amplitude values.  The Defendants Greenwood and Regal do not state what distal latency values and amplitude values yield an Impression of absent SSR.

340.    Allstate received purported SSR testing report from Greenwood as to patient, F.A.J. claim number 0656468758 for date of service February 7, 2022 which had the following findings:

"Evaluation of the Left hand sympathetic skin response nerve showed normal distal onset latency (78.1.6 ms) and reduced amplitude (401,2 µV).  The right foot sympathetic skin response nerve showed prolonged distal onset latency (3171.9 ms) and reduced amplitude (539.2 µV)."

The Impression for these findings is stated in the report as "The absent left hand SSR is consistent with neuropathy."

341.    Allstate received purported SSR testing report from Greenwood as to patient D.D. claim number 0622727989, for date of service July 13, 2021 which had the following findings:

217

"Evaluation of the Left hand sympathetic skin response and Right hand sympathetic skin response nerves showed normal distal onset latency (L1625.0, R351.6 ms) and reduced amplitude (L144.4, R95.7 µV). "

The Impression for these findings is stated in the report as "The absent right Hand SSR is consistent with a neuropathy."

342.    Allstate received purported SSR testing report from Greenwood as to patient D.D. claim number 0622727989, for date of service April 28, 2021 which had the following findings:

"Evaluation of the Left foot sympathetic skin response and Right foot sympathetic skin response nerves showed normal distal onset latency (L78.1, R1101.6 ms) and normal amplitude (L1966.6, R1728.2 µV). "

The Impression for these findings is stated in the report as "The absence of Foot SSRs is consistent with a neuropathy."

343.    The abusive and excessive billing practices of the Defendants Greenwood and Regal and the related parties who assisted their billing are clearly shown in the SSR bills submitted for patient D.D. claim number 0622727989.  After normal upper and lower extremity SSR testing results were obtained, another SSR test was performed on the upper and lower extremities a few months after the initial testing.  There is no need for a second test when the first test was already performed and had normal SSR testing result.

344.    Allstate received two separate bills and corresponding SSR testing report from Greenwood and Regal for Left and Right Hand SSR allegedly provided to patient D.D. claim number 0622727989, for date of service December 13, 2021.  The Impression is:

"This Hand SSR study is normal."

345.    After having a normal Hand SSR testing on December 13, 2021 as discussed above, another Hand SSR testing was performed by Greenwood and Regal for Left and Right Hand SSR allegedly provided to patient D.D. claim number 0622727989, for date of service April 18, 2022.

346.    Allstate received two separate bills and corresponding SSR testing report from Greenwood and Regal for Left and Right Hand SSR allegedly provided to patient D.D. claim number 0622727989, for date of service April 18, 2022.  The Impression is:

"This Hand SSR study is normal."

347.    Allstate received two separate bills and corresponding SSR testing reports from Greenwood and Regal for Left and Right Foot SSR allegedly provided to patient D.D. claim number 0622727989 for date of service May 25, 2022.  The Impression is:

"This Foot SSR study is normal."

348.    After having a normal Foot SSR testing on May 25, 2022, another Foot SSR testing was performed by Greenwood and Regal for Left and Right Hand to patient D.D. claim number 0622727989, for date of service September 29, 2022.

349.    Allstate received two separate bills and corresponding SSR testing reports from Greenwood and Regal for Left and Right Foot  SSR allegedly provided to patient D.D. claim number 0622727989, for date of service September 29, 2022.  The Impression is:

"This Foot SSR study is WNL." (Within Normal Limits)

350.    On or about February 13, 2023, two separate bills were mailed by or on behalf of the Defendants Diag Neuro and Sinai, respectively, to Allstate for SSR testing purportedly provided by Diag Neuro and Sinai to patient M.L. claim number 0712759372, in a clinic located at 7945 Metropolitan Avenue, Flushing, NY 11379 on May 31, 2023. The bill of Diag Neuro consists of two charges for SSR testing under CPT code 95923-PC for upper extremity and CPT code 95923-PC for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Sinai  consists of two charges for SSR testing under CPT code 95923-TC for

upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $159.47 each, for a total of $318.94.

351.    The SSR report states the following in the Impression portion of the Lower Extremities  in part as follows:

" This left Lower extremity sympathetic skin response study is abnormal and findings are consistent with peripheral neuropathy."

Although the Defendants Diag Neuro and Sinai billed for the testing of the left and right lower extremities, only an impression of the lower Left extremity was submitted.  No impression of the lower right extremity was submitted.

352.    On or about March 30, 2021, two separate bills were mailed by or on behalf of the Defendants Interventional and Sinai, respectively, to Allstate for SSR testing purportedly provided by Interventional and Sinai to patient J.F. claim number 0614879732, in a clinic located at 1975 Linden Blvd. Elmont, NY 11003 on February 25, 2021. The bill of Interventional consists of two charges for SSR testing under CPT code 95923-26 for upper extremity and CPT code 95923-26 for lower extremity, in the respective amounts of $65.14 each, for a total of $130.28. The bill of Sinai consists of two charges for SSR testing under CPT code 95923-TC for upper extremity and CPT code 95923-TC for lower extremity, in the respective amounts of $157.47 each, for a total of $314.94.  The SSR report states the following in the Findings portion of the Lower Extremities states in part as follows"

"Evaluation of the Right foot sympathetic skin response nerve showed normal distal onset latency(1007.8 ms) and reduced amplitude (114.9."

Although the Defendants Diag Neuro and Refuah billed for the testing of the left and right lower extremities, only a finding of the lower right  foot was submitted.  No impression of the lower left foot was submitted.

353.     Each of these Defendants' reports set forth a recommendation for EMG for numerous patients. Numerous bills from Interventional, Diag Neuro, Greenwood BLK, Refuah, Sinai, and Regal use the same recommendation for EMG for all their patients even though the Impression of the SSR nerve test were different for each patient.  Allstate received purported SSR testing report from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient D. P. claim number 0617201966 for date of service March 30, 2021. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response nerve showed prolonged distal onset latency (3460.9 ms) and reduced amplitude (463.2 µV).  The right hand sympathetic skin response nerve showed prolonged distal onset latency (2695.3 ms) and normal amplitude (1128.5 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

354.     Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient D. P. claim number 0617201966 for date of service March 30, 2021. The reports for the SSR of the lower extremities had the following findings:

> "Evaluation of the left foot sympathetic skin response nerve showed prolonged distal onset latency (2898.4 ms) and reduced amplitude (419.5 µV).  The right foot sympathetic skin response nerve showed normal distal onset latency (1218.8 ms) and normal amplitude (257.9 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

355.     Allstate received purported SSR testing reports  from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient A.S. claim number 0620911925, for date of service April 14, 2021. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response and the right hand sympathetic skin response nerves showed normal distal onset latency (L1265.6, R1625.0 ms) and reduced amplitude (L55.8, R54.3 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

356.    Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient A.S. claim number 0620911925, for date of service April 14, 2021. The report for the SSR of the lower extremities had the following findings:

> "Evaluation of the left foot sympathetic skin response and the right foot sympathetic skin response nerves showed normal distal onset latency (L1570.3, R1835.9 ms) and normal amplitude (L700.8, R604.4 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

357.    Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient J.T. claim number 0633120530, for date of service July 26, 2021. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response and the right hand sympathetic skin response nerves showed normal distal onset latency (L1468.8, R1617.2 ms) and reduced amplitude (L135.0, R141.7 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

358.    Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient J.T. claim number 0633120530, for date of service July 26, 2021. The report for the SSR of the lower extremities had the following findings:

"Evaluation of the left foot sympathetic skin response nerve showed prolonged distal onset latency (2335.9 ms) and reduced amplitude (335.5 µV).  The right foot sympathetic skin response nerve showed normal distal onset latency (L2132.8 ms) and reduced amplitude (192.9 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

359.    Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient Y.N. claim number 0628499401 for date of service June 29, 2021. The report for the SSR of the upper extremities had the following findings:

"Evaluation of the left hand sympathetic skin response and the right hand sympathetic skin response nerves showed prolonged distal onset latency (L3585.9, R3820.3 ms) and normal amplitude (L1964.3, R1662.0 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

360.    Allstate received purported SSR testing reports from provider Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient Y.N., claim number 0628499401 for date of service June 29, 2021. The report for the SSR of the lower extremities had the following findings:

"Evaluation of the left foot sympathetic skin response nerve showed normal  distal onset latency (2039.1 ms) and reduced amplitude (460.1 µV).  The right foot sympathetic skin response nerve showed normal distal onset latency (1625.0 ms) and normal amplitude (940.1 µV) "

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

361.    Allstate received purported SSR testing reports from Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient K.B. claim number

0615248341 for date of service April 13, 2021. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response nerve showed prolonged distal onset latency (3718.8 ms) and normal amplitude (1609.9 µV). The right hand sympathetic skin response nerve showed prolonged distal onset latency (3703.1 ms) and reduced amplitude (124.7 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

362. Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient K.B. claim number 0615248341 for date of service April 13, 2021. The report for the SSR of the lower extremities had the following findings:

> "Evaluation of the left foot sympathetic skin response and the right foot sympathetic skin response nerves showed prolonged distal onset latency (L4273.4, R3375.0 ms) and reduced amplitude (L192.6, R42.6 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

363. Allstate received purported SSR testing reports from Defendants Interventional and Refuah for SSR testing purportedly provided by Interventional and Refuah to patient T.J., claim number 0618829451 for date of service March 24, 2021. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response and the right hand sympathetic skin response nerves showed normal distal onset latency (L1187.5, R1312.5 ms) and reduced amplitude (L206.6, R205.7 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

364.    Allstate received purported SSR testing reports from Defendants Interventional and Refuah for SSR testing purportedly provided by Interventional and Refuah to patient T.J. claim number 0618829451 for date of service March 24, 2021. The report for the SSR of the lower extremities had the following findings:

> "Evaluation of the left foot sympathetic skin response and the right foot sympathetic skin response nerves showed normal distal onset latency (L929.7, R1679.7 ms) and reduced amplitude (L83.2, R45.2 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

365.    Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient N.A. claim number 0610835472 for date of service February 3, 2021. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response nerve showed normal normal distal onset latency (492.2 ms) and normal amplitude (1056.4 µV). The right hand sympathetic skin response nerve showed normal distal onset latency (1148.4 ms) and reduced amplitude (169.9 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

366.    Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient N.A. claim number 0610835472 for date of service February 3, 2021. The report for the SSR of the lower extremities had the following findings:

> "Evaluation of the left foot sympathetic skin response and the right foot sympathetic response nerves showed prolonged distal onset latency (L2304.7, R2382.8 ms) and reduced amplitude (L222.3, R298.2 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

367.    Allstate received purported SSR testing reports from Defendants Interventional and Refuah for SSR testing purportedly provided by Interventional and Refuah to patient H.B. claim number 0614955938 for date of service March 24, 2021. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response nerve showed normal distal onset latency (273.4 ms) and normal amplitude (958.7 µV)."  The right hand sympathetic skin response nerve showed prolonged distal onset latency (2984.4 ms) and normal amplitude (955.9 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

368.    Allstate received purported SSR testing reports from Defendants Interventional and Refuah for SSR testing purportedly provided by Interventional and Refuah to patient H.B. claim number 0614955938 for date of service March 24, 2021. The report for the SSR of the lower extremities had the following findings:

> "Evaluation of the left foot sympathetic skin response and the right foot sympathetic skin response nerves showed normal distal onset latency (L1757.8, R1195.3 ms) and reduced amplitude (L536.0, R329.7  µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

369.    Allstate received purported SSR testing reports from Defendants Interventional and Sinai for SSR testing purportedly provided by Interventional and Sinai to patient J.F. claim number 0614879732 for date of service February 25, 2021. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response and the right hand sympathetic skin response nerves showed normal distal onset latency (L1250.0, R1500.0 ms) and reduced amplitude (L265.0, R403.9 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

370.    Allstate received purported SSR testing reports from Defendants Interventional and Sinai for SSR testing purportedly provided by Interventional and Sinai to patient J.F. claim number 0614879732 for date of service February 25, 2021. The report for the SSR of the lower extremities had the following findings:

> "Evaluation of the right foot sympathetic skin response nerve showed normal distal onset latency (1007.8 ms) and reduced amplitude (114.9 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

371.    For example, Allstate received purported SSR testing reports from Defendants Greenwood and Regal for SSR testing purportedly provided by Greenwood and Regal to patient F.A.J. claim number 0656468758, for date of service February 7, 2022. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response nerve showed normal distal onset latency (78.1 ms) and reduced amplitude (401.2 µV).  The right hand sympathetic skin response nerves showed prolonged  distal onset latency (3171.9 ms) and reduced amplitude (539.2 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

372.    Allstate received purported SSR testing reports from Defendants Greenwood and Regal for SSR testing purportedly provided by Greenwood and Regal to patient D.D. claim number 0622727989, for date of service September 13, 2021. The report for the SSR of the upper extremities had the following findings:

227

"Evaluation of the left hand sympathetic skin response and the right hand sympathetic skin response nerves showed normal distal onset latency (L1625.0, R351.6 ms) and reduced amplitude (L144.4, R95.7 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

373.    Allstate received purported SSR testing reports from Defendants Diag Neuro and Sinai for SSR testing purportedly provided by Diag Neuro and Sinai to patient M.L. claim number 0712759372, for date of service May 31, 2023. The report for the SSR of the upper extremities had the following findings:

"Evaluation of the left hand sympathetic skin response and the right hand sympathetic skin response nerves showed normal distal onset latency (L335.9, R1335.9 ms) and reduced amplitude (L705.7, R196.5 µV)."

The report had the following Impression:

"This upper extremities sympathetic skin response  nerve study is abnormal and findings are consistent with mild peripheral neuropathy."

The report further states "Electromyography is recommended to rule out radiculopathy, plexopathy or myopathy."

374.    Allstate received purported SSR testing reports from Defendants Diag Neuro and Sinai for SSR testing purportedly provided by Diag Neuro and Sinai to patient M.L. claim number 0712759372, for date of service May 31, 2023. The report for the SSR of the lower extremities had the following findings:

"Evaluation of the left hand sympathetic skin response and the right hand sympathetic skin response nerves showed normal distal onset latency (L335.9, R1335.9 ms) and reduced amplitude (L705.7, R196.5 µV)."

The report had the following Impression:

"This left lower extremity sympathetic skin response nerve study is abnormal and findings are consistent with peripheral neuropathy."

228

The report further states "Electromyography is recommended to rule out radiculopathy, plexopathy or myopathy."

375.    Allstate received purported SSR testing reports from Defendants Diag Neuro and Refuah, for SSR testing purportedly provided by Diag Neuro and Refuah to patient S.W. claim number 0677527947, for date of service January 3, 2023. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response and the right hand sympathetic skin response nerves showed normal distal onset latency (L1164.1, R937.5 ms) and reduced amplitude (L243.8, R373.5 µV)."

The report had the following Impression:

> "This upper extremities sympathetic skin response nerve study is abnormal and findings are consistent with possible mild peripheral neuropathy."

The report further states "Electromyography is recommended to rule out radiculopathy, plexopathy or myopathy."

376.    Allstate received purported SSR testing reports from Defendants Diag Neuro and Refuah for SSR testing purportedly provided by Diag Neuro and Refuah to patient E.H. claim number 0691418859, for date of service January 23, 2023. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response and the right hand sympathetic skin response nerves showed normal distal onset latency (L1242.2, R1453.1 ms) and reduced amplitude (L777.8, R468.2 µV)."

The report had the following Impression:

> "This upper extremities sympathetic skin response nerve study is abnormal and findings are consistent with possible mild peripheral neuropathy."

The report further states "Electromyography is recommended to rule out radiculopathy, plexopathy or myopathy."

377.    The Defendants recommended EMG for patients to rule out radiculopathy, plexopathy or myopathy even though SSR nerve test results are Normal.

378.    For example, Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient V.L. claim number 0631462165for date of service July 28, 2021. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response nerve showed normal distal onset latency (1437.5 ms) and reduced amplitude (176.4 µV)."

The report had the following Impression:

> "This Hand SSR study is normal."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

379.    Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient V.L. claim number 0631462165, for date of service July 28, 2021. The report for the SSR of the lower extremities had the following findings:

> "Evaluation of the right foot sympathetic skin response nerve showed normal distal onset latency (46.9 ms) and reduced amplitude (128.7 µV)."

The report had the following Impression:

> "This Foot SSR study is normal."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

380.    Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient K.B. claim

number 0651017196, for date of service December 31, 2021. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response and right hand sympathetic skin response nerves showed normal distal onset latency (L1460.9, R1390.6 ms) and reduced amplitude (L403.2, R 788.2 µV)."

The report had the following Impression:

> "This Hand SSR study is normal."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

381.    Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient K.B. claim number 0651017196, for date of service December 31, 2021. The report for the SSR of the lower extremities had the following findings:

> "Evaluation of the left foot sympathetic skin response nerve showed normal distal latency (1703.1 ms)/ and reduced amplitude (354.5 µV). The right foot sympathetic skin response nerve showed prolonged distal onset latency (2750.0 ms) and reduced amplitude (88.0 µV)."

The report had the following Impression:

> "This Foot  SSR study is normal."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

382.    Allstate received purported SSR testing reports from Defendants Interventional and Refuah for SSR testing purportedly provided by Interventional and Refuah to patient C.M. claim number 978313547for date of service February 2, 2021. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response and the right hand sympathetic skin response nerves showed normal distal onset latency (L390.6, R812.5 ms) and normal amplitude (L1407, R1704.8 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

383.    Allstate received purported SSR testing reports from Defendants Interventional and Refuah for SSR testing purportedly provided by Interventional and Refuah to patient C.M. claim number 978313547for date of service February 2, 2021. The report for the SSR of the lower extremities had the following findings:

> "Evaluation of the left foot sympathetic skin response and the right foot sympathetic skin response nerves showed normal distal onset latency (L828.1, R835.9 ms) and normal amplitude (L2375.6, R1853.0 µV)."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

384.    Allstate received purported SSR testing reports from Defendants Greenwood and Regal for SSR testing purportedly provided by Greenwood and Regal to patient  D.D. claim number 0622727989 for date of service December 13, 2021. The report for the SSR of the upper extremities had the following findings:

> "Evaluation of the left hand sympathetic skin response nerve showed prolonged distal latency (2367.2 ms) and normal amplitude (1245.4 µV).  The right hand sympathetic skin response nerve showed prolonged  distal onset latency (3500.0 ms) and reduced amplitude (187.8 µV)."

The report had the following Impression:

> "This Hand SSR study is normal."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

385.    Allstate received purported SSR testing reports from Defendants Greenwood and Regal for SSR testing purportedly provided by Greenwood and Regal to patient  D.D. claim number 0622727989 for date of service April 18, 2022. The report for the SSR of the upper extremities had the following findings:

"Evaluation of the left hand sympathetic skin response and the right hand sympathetic skin response nerves showed normal   distal onset latency (L1531.3, R1500.0 ms) and reduced amplitude (L161.0, R95.6 μV)."

The report had the following Impression:

"This Hand SSR study is normal."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

386.    The Defendants Interventional, Greenwood, BLK, Refuah and Regal recommended EMG for patients to rule out radiculopathy, plexopathy or myopathy even though SSR nerve test results were Within Normal Limits.

387.    Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient B.G. claim number is 0677715153, for date of service August 31, 2022. The report for the SSR of the upper extremities had the following findings:

"Evaluation of the left hand sympathetic skin response and right hand sympathetic skin response nerves showed normal distal onset latency (L398.4, R1296.9 ms) and reduced amplitude (L580.1, R607.1 μV)."

The report had the following Impression:

"This Hand SSR study is WNL."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

388.    Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient B.G. claim number is 0677715153, for date of service August 31, 2022. The report for the SSR of the lower extremities had the following findings:

"Evaluation of the left foot sympathetic skin response and right foot sympathetic skin response nerves showed normal distal onset latency (L421.9, R492.2 ms) and reduced amplitude (L276.3, R580.1 µV)."

The report had the following Impression:

"This Foot SSR study is WNL."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

389.    Allstate received purported SSR testing reports from Defendants Interventional and BLK for SSR testing purportedly provided by Interventional and BLK to patient D.T. claim number 0653548601, for date of service March 24, 2022. The report for the SSR of the lower extremities had the following findings:

"Evaluation of the left hand sympathetic skin response and right hand sympathetic skin response nerves showed prolonged distal onset latency (L2437.5, R2515.6  ms) and reduced amplitude (L1327.5, R1127.5 µV)."

The report had the following Impression:

"This Foot SSR study is WNL."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

390.    Allstate received purported SSR testing reports from Defendants Interventional and Refuah for SSR testing purportedly provided by Interventional and Refuah to patient C.B., claim number 0671495710, for date of service June 8, 2022. The report for the SSR of the upper extremities had the following findings:

"Evaluation of the left hand sympathetic skin response nerve showed normal distal onset latency (1046.9 ms) and reduced amplitude (590.1 µV). The right hand sympathetic skin response nerve showed normal distal onset latency (976.6 ms) and reduced amplitude (1326.8 µV)."

The report had the following Impression:

"This Hand SSR study is WNL."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

391.    Allstate received purported SSR testing reports from Defendants Interventional and Refuah for SSR testing purportedly provided by Interventional and Refuah to patient C.B., claim number 0671495710, for date of service June 8, 2022. The report for the SSR of the lower extremities had the following findings:

"Evaluation of the left foot sympathetic skin response nerve showed prolonged distal onset latency (2921.9 ms) and normal amplitude (703.9 µV). The right foot sympathetic skin response nerve showed normal distal onset latency (1148.4 ms) and reduced amplitude (554.9 µV)."

The report had the following Impression:

"This Foot SSR study is WNL."

The report further states "EMG is recommended to rule out radiculopathy, plexopathy or myopathy."

## VII.    The Provider Defendants' Interrelationships

392.    The Defendants in this case have been interrelated in the fraudulent scheme perpetrated upon the Plaintiffs.

393.    By dividing the fraudulent services and billing among numerous separate entities and individuals, the total revenue realized by the scheme has been maximized, while the amount attributable to any single billing Defendant has been minimized.  The Defendants have been

connected and interrelated. The Defendants have been joined and connected in multiple ways. First, multiple billing Defendants used the same clinic location where services are provided, with most of them sharing more than one of these clinic locations. Second, a consistent practice involved two Defendants billing for the same services with one Defendant entity claiming to administer the services, while another claimed to interpret services, splitting the claims between Defendants. Third, some of the individual Defendants owned multiple Defendant entities, each offering identical services, minimizing the likelihood of detection of the true scale of the fraud. Fourth, multiple Defendants have shared diagnoses and language in the bills and reports, frequently using language that was not only the same for multiple patients of the same providers; they were also the same for patients of different Defendants. The use of the same language in the reports of these supposedly separate entities was a prevalent feature, further demonstrating the direct connection and interrelationships among the Defendants. Fifth, all of the Defendants had waveforms of their testing results that matched those of other patients, and they regularly had waveforms that matched those of other patients of other entities and providers. These waveforms are unique and should not have been duplicated even between two patients of one Defendant. The Defendants used the same waveforms for numerous patients. It is a clear indication of the degree of interrelationship among the Defendants that the identical matching waveforms were not only fraudulently used for patients of the same Defendants, but also for patients of different Defendants as well.

A.    **Multiple Billing Defendants Used the Same Clinic Locations**

394.    In this scheme, multiple billing Defendants were frequently sent to the same clinic locations, where they purportedly provided the same types of fraudulent diagnostic services to No-

Fault patients, often on the very same patient. As a further measure to inflate billing and minimize the amount billed by any one entity, the billing for TCD testing and VNG testing was submitted separately, even though these testing services were purportedly performed by the same provider Defendant for the same patient, on the same date at the same location. For patient after patient, their bills generally duplicated the services, CPT codes, and charged amounts represented thereon.

395.    At the clinical location of 430 West Merrick Rd., Valley Stream, NY 11580 ("West Merrick"), at least seven Defendants have billed Allstate for providing patients on its premises with TCD, VNG, and/or SSR testing services.  This number includes at least two lay entities billing for such testing.

396.    For example, Defendant Chai LLC mailed a bill, on or about the time it was dated, December 7, 2022, totaling $1,388.46 to Allstate for TCD, complete study (CPT 93886-TC), TCD, emboli detection (93892-TC), TCD, vasoreactivity study (93890-TC), sinusoidal vertical axis rotational texting (billed twice under 92546-59-TC and 92546-59-76-TC), computerized dynamic posturography (92548-TC), use of vertical electrodes (92547-TC), basic vestibular evaluation (92540-TC), and caloric vestibular testing (92537-TC), all as allegedly provided on November 14, 2022 to patient D.R., identified by claim number 0680071883, at the West Merrick clinic.

397.    Regarding the same patient D.R. and date of service November 14, 2022, the Defendant Diag Neuro mailed a bill, on or about the time it was dated, December 7, 2022, totaling $907.68 to Allstate for the same nine testing services, and under the same CPT codes (minus the technical component modifier "-TC") as allegedly provided to patient D.R. at the West Merrick clinic.

398.    Chai LLC then mailed a bill again, on or about the time it was dated, January 3, 2023, totaling $1,388.46 to Allstate for the same nine services and charges for the TCD and VNG

testing as allegedly provided to patient Z.W., identified by claim number 0693926362, at the West Merrick clinic on January 3, 2023. Once again, Diag Neuro mailed a bill, on or about the time it was dated, January 3, 2023, totaling $907.68 to Allstate for the same nine testing services, as allegedly performed on patient Z.W. at the West Merrick clinic.

399.    Defendant Refuah LLC mailed a bill on or about the time it was dated, March 31, 2021, totaling $314.94 to Allstate for autonomic nervous system function testing – upper extremity (95923-TC) and autonomic nervous system function testing – lower extremity (95923-TC), all as allegedly provided on March 24, 2021, to patient H.B., identified by claim number 0614955938, at the West Merrick clinic.

400.    Regarding the same patient H.B., and date of service March 24, 2021, Defendant Interventional PLLC mailed a bill on or about the time it was dated, March 31, 2021, totaling $130.28 to Allstate for the same two autonomous nervous system testing services, under the same CPT codes (minus the technical component modifier "-TC") as allegedly provided to patient H.B., identified by claim number 0614955938, at the West Merrick clinic.

401.    Regarding the same patient H.B., and date of service March 24, 2021, Defendant Direct Med mailed two bills on or about the time they were dated, April 14, 2021, to Allstate, the first totaling $1,641.79 for TCD, complete study (CPT 93886), TCD, vasoreactivity study (93890), TCD, emboli detection (93892-59), and the second bill totaling $654.34 for caloric vestibular testing (92537), basic vestibular evaluation (92540), sinusoidal vertical axis rotational texting (billed twice under 92546-59 and 92546-59-76), use of vertical electrodes (92547), computerized dynamic posturography (92548), all as allegedly provided to patient H.B., identified by claim number 0614955938, at the West Merrick clinic.

402.    Defendant Hillside mailed two bills on or about the time they were dated, February 3, 2021, to Allstate, the first totaling $1,641.79 for TCD, complete study (CPT 93886), TCD, vasoreactivity study (93890), TCD, emboli detection (93892-59), and the second bill totaling $666.34 for caloric vestibular testing (92537), basic vestibular evaluation (92540), sinusoidal vertical axis rotational texting (billed twice under 92546-59 and 92546-59-76), use of vertical electrodes (92547), and computerized dynamic posturography (92548), all as allegedly provided on January 5, 2021 to patient A.R., identified by claim number 0609536874, at the West Merrick clinic.

403.    Defendant Lifeline mailed two bills on or about the time they were dated, November 19, 2019, to Allstate, the first bill totaling $1,253.21 for TCD, complete study (CPT 93886), TCD, vasoreactivity study (93890), TCD, emboli detection (93892), and the second bill totaling $381.52 for caloric vestibular testing (92533), basic vestibular evaluation (92540), sinusoidal vertical axis rotational texting (92546), and computerized dynamic posturography (92548), all as allegedly provided on October 17, 2019 to patient E.J., identified by claim number 0531309847, at the West Merrick clinic.

404.    At the clinical location of 1568 Ralph Ave, Brooklyn, NY 11234 ("Ralph Avenue"), at least six Defendants have billed Allstate for providing patients on its premises with TCD, VNG, and/or SSR testing services.  This number includes at least three lay Defendants billing for the testing.

405.    Allstate was billed by at least four (4) Defendants for the same patient A.S. on the same date of service April 14, 2021, at the Ralph Avenue clinic. Defendant Chai mailed two bills on or about the time they were dated, May 5, 2021, to Allstate, the first bill totaling $1,155.24 for TCD, complete study (CPT 93886-TC), TCD, vasoreactivity study (93890-TC), TCD, emboli

detection (93892-59-TC), and the second bill totaling $233.21 for caloric vestibular testing (92537-TC), basic vestibular evaluation (92540-TC), sinusoidal vertical axis rotational testing (billed twice under 92546-59-TC and 92546-59-76-TC), use of vertical electrodes (92547-TC), and computerized dynamic posturography (92548-TC), all as allegedly provided on April 14, 2021 to patient A.S., identified by claim number 0620911925, at the Ralph Avenue clinic.

406.    Regarding the same patient A.S., and date of service April 14, 2021, Defendant Diag Neuro mailed a bill on or about the time it was dated, May 5, 2021, totaling $421.13 to Allstate for the same testing services, and under the same CPT codes, (minus the technical component modifier "-TC") all as allegedly provided on April 14, 2021 to patient A.S., identified by claim number 0620911925, at the Ralph Avenue clinic.

407.    Regarding the same patient A.S., and date of service April 14, 2021, Defendant BLK mailed a bill on or about the time it was dated, April 21, 2021, totaling $314.94 to Allstate for autonomic nervous system function testing – upper ext (95923-TC) and autonomic nervous system function testing – lower ext (95923-TC), all as allegedly provided on April 14, 2021 to patient A.S., identified by claim number 0620911925, at the Ralph Avenue clinic.

408.    Regarding the same patient A.S., and date of service April 14, 2021, Defendant Interventional mailed a bill on or about the time it was dated, April 21, 2021, totaling $130.28 to Allstate for the same two autonomic nervous system testing services, under the same CPT codes (minus the technical component modifier "-TC"), all as allegedly provided on April 14, 2021 to patient A.S., identified by claim number 0620911925, at the Ralph Avenue clinic.

409.    Defendant Regal LLC mailed a bill on or about the time it was dated, January 22, 2021, totaling $290.92 for VNG testing with recording (92537-TC), vestibular evaluation (92540-TC), sinusoidal rotational test (billed twice under 92546-59-TC and 92546-59-TC-76),

supplemental electrical test (92547), and posturography (92548-TC), all as allegedly provided on January 12, 2021 to patient A.C., identified by claim number 0611468991, at the Ralph Avenue clinic.

410.    Regarding the same patient A.C., and date of service January 12, 2021, Defendant Healthcare Med mailed a bill on or about the time it was dated, January 22, 2021, totaling $486.55 to Allstate for intracranial study (CPT 93886-26), TCD, intracranial arteries (93890-26), TCD, intracranial arteries emboli detection (93892-26), all as allegedly provided on January 12, 2021 to patient A.C., identified by claim number 0611468991, at the Ralph Avenue clinic.

411.    At the clinical location of 1975 Linden Blvd, Elmont, NY 11003 ("Linden Blvd"), at least five Defendants have billed Allstate for providing patients on its premises with TCD, VNG, and/or SSR testing services.  This number includes at least one lay Defendant billing for such testing.

412.    For example, Defendant Sinai mailed a bill on or about the time it was dated, March 30, 2021, totaling $314.94 to Allstate for autonomic nervous system function testing – upper ext (95923-TC) and autonomic nervous system function testing – lower ext (95923-TC), all as allegedly provided on February 25, 2021, to patient J.F., identified by claim number 0614879732, at the Linden Blvd clinic.

413.    Regarding the same patient J.F., and date of service February 25, 2021, Defendant Interventional mailed a bill on or about the time it was dated, March 30, 2021, totaling $130.28 to Allstate for the same two autonomic nervous system testing services, under the same CPT codes (minus the technical component modifier "-TC"), all as allegedly provided on February 25, 2021 to patient J.F., identified by claim number 0614879732, at the Linden Blvd clinic.

414.    Regarding the same patient J.F., and date of service February 25, 2021, Defendant Direct mailed two bills on or about the time they were dated, March 22, 2021, to Allstate, the first bill totaling $1,641.79 for TCD, complete study (CPT 93886), TCD, vasoreactivity study (93890), and TCD, emboli detection (93892-59), and the second bill totaling $654.34 for caloric vestibular testing (92537), basic vestibular evaluation (92540), sinusoidal vertical axis rotational testing (billed twice under 92546-59 and 92546-59-76), use of vertical electrodes (92547), and computerized dynamic posturography (92548), all as allegedly provided on February 25, 2021 to patient J.F., identified by claim number 0614879732, at the Linden Blvd clinic.

415.    Defendant Hillside mailed two bills on or about the time they were dated, January 6, 2021, to Allstate, the first bill totaling $1,641.79 for TCD, complete study (CPT 93886), TCD, vasoreactivity study (93890), TCD, emboli detection (93892-59), and the second bill totaling $666.34 for caloric vestibular testing (92537), basic vestibular evaluation (92540), sinusoidal vertical axis rotational testing (billed twice under 92546-59 and 92546-59-76), use of vertical electrodes (92547), and computerized dynamic posturography (92548), all as allegedly provided on December 15, 2020 to patient J.C., identified by claim number 0609100912, at the Linden Blvd clinic.

416.    Defendant Sanitas mailed two bills on or about the time they were dated, February 25, 2022, to Allstate, the first bill totaling $1,641.79 for TCD, complete study (CPT 93886), TCD, vasoreactivity study (93890), TCD, emboli detection (93892-59), and the second bill totaling $654.34 for caloric vestibular testing (92537), basic vestibular evaluation (92540), sinusoidal vertical axis rotational testing (billed twice under 92546-59 and 92546-59-76), use of vertical electrodes (92547), and computerized dynamic posturography (92548), all as provided on

February 17, 2022 to patient D.C., identified by claim number 0656877503, at the Linden Blvd clinic.

417.    At the clinical location of 4014A Boston Road, Bronx, NY 10475 ("Boston Road"), five Defendants have billed Allstate for providing patients on its premises with TCD, VNG, and/or SSR testing services.  This number includes at least two lay Defendants billing for such testing.

418.    For example, Defendant Chai LLC mailed a combined TCD and VNG testing bill on or about the time it was dated, December 29, 2022, totaling $1,388.46 for TCD, emboli detection (93892-TC), TCD, vasoreactivity study (93890-TC), TCD, complete study (CPT 93886-TC), computerized dynamic posturography (92548-TC), use of vertical electrodes (92547-TC), sinusoidal vertical axis rotational testing (billed twice under 92546-59-TC and 92546-59-76-TC), basic vestibular evaluation (92540-TC), and caloric vestibular testing (92537-TC), all as allegedly provided on November 8, 2022 to patient N.A., identified by claim number 0644027682, at the Boston Road clinic.

419.    Regarding the same patient N.A., and date of service November 8, 2022, Defendant Diag Neuro mailed a combined TCD and VNG bill on or about the time it was dated, December 29, 2022, totaling $907.68 to Allstate for the same testing services, and under the same CPT codes, (minus the technical component modifier "-TC") all as allegedly provided on November 8, 2022 to patient N.A., identified by claim number 0644027682, at the Boston Road clinic.

420.    Regarding the same patient N.A., and date of service October 14, 2021, Defendant Refuah mailed a bill on or about the time it was dated, October 22, 2021, totaling $318.94 to Allstate for autonomous nervous system testing – upper (95923-TC), and autonomous nervous system testing – lower (95923-TC), all as allegedly provided on October 14, 2021 to patient N.A., identified by claim number 0644027682, at the Boston Road clinic.

421.    Regarding the same patient N.A., and date of service October 14, 2021, Defendant Interventional mailed a bill on or about the time it was dated, October 22, 2021, totaling $130.28 to Allstate for the same autonomic nervous system testing services, and under the same CPT codes, (minus the technical component modifier "-TC") all as allegedly provided on October 14, 2021, to patient N.A., identified by claim number 0644027682, at the Boston Road clinic.

422.    Defendant Direct Med mailed two bills on or about the time they were dated, February 15, 2021, to Allstate, the first bill totaling $1,641.79 for TCD, emboli detection (93892-59), TCD, vasoreactivity study (93890), and TCD, complete study (CPT 93886), and the second bill totaling $666.34 for computerized dynamic posturography (92548), use of vertical electrodes (92547), sinusoidal vertical axis rotational testing (billed twice under 92546-59 and 92546-59-76), basic vestibular evaluation (92540), and caloric vestibular testing (92537) all as allegedly provided on January 18, 2021 to patient C.M., identified by claim number 978313547, at the Boston Road clinic.

423.    At the clinical location of 7945 Metropolitan Avenue, Flushing, NY 11379 ("Metropolitan"), at least five Defendants have billed Allstate for providing patients on its premises with TCD, VNG, and/or SSR testing services.  This number includes at least two lay Defendants billing for such testing.

424.    For example, Defendant Maimonides mailed a combined TCD and VNG testing bill on or about the time it was dated, June 13, 2023, totaling $1,388.46 for the use of vertical electrodes (92547-TC), sinusoidal vertical axis rotational testing (billed twice under 92546-59-TC and 92546-59-76-TC), computerized dynamic posturography (92548-TC), caloric vestibular testing (92537-TC), basic vestibular evaluation (92540-TC), and TCD, vasoreactivity study (93890), TCD, emboli detection (93892), TCD, complete study (CPT 93886), all as allegedly

provided on May 31, 2023 to patient M.L., identified by claim number 0712759372, at the Metropolitan clinic.

425.    Regarding the same patient M.L., and date of service May 31, 2023, Defendant Diag Neuro mailed a combined TCD and VNG bill on or about the time it was dated, June 13, 2023, totaling $907.68 to Allstate for the same CPT codes, (minus the technical component modifier "-TC") all as allegedly provided on May 31, 2023 to patient M.L., identified by claim number 0712759372, at the Metropolitan clinic.

426.    Regarding the same patient M.L., and date of service May 31, 2023, Defendant Sinai mailed a bill on or about the time it was dated, June 13, 2023, totaling $318.94 to Allstate for autonomous nervous system testing – upper (95923-TC), and autonomous nervous system testing – lower (95923-TC), all as allegedly provided on May 31, 2023 to patient M.L., identified by claim number 0712759372, at the Metropolitan clinic.

427.    Defendant Hillside mailed two bills on or about the time they were dated, January 28, 2021, to Allstate, the first bill totaling $1,641.79 for TCD, complete study (CPT 93886), TCD, vasoreactivity study (93890), TCD, emboli detection (93892-59), and the second bill totaling $666.34 for caloric vestibular testing (92537), basic vestibular evaluation (92540), sinusoidal vertical axis rotational testing (billed twice under 92546-59 and 92546-59-76), use of vertical electrodes (92547), and computerized dynamic posturography (92548), all as allegedly provided on January 4, 2021 to patient W.C., identified by claim number 0609600209, at the Metropolitan clinic.

428.    Defendant Lifeline mailed two bills on or about the time they were dated, October 18, 2019, to Allstate, the first bill totaling $1,253.21 for TCD, complete study (CPT 93886), TCD, vasoreactivity study (93890), TCD, emboli detection (93892), and the second bill totaling $381.52

245

for caloric vestibular testing (92533), basic vestibular evaluation (92540), sinusoidal vertical axis rotational texting (92546), and computerized dynamic posturography (92548), all as allegedly provided on September 10, 2019 to patient E.G., identified by claim number 0551577265, at the Metropolitan clinic.

429.    At the clinical location of 11 E Hawthorne Ave, Valley Stream, NY 11580 ("Hawthorne"), at least four Defendants have billed Allstate for providing patients on its premises with TCD, VNG, and/or SSR testing services.  This number includes at least one lay Defendant billing for such testing.

430.    For example, Defendant Refuah mailed a bill on or about the time it was dated, March 9, 2022, totaling $318.94 to Allstate for autonomic nervous system function testing – upper (95923-TC) and autonomic nervous system function testing – lower (95923-TC), all as allegedly provided on February 23, 2022, to patient I.C., identified by claim number 0653732578, at the Hawthorne clinic.

431.    Regarding the same patient I.C., and date of service February 23, 2022, Defendant Interventional mailed a bill on or about the time it was dated, March 9, 2022, totaling $130.28 to Allstate for two autonomous nervous system testing services, and under the same CPT codes (minus the technical component modifier "-TC") as allegedly provided to patient I.C., identified by claim number 0653732578, at the Hawthorne clinic.

432.    Defendant Central Park mailed two bills on or about the time they were dated, September 28, 2020, to Allstate, the first bill totaling $1,253.21 for TCD, complete study (CPT 93886), TCD, vasoreactivity study (93890), TCD, emboli detection (93892), and the second bill totaling $628.21 for caloric vestibular testing (92537), basic vestibular evaluation (92540), sinusoidal vertical axis rotational testing (billed twice under 92546-59 and 92546-59-76), use of

vertical electrodes (92547), and computerized dynamic posturography (92548), all as allegedly provided on September 16, 2020 to patient R.P., identified by claim number 0595587759, at the Hawthorne clinic.

433.    Defendant Hillside mailed two bills on or about the time they were dated, January 15, 2021, to Allstate, the first totaling $1,641.79 for TCD, complete study (CPT 93886), TCD, vasoreactivity study (93890), TCD, emboli detection (93892-59), and the second bill totaling $666.34 for caloric vestibular testing (92537), basic vestibular evaluation (92540), sinusoidal vertical axis rotational texting (billed twice under 92546-59 and 92546-59-76), use of vertical electrodes (92547), and computerized dynamic posturography (92548), all as allegedly provided on December 30, 2020 to patient C.G., identified by claim number 0608947999, at the Hawthorne clinic.

434.    At the clinical location of 1575 Hillside Ave, Ste 100, New Hyde Park, NY 11040 ("Hillside"), three Defendants have billed Allstate for providing patients on its premises with TCD, VNG, and/or SSR testing services.  This number includes at least one lay Defendant billing for such testing.

435.    For example, Defendant Regal mailed a bill on or about the time it was dated, August 13, 2022, totaling $278.15 to Allstate for caloric vestibular test (92537-TC), vstblr funcj nystag fovl & perph stimj osc (92540-TC), sinusoidal ver axis rotational tstg (billed twice under 92546-59-TC and 92546-59-76-TC), use vert eltrds (92547-TC), cptrized dynamic posturography (92548-TC), all as allegedly provided on August 2, 2022, to patient J.G., identified by claim number 0674627491, at the Hillside clinic.

436.     Regarding the same patient J.G., and date of service August 2, 2022, Defendant Greenwood mailed a bill on or about the time it was dated, August 13, 2022, totaling $600.73 to

Allstate for the same CPT codes (minus the technical component modifier "-TC") as allegedly provided to patient J.G., identified by claim number 0674627491, at the Hillside clinic.

437.    Defendant Regal  also mailed a bill on or about the time it was dated, July 2, 2020, totaling $238.81 to Allstate for the caloric vestibular testing (92543-TC), vestibular evaluation (92540-TC), sinusoidal rotational test (billed twice under 92546-59-TC and 92546-59-TC-76), supplemental electrical test (92547), posturography (92548-TC), all as allegedly provided on March 2, 2020 to patient G.C., identified by claim number 0575409636, at the Hillside clinic.

438.    Regarding the same patient G.C., and date of service March 2, 2020, Defendant Healthcare Med mailed a bill on or about the time it was dated, July 2, 2020, totaling $564.47 to Allstate for VNG testing services, under the same CPT codes (minus the technical component modifier "-TC") as allegedly provided to patient G.C., identified by claim number 0575409636, at the Hillside clinic.

439.    At the clinical location of 632 Utica Ave, Brooklyn, NY 11203 ("Utica"), –three Defendants have billed Allstate for providing patients on its premises with TCD, VNG, and/or SSR testing services.

440.    For example, Defendant Wilson mailed a bill on or about the time it was dated, July 8, 2021, totaling $1,641.79 to Allstate for TCD, emboli detection (93892), TCD, vasoreactivity study (93890), and TCD, complete study (CPT 93886), all as allegedly provided on June 23, 2021 to patient D.G., identified by claim number 0629756668, at the Utica clinic.

441.    Similarly, Defendant Hillside mailed a bill on or about the time it was dated, January 20, 2021, totaling $1,641.79 to Allstate for TCD, complete study (CPT 93886), TCD, vasoreactivity study (93890), and TCD, emboli detection (93892-59), all as allegedly provided on December 23, 2020 to patient T.P., identified by claim number 0609065636, at the Utica clinic.

248

442.    Similarly, Defendant Pitch PC mailed a bill on or about the time it was dated, May 16, 2022, totaling $1,641.79 to Allstate for TCD, emboli detection (93892), TCD, vasoreactivity study (93890), and TCD, complete study (CPT 93886), all as allegedly provided on April 6, 2022 to patient C.Q., identified by claim number 0660810144, at the Utica clinic.

443.    At the clinical location of 318 Seguine Ave, Staten Island, NY 10309 ("Seguine"), three Defendants have billed Allstate for providing patients on its premises with TCD, VNG, and/or SSR testing services.  This number includes at least one lay Defendant billing for such testing.

444.    For example, Defendant Regal mailed a bill on or about the time it was dated, October 20, 2020, totaling $243.46 to Allstate for autonomic nervous func test (95923-TC), and autonomic nervous func test (95923-TC), all as provided on September 9, 2020, to patient M.P., identified by claim number 0591029731, at the Seguine clinic.

445.    Regarding the same patient M.P., and date of service September 9, 2020, Defendant Greenwood mailed a bill on or about the time it was dated, October 20, 2020, totaling $99.44 to Allstate for autonomic nervous testing services, and under the same CPT codes (minus the technical component modifier "-TC") as allegedly provided to patient M.P., identified by claim number 0591029731, at the Seguine clinic.

446.    Defendant Central Park mailed two bills on or about the time they were dated, October 5, 2020, to Allstate, the first bill totaling $1,253.21 for TCD, complete study (CPT 93886), TCD, vasoreactivity study (93890), TCD, emboli detection (93892-59), and the second bill totaling $628.21 for caloric vestibular testing (92537), basic vestibular evaluation (92540), sinusoidal vertical axis rotational testing (billed twice under 92546-59 and 92546-59-76), use of vertical electrodes (92547), and computerized dynamic posturography (92548), all as allegedly provided

on September 16, 2020 to patient L.P., identified by claim number 0596238071, at the Seguine clinic.

**B.**     **Separate Billing Entities for Administration and Interpretation of Results**

447.    In this aspect of the scheme, lay Defendants have billed for the services of a "technician" or "technologist" in performing the testing, while the provider billing Defendants have billed for interpretation of the purported testing results.  Thus there have been pairs of Defendants and their owners for much of the billing linking many of the Defendants together.

448.    There is no license in New York for such a "technician" or "technologist" nor any required qualification.  This is a fancy name for a lay person.  For patient after patient, their bills generally set forth the same services, CPT codes, and charged amounts represented thereon regardless of any differences between the patients.

449.    For example, Defendant Chai LLC mailed a combined TCD and VNG testing bill on or about the time it was dated, March 7, 2023, totaling $1,388.46 for the technical components of two sinusoidal vertical axis testing (92546-59-76-TC and 94546-59-TC), computerized dynamic posturography (92548-TC), use of vertical electrodes (92547-TC), basic vestibular evaluation (92540-TC), caloric vestibular test (92537-TC), TCD emboli detection (93892-59-TC), TCD vasoreactivity study (93890-TC), and TCD complete study (93886-TC), all as allegedly provided by a technician on February 6, 2023 to patient S.S., identified by claim number 0700543267.

450.    Regarding the same patient S.T., and date of service February 6, 2023, Defendant Diag Neuro mailed a combined TCD and VNG bill on or about the time it was dated, March 7, 2023, totaling $907.68 to Allstate for the interpretive components of the same testing services, and

under the same CPT codes, (minus the technical component modifier "-TC") all as allegedly provided to patient S.T.

451.    In another example, Defendant BLK LLC mailed a bill on or about the time it was dated, August 17, 2021, totaling $314.94 to Allstate for the technical components of autonomic nervous system function testing – upper ext (95923-TC) and autonomic nervous system function testing – lower ext (95923-TC), all as allegedly provided on July 26, 2021, to patient J.T., identified by claim number 0633120530.

452.    Regarding the same patient J.T., and date of service July 26, 2021, Defendant Interventional PLLC mailed a bill on or about the time it was dated, August 17, 2021, totaling $130.28 to Allstate for the interpretive components of the same two testing services, and under the same CPT codes (minus the technical component modifier "-TC") all as allegedly provided to patient J.T.

### C.    Multiple Entities Owned by Same Individual Defendant

453.    The Defendants in this scheme were also interconnected with overlapping ownership between many of the Defendants.  By distributing the billing among several providers with overlapping ownership instead of billing through one entity, the amount attributable to any one provider Defendant was reduced, further obscuring the nature and scale of the fraud.  For example, individual Defendant Duhamel  is listed as the nominal owner of at least two billing Defendants, Hillside and Wilson.

454.    Layperson Defendant D. Bogatin is listed as the nominal owner of at least five billing Unlicensed Defendants: BLK, Chai, Maimonides, Refuah, and Sinai.

455.   Layperson Defendant G. Bogatin is listed as the nominal owner of at least five billing Unlicensed Defendants: BLK, Chai, Maimonides, Refuah, and Sinai.

456.   Layperson Defendant Khanatayev is listed as the nominal owner of at least five billing Unlicensed Defendants: BLK, Chai, Maimonides, Refuah, and Sinai.

457.   Layperson Defendant Kofman is listed as the nominal owner of at least five billing Unlicensed Defendants: BLK, Chai, Maimonides, Refuah, Sinai, and Regal.

458.   Licensed Defendant Khanna is listed as the nominal owner of at least two billing Licensed Defendants: Pitch and Emote.

## D.   Use of Same Diagnoses and Duplication of Data and Waveforms

459.   As discussed, and demonstrated through examples in the factual allegations above, numerous fraudulent bills were mailed to Allstate on behalf of the billing Defendants for TCD, VNG, and SSR testing using the same diagnoses regardless of the patient's age, symptoms, or medical conditions.

460.   In many cases, as demonstrated through examples in this complaint, numerous fraudulent bills for TCD testing, VNG testing, and SSR testing by the separate billing Defendant entities were supported by reports with identical data and waveforms. In some of these cases, despite identical data and waveforms, the results and/or impressions differed, further demonstrating the lack of medical necessity and lack of actual relationship of these reports to the particular patient or their history.

461.   For example, on multiple TCD bills of Direct Med, Green Power, Hillside, Chai, Diag Neuro, Wizard, and Sanitas, and some of Pitch, their patients are purportedly diagnosed again and again with the same serious conditions *verbatim*:

462.    G45.1 Carotid artery syndrome,G45.8 Other transient cerebral ischemic attacks and related syndromes,I63.8 Othercerebral infarction,I63.89 Other cerebral infarction,I65.1 Occlusion and stenosis of basilar artery,I65.29 Occlusion and stenosis of unspecified carotid artery,I66.8 Occlusion and stenosis of other cerebral arteries,

463.    On multiple VNG testing bills of Sanitas, Direct Med, and Green Power, patients are purportedly diagnosed again and again with the same conditions *verbatim*:

464.    H81.399 Other peripheral vertigo, unspecified ear,H81.09 Meniere's disease, unspecified,H81.13 Benign paroxysmal vertigo, bilateral,H81.49 Vertigo of central origin,R26.9 Awkward uncoordinated of walking,R27.0 Loss of coordination of voluntary muscular movement,R42 Dizziness,Z91.81 History of falling,

465.    On multiple VNG testing bills of Direct Med, Wilson, patients are purportedly diagnosed again and again with the same conditions *verbatim*:

> R42 – DIZZINESS
> H81.399-Peripheral vertigo, unspecified
> R26.9 - Unspecified abnormalities of gait and mobility

466.    On multiple SSR bills of Interventional, BLK, Refuah, and Sinai, patients are purportedly diagnosed again and again with the same conditions *verbatim*:

> M54.5 Low Back Pain
> R20.2 Paresthesis of Skin

467.    On multiple SSR bills of Interventional, Diag Neuro, BLK, Refuah, and Sinai, patients are purportedly diagnosed again and again with the same conditions *verbatim*:

> G60.0 Neuropathy, motor and sensory

468.    For patient after patient, the bills of these billing Defendants listed the same phony – and sometimes potentially life-threatening – diagnoses of the patients' relevant conditions. It is absurd for numerous patients to have word for word the same brain injury diagnoses. It is also absurd for numerous patients to have word for word the same vestibular disorders or autonomous system function abnormalities. And it is beyond absurd for patient after patient after patient to have both sets of symptoms with word-for-word identical language.

253

469.     Additionally, as demonstrated through examples in this complaint, numerous phony reports for TCD testing, VNG testing, and SSR testing were generated by the separate billing Defendants which purported to show each individual patient's testing results. In some of these cases, the data and waveforms were identical and were simply copied and pasted from the reports for another patient.

470.     Set forth in the earlier sections of this complaint are examples of identical TCD data and waveforms of different patients from different Defendant entities.  Set forth in the earlier sections of this complaint are examples of identical VNG data and waveforms of different patients from different Defendant entities.  Set forth in the earlier sections of this complaint are examples of examples of identical SSR data and waveforms of different patients from different Defendant entities.

**E.     Use of Same Forms and Same Language in Reports**

471.     Furthermore, the billing Defendants frequently utilized identical forms already filled with predetermined information. The consistent language found in the reports of these seemingly distinct entities was a common characteristic, providing further evidence of the direct association and interconnectedness among the Defendants.

472.     In many cases, as demonstrated through examples in this complaint, these separate billing Defendant entities used the same forms, used the same language in reports, and filled them using preselected information, with rote diagnoses and charges having no medical necessity, and no relationship to the particular patient or their history.

473.     For example, the Licensed Defendants Diag Neuro, Direct Med, Emote, Hillside, Lifeline, Pitch, Sanitas, Seneca, and Wilson have used identical language again and again on their TCD reports *verbatim*:

Technical Result: Pulsed-Doppler mean velocities(cm/sec) and the Gosling pulsatility indices for each vessel insonated from the temporal, orbital, and sub-occipital windows. Vasomotor Reactivity is the percentage increase in mean flow velocity following a 20-30 second breath-holing maneuver(B/H).

474.    Direct Med, Hillside, Pitch, Sanitas, Seneca, and Wilson have used identical language again and again on their TCD reports *verbatim*:

This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. Vasomotor Reactivity (VMR) testing showed normal vasodilator reactivity in the right(r) MCA. No evidence of emboli detection throughout the monitoring period. TCD is not sensitive for tumors, aneurysms and small AVMs.

475.    Diag Neuro, Emote, and Lifeline have used identical language again and again on their TCD reports *verbatim*:

This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease. TCD is not sensitive for tumors, aneurysms and small AVMs The testing was performed by a technician and is based solely on the tracing provided (in this report – lifeline)

476.    Lifeline and 334 Grand have used identical language again and again on their TCD reports *verbatim*:

Normal Transcranial Doppler Study. No evidence of hemodynamically significant stenosis or occlusion in the intracerebral arteries. Breath holding index with quesitonably abnormal or normal vasoreactivity. No evidence of intensity transient signals(micro-emboli).There is no evidence of intracranial stenosis or occlusive disease. TCD is not sensitive for tumors, aneurysms and small AVMs The testing was performed by a technician and is based solely on the tracing provided(in this report – lifeline)

477.    Green Power and Lifeline have used identical language again and again on their TCD reports *verbatim*:

Normal Study with adequate functional reserve testing (VMR). No evidence of intensity transient signals(micro-emboli).    This study confirms the patency of the major basal intracranial arteries of the Circle of Willis.  There is no evidence of intracranial stenosis or occlusive disease.  TCD is not sensitive for tumors, aneurysms and small AVMs The testing was performed by a technician and is based solely on the tracing provided(in this report – lifeline)

255

478.    Diag Neuro, Interventional and Greenwood have used identical language again and again on their SSR reports *verbatim*:

> C/o Neck pain with radiation to both upper extremities; numbness in hands
> C/o back pain with radiation to both lower extremities; numbness in feet

479.    Diag Neuro, Interventional and Greenwood have used identical language again and again on their SSR reports *verbatim*:

> Findings:    EMG is recommended to rule out radiculopathy, plexopathy, or myopathy.    Clinical correlation is recommended.    The testing was performed by a technician and interpretation is solely based on the graphics and tracing provided in this report.

480.    In addition to using identical language in their reports, the Defendants also used the same forms for their reports.

481.    For example, the entire first page of the "Videonystagmography (VNG) with Computerized Dynamic Posturography (DPP) REPORT" often used by Defendants 334 Grand Concourse, Diag Neuro, Emote, Hillside, Lifeline, Pitch, and Sanitas are identical.

482.    The Infrared/Video ENG Report often used by Defendants Direct Med, Hillside, Pitch, Sanitas, Seneca, and Wilson are identical.

483.    The first page of the Upper Extremity Sympathetic Skin Response Report often used by Defendants Diag Neuro, Interventional and Greenwood are identical.

484.    The first page of the Lower Extremity Sympathetic Skin Response Report often used by Defendants Diag Neuro, Interventional and Greenwood are identical.

485.    The billing Defendants' connections and interrelations are apparent through various practices utilized by the managers of the scheme. These deceptive strategies emphasize the complexity and sophistication employed by the scheme's architects to obscure their illicit activities, thereby complicating the detection process further.

## VIII.   The Defendants' Failure to Verify Claims

486.    Bills were submitted on behalf of the Licensed Defendant Central Park, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.  Allstate has made numerous written verification requests which have been ignored.  Allstate has also requested the examination under oath (EUOs) of Central Park, which has failed to appear for such EUO, and who has thereby violated a policy condition.

487.    Bills were submitted on behalf of the Unlicensed Defendant Chai, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.  Allstate has made numerous written verification requests which have been ignored.

488.    Bills were submitted on behalf of the Licensed Defendant Direct Med, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.  Allstate has made numerous written verification requests which have been ignored.  Allstate has also requested the examination under oath (EUOs) of Direct Med, which has failed to appear for such EUO, and who has thereby violated a policy condition.

489.    Bills were submitted on behalf of the Unlicensed Defendant Green Power, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.  Allstate has made numerous written verification requests which have been ignored.

490.    Bills were submitted on behalf of the Licensed Defendant Greenwood, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.  Allstate has made numerous written verification requests which have been ignored.

491.    Bills were submitted on behalf of the Licensed Defendant Hillside, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.  Allstate has made numerous written verification requests which have been ignored.  Allstate has also

requested the examination under oath (EUOs) of Hillside, which has failed to appear for such EUO, and who has thereby violated a policy condition.

492.    Bills were submitted on behalf of the Licensed Defendant Lifeline, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.  Allstate has made numerous written verification requests which have been ignored.

493.    Bills were submitted on behalf of the Unlicensed Defendant Regal, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.  Allstate has made numerous written verification requests which have been ignored.

494.    Bills were submitted on behalf of the Licensed Defendant Sanitas, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.  Allstate has made numerous written verification requests which have been ignored.  Allstate has also requested the examination under oath (EUOs) of Sanitas, which has failed to appear for such EUO, and who has thereby violated a policy condition.

495.    Bills were submitted on behalf of the Licensed Defendant Seneca, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.  Allstate has made numerous written verification requests which have been ignored.  Allstate has also requested the examination under oath (EUOs) of Seneca, which has failed to appear for such EUO, and who has thereby violated a policy condition.

496.    Bills were submitted on behalf of the Licensed Defendant Wilson, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.  Allstate has made numerous written verification requests which have been ignored.

497.    Bills were submitted on behalf of the Unlicensed Defendant Wizard, and Allstate has sought to verify these claims and to ascertain the basis(es) or lack thereof for such billing.  Allstate has made numerous written verification requests which have been ignored.

## IX.    The Defendants' Fraudulent Scheme to Bill for <u>Services Rendered by Independent Contractors</u>

498.    Under the No-Fault Law, a health care provider is not entitled to payment from insurers for services provided by independent contractors.  The applicable DFS Regulations provide, in pertinent part, for "pay[ment of] benefits <u>directly to providers</u> of health care services." 11 NYCRR 65-3.11(a) (emphasis added).  In the leading decision on this question, the Appellate Division, Second Department held that "11 NYCRR 65-3.11(a)does not authorize direct payment to a medical provider which submits a bill identifying the treating provider as an independent contractor." *A.M. Med. Servs. v. Progressive Cas. Ins. Co.*, 101 A.D.3d 53, 62 (2nd Dep't 2012).

499.    The DFS and its predecessor the Insurance Department have issued a series of opinion letters setting forth their position that professional corporations (PCs) cannot submit bills in their own name for services provided by independent contractors, and those opinions are entitled to deference by the courts unless irrational or unreasonable.  *See Marin v. Apple-Metro, Inc.*, No. 12-cv-5274 (ENV) (CLP), 2020 U.S. Dist. LEXIS 195258, at *34-35 (E.D.N.Y. Oct. 7, 2020) ("Deference extends even to informal opinion letters that 'represent[] the position' of the relevant agency.") (quoting *A.M. Medical*, 101 A.D.3d at 64).

500.    The decision of the Appellate Division in *A.M. Medical* was rendered in deference to a February 21, 2001 informal opinion letter of the General Counsel of the Insurance Department. In that letter, the General Counsel stated that "[w]here the health services are performed by a provider who is an independent contractor with [a (PC)] and is not an employee under the direct

supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider

of those services." *A.M Medical*, 101 A.D.3d at 63. The Appellate Division quoted at length from

the February 21, 2001 opinion letter:

> Such direct billing by the PC, due to the lack of supervisory control by the PC, may facilitate fraud, since the PC might bill under its own fee schedule as a specialist rather than the general practitioner fee schedule of the independent contractor, who actually provided the service. In addition, the patient may wrongfully believe the independent contractor's actions are under the supervision of the PC.

> Since New York Education Law § 6509-aspecifically authorizes shareholders and employees to contribute to the income of a PC, and is separate with respect to independent contractors, allowing the PC to bill for the independent contractor may constitute unlawful fee splitting....

> Accordingly, since the control, and therefore the liability, of the principal for the acts of the independent contractor is attenuated, and in order to preserve the integrity of the No-Fault and physician licensing systems, this Department has determined that, when the services are provided by an independent contractor, the PC should not be considered as the 'licensed provider' authorized to bill under No-Fault."

*Id*. (quoting Ops. Gen. Counsel NY Ins. Dep't No. 01-02-13 (Feb. 21, 2001)).

501.    The Insurance Department (now the DFS) upheld and reaffirmed the 2001 opinion

regarding billing for services performed by independent contractors in subsequent opinion letters,

including without limitation letters dated February 5, 2002; March 11, 2002; October 29, 2003;

and March 21, 2005.

502.    In order to permit insurers to know whether services have been provided by

employees or independent contractors, DFS promulgated a prescribed claim form – Form NF-3 –

that requires a health care provider to disclose whether the billed-for services were provided by

employees or independent contractors. The health provider Defendants have repeatedly set forth

false information as to who provided the services, claiming that it was the Defendant health

providers or their owners who are licensed physicians, when in actuality it was performed by

laypersons or by no one at all.  These laypersons were not employees of the billing provider Defendants but were independent contractors to the extent they provided any services.  As set forth in the deposition testimony taken by GEICO of the laypersons who administered these services, the laypersons did not even know for which medical practice they were supposedly working.

503.    To the extent that any services were provided at all, the services were provided by independent contractors, and the provider Defendants or their nominal owners who are physicians were not involved in the providing of services.


X.    **The Defendants' Fraudulent Scheme was Enabled by Illegal Referrals of Patients**

504.    The referral network and the payments to referring providers were the foundation of this scheme.  The Defendants obtained the patients with payments to the referring providers. The services billed for the Defendants were of no value and there was no reason for any of the referring providers and clinics to make such referrals.  The only reason were the financial incentives provided by the Defendants.

505.    GEICO has chronicled in case after case against many of the Defendants in this case the schemes utilized to obtain patients by making payments to the referring providers often making use of intermediaries with criminal and fraudulent backgrounds including money laundering.

506.    Under Section 238-d of the New York Public Health Law, referrals between financially related providers are generally prohibited, except where that financial relationship is disclosed to the patient.  Courts have interpreted this statute as prescribing a non-precludable defense for insurers against No-Fault claims.  *See Fair Price Med. Supp. Corp. v. ELRAC Inc.*, 12 Misc. 3d 119, 121-22, 820 N.Y.S.2d 679, 681 (App. Term 2nd Dep't 2006).

507.    Moreover, for certain enumerated health care services, even disclosure of a relationship to patients will not cure a self-referral violation.  Section 238-a(1) of the Public Health Law forbids a provider from referring patients to another provider with which it has a financial relationship for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy (PT) services, and x-ray or imaging services.  Any billing for services resulting from such a referral is also prohibited by Section 238-a(2).  Such referrals and billing are illegal even with disclosure to the patient of a financial relationship between the providers.

508.    Ultrasound, which encompasses TCD testing, is an enumerated service under Section 238-a(1) of the Public Health Law.

## A.    Illegal Referrals to the Defendants (P.H.L. § 238-d)

509.    The Defendants obtained their patients from referring providers that they had financial relationships with and did not disclose that financial relationship to patients, in violation of Section 238-d of the Public Health Law.

510.    The referral of patients between these financially related entities was illegal under New York law.  The true nature and extent of the interrelationships were not disclosed to patients.

511.    In addition, the provider Defendants have been extensively connected and interrelated, with sharing of patients between financially related entities.  This is also illegal and was part of an illegal pattern of referrals.

## B.    Illegal Referrals for TCD Testing (P.H.L. § 238-a)

512.    Ultrasound, which encompasses TCD testing, is an enumerated service pursuant to P.H.L. § 238-a.

513.    The referring providers are prohibited from making referrals to the health provider Defendants for Doppler testing under P.H.L. § 238-a(1), and the Defendants 334 Grand, Central Park, Chai, Diag Neuro, Direct Med, Green Power, Healthcare Med, Hillside, Lifeline, Maimonides, Pitch, Regal, Sanitas, Seneca, Wilson, and Wizard are prohibited from billing Allstate for doppler testing based on such referrals under P.H.L. § 238-a(1) and Allstate has the right to recover all amounts paid under P.H.L. § 238-a(1).

**FIRST CLAIM FOR RELIEF**

**(Common Law Fraud)**

**(Against All Defendants)**

514.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 513 of this Complaint with the same force and effect as if set forth fully herein.

515.    As part of the fraudulent scheme implemented by the Defendants, as set forth in detail in this Complaint, the Defendants made material misrepresentations and/or omitted material statements in submitting No-Fault claims to ALLSTATE for payment.

516.    As set forth herein, the Defendants intentionally, knowingly, fraudulently, and with an intent to deceive ALLSTATE and the public, omitted material facts and made various misleading statements (i) intending to hold out the Defendants as legal and lawfully operating professional entities licensed in the state where the services were provided when in fact they were not; (ii) intending to fraudulently induce ALLSTATE to make payments that the Defendants were not entitled to because of their illegal operation or because of the existence of an illegal referral arrangement and/or because the services were not provided as billed and/or because the findings and reports of the Defendants were fictitious; (iii) intending to fraudulently induce ALLSTATE to

263

make payments by representing that the services had been provided by properly licensed doctors; (iv) misrepresenting the nature of the services that had been administered and misrepresenting the relationship of the services to a covered accident; (v) misrepresenting that the referrals and services were necessary; (vi) misrepresenting that the services were provided by employees; (vii) misrepresenting that Defendants were being legally owned and lawfully operating as required by licensing requirements; and (viii) setting forth fictitious diagnoses and representations of services provided.

517.    As set forth herein, the Defendants intentionally, knowingly, fraudulently, and with an intent to deceive ALLSTATE, their own patients and the general public, hid improper referral relationships and did not provide the services that were billed by making false representations of material facts, including, but not limited to, the following fraudulent misrepresentations:  (i) false and misleading statements that services had been provided and were provided by employees when the services were fictitious and were not provided as billed and were not provided by employees; (ii) false and misleading statements contained in each separate bill, medical record and report submitted to ALLSTATE regarding the nature of service provided and/or the relationship between the Defendants, the shareholder-doctors, and entities to which referrals were made;(iii) false and misleading statements as to the details of the Defendants' operation, management, ownership and lack of compliance with State licensing requirements which not only defrauded ALLSTATE but also endangered the welfare of the public; and (iv) false and misleading statements as to the details of the services administered to patients.

518.    The Individual Defendants, acting in concert with the Entity Defendants, participated in, conspired together, aided and abetted, and furthered the fraudulent schemes through a common course of conduct and purpose.

519.    The Defendants concealed the fraudulent nature of their claims through their misrepresentations and material omissions. In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. The Defendants' fraudulent concealment of their scheme to defraud prevented ALLSTATE from discovering or asserting, until now, the foregoing fraud, or the injury resulting therefrom to ALLSTATE.

520.    ALLSTATE has no obligation to pay for health care services allegedly rendered by individuals acting in the employ of a professional corporation and/or physician, where, as here, the services were not provided by properly licensed providers, the services billed were not provided, the services were not provided as billed, the services were provided by independent contractors, the services were provided pursuant to an illegal referral scheme, the claimed injuries did not exist, the claimed diagnoses were fictitious and not related to a covered accident, the claimed test results were fictitious, the submitted claims are fraudulent in nature, the services were provided by entities and individuals that were not legally owned, controlled, and managed according to state licensing and operating requirements; and/or the services were provided as part of a scheme and pattern to bill unnecessary services in order to submit substantial fraudulent billing to ALLSTATE.

521.    The Defendants knew the foregoing material misrepresentations to be false when made and made or facilitated these false representations with the intention and purpose of inducing ALLSTATE to rely thereon.

522.    ALLSTATE did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts that ALLSTATE was led to believe existed as a result

of the Defendants' acts of fraud and deception, and which led to ALLSTATE making payments to the Defendants and incurring expenses as a result.

523.    Had ALLSTATE known of the fraudulent content of the reports, the fraudulent nature of the diagnoses, the fictitious nature of the claimed injuries, the fictitious nature of the services that were represented to be provided, the referrals by financially related entities, the illegal payments made to obtain referrals, the fact that the services had not been provided as billed, the fact that the fees billed were in violation of the law, the fact that the services had not been provided by licensed providers, the illegal operation, management, ownership, and lack of compliance with state licensing requirements of the Defendant health providers, and the fact that the services were provided by independent contractors, it would not have paid the Defendants' claims for No-Fault insurance benefits submitted in connection therewith.

524.    In reliance upon these false representations and/or omissions, during the six (6) years preceding this Complaint, ALLSTATE has made payments to the Defendants and incurred additional costs totaling at least $1,668,862.73 as a result of the fraudulent billing.

525.    ALLSTATE was thus injured as a proximate result and is entitled to recover, jointly and severally, the payments it made to the Defendants. As a result of the fraud of the Defendants, ALLSTATE should recover, jointly and severally, all of its payments and be reimbursed for the costs incurred as a result of the fraudulent billing.

526.    ALLSTATE also requests punitive damages, joinlty and severally, in the amount of $1,000,000, plus interest.

## SECOND CLAIM FOR RELIEF

### (Unjust Enrichment)

### (Against All Defendants)

527.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 526 of this Complaint with the same force and effect as if set forth fully herein.

528.    By reason of their wrongdoing, the Defendants have been unjustly enriched, in that they have received monies from ALLSTATE that are the result of unlawful conduct, and that in equity and good conscience, they should not be permitted to keep.

529.    No contract exists between ALLSTATE and the Defendants.  ALLSTATE is not asserting any ground for recovery that arises from any contract.

530.    ALLSTATE is therefore entitled to restitution from the Defendants in the amount by which the Defendants have been unjustly enriched.


## THIRD CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (PC Enterprise)

### (Against Defendants Wizard, Duhamel, John Doe 1 and ABC Corp. 1)

531.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 530 of this Complaint with the same force and effect as if set forth fully herein.

532.    At all times relevant to this Complaint, the Defendant Hillside constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

533.    At all times relevant to this Complaint, the Defendants Wizard, Duhamel, John Doe 1 and ABC Corp. 1 were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c).

534.    The Defendants Wizard, Duhamel, John Doe 1 and ABC Corp. 1 conducted or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  These Defendants enabled and/or controlled the billing of the Hillside who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.  In addition, Wizard submitted more billing in its own name for services allegedly performed and/or interpreted by Hillside even though Wizard had no license as a health provider.  Wizard used a phony name on its corporate papers for its owner.  Duhamel enabled the fraudulent use of his name and license and that of Hillside in order to submit billing to ALLSTATE and other insurers.  All of these Defendants enabled and/or controlled the reports of Hillside which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided.  Wizard added fraudulent billings in its own name.  Substantial billing was mailed to ALLSTATE on behalf of Hillside for TCD and VNG testing.  These services were not provided as billed and were not provided by Duhamel.  Indeed, Duhamel was practicing illegally suspended in March 2021.  He was incapable of providing the services that Hillside and Wizard billed for.  Many of these tests were not administered at all.  The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology.  This fraudulent billing was enabled by the Defendants Duhamel, Wizard, John Doe 1, and ABC Corp. 1.  The Defendant Wizard provided and directed many of the persons including laypersons who actually administered any purported health care

268

services that were provided by the Defendants.  The Defendants Duhamel, Wizard, John Doe 1 and ABC Corp. 1 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services.  Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed and some of which could have harmed the patients. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.  The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

     a)     Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

     b)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Hillside had financial relationships with its referring providers, and did not disclose these relationships;

     c)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Hillside for services that were not provided by Hillside and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

     d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Hillside had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

     e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

     f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Hillside billed for had been administered by employees

269

of the Defendant Hillside when in fact the services were administered by independent contractors or had not been administered at all;

g)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Hillside billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

h)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

i)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

j)    Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Hillside and Duhamel were properly licensed and operating within the scope of their licenses and that the Defendants Hillside and Duhamel administered the services billed under their names and licenses. And these Defendants submitted billing in the name of Duhamel after his license to practice medicine was suspended by the Department of Health State Board for Professional Misconduct in March 2021;

k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

535.    The Defendants have engaged in this scheme from October 2020 and up to the present and continuing, and if the Court does not provide relief, the fraudulent enterprise will continue to seek to submit and collect fraudulent claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

536.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

537.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

538.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.   During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Hillside the substantial claim amount of approximately $105,322.68.

539.    Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.   In addition to concealing the fraudulent nature of each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

540.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant Hillside which would not have otherwise been made but for the fraudulent activities.

## FOURTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (Association In Fact Enterprise)

### (Against Defendants Hillside, Wizard, Duhamel, John Doe 1 and ABC Corp. 1)

541.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 540 of this Complaint with the same force and effect as if set forth fully herein.

542.    At all times relevant to this Complaint, the Defendants Hillside, Wizard, Duhamel, John Doe 1 and ABC Corp. constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise").  This enterprise was formed with the common purpose of engaging in fraudulent activities.

543.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

544.    The Defendants Hillside, Wizard, Duhamel, John Doe 1 and ABC Corp. 1 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.  In addition to services billed in the name of Hillside, Wizard submitted more billing in its own name for services allegedly performed and/or interpreted by Hillside even though Wizard had no license as a health provider.  Wizard used a phony name on its corporate papers for its owner.  Duhamel enabled the fraudulent use of his name and license and that of Hillside in order to submit billing

272

to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Hillside and Wizard which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Hillside and Wizard for TCD and VNG testing. These services were not provided as billed and were not provided by Duhamel. Indeed, Duhamel was practicing illegally and had his license suspended in March 2021. He was incapable of providing the services that Hillside and Wizard billed for. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Hillside, Wizard, Duhamel, and the John Doe 1 and ABC Corp. 1 Defendants. The Defendant Wizard provided and directed many of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants. The Defendants Hillside, Wizard, Duhamel, John Doe 1 and ABC Corp. 1 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

> (a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendants Hillside and Wizard had financial relationships with their referring providers, and did not disclose these relationships;

(c)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Hillside for services that were not provided by Hillside and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Hillside and Wizard had administered TCD and VNG tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Hillside billed for had been administered by employees of the Defendant Hillside when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Hillside billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Hillside and Duhamel were properly licensed and operating within the scope of their licenses and that the Defendants Hillside and Duhamel administered the services billed under their names and licenses.  And these Defendants submitted billing in the name of Duhamel after his license to practice medicine was suspended by the Department of Health State Board for Professional Misconduct in March 2021.

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

545.    The Defendants have engaged in this scheme from October 2020 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers. Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

546.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

547.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

548.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained

by ALLSTATE and the costs of this suit, including reasonable attorneys' fees. During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Hillside substantial claim amounts totaling at least $105,322.68, and to the Defendant Wizard substantial claim amounts totaling about $30,670.13.

549.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions. In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

550.    ALLSTATE was damaged by this scheme in that payments were made to, or others on behalf of, the Defendants Hillside and Wizard which would not have otherwise been made but for the fraudulent activities.


### FIFTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants Hillside, Wizard, Duhamel, John Doe 1 and ABC Corp. 1)**

551.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 550 of this Complaint with the same force and effect as if set forth fully herein.

552.    The Defendants Hillside, Wizard, Duhamel, John Doe 1, and ABC Corp. 1 have conspired with each other to violate 18 U.S.C. § 1962(c).

553.    The Defendants Hillside, Wizard, Duhamel, John Doe 1 and ABC Corp. 1 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the

affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

554.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents. Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

555.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

556.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Hillside, Wizard, Duhamel, John Doe 1 and ABC Corp. 1 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

557.    The Defendants Hillside, Wizard, Duhamel, John Doe 1 and ABC Corp. 1 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

## SIXTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (PC Enterprise)

### (Against Defendants Duhamel, John Doe 2 and ABC Corp. 2)

558.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 557 of this Complaint with the same force and effect as if set forth fully herein.

559.    At all times relevant to this Complaint, the Defendant Wilson constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

560.    At all times relevant to this Complaint, the Defendants Duhamel, John Doe 2 and ABC Corp. 2 were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c).

561.    The Defendants Duhamel, John Doe 2 and ABC Corp. 2 conducted or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).   These Defendants enabled and/or controlled the billing of Wilson who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.   Duhamel enabled the fraudulent use of his name and license and that of Wilson in order to submit billing to ALLSTATE and other insurers.   All of these Defendants enabled and/or controlled the reports of Wilson which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided.   Substantial billing was mailed to ALLSTATE on behalf of Wilson for TCD and VNG testing.   These services were not

provided as billed and were not provided by Duhamel. Indeed, Duhamel was practicing illegally and had his license suspended in March 2021. He was incapable of providing the services that Wilson billed for. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Duhamel, John Doe 2, and ABC Corp. 2. The Defendants Duhamel, John Doe 2 and ABC Corp. 2 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed and some of which could have harmed the patients. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

    (a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

    (b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Wilson had financial relationships with its referring providers, and did not disclose these relationships;

    (c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Wilson for services that were not provided by Wilson and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

    (d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Wilson had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

279

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Wilson billed for had been administered by employees of the Defendant Wilson when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Wilson billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Wilson and Duhamel were properly licensed and operating within the scope of their licenses and that the Defendants Wilson and Duhamel administered the services billed under their names and licenses.  And these Defendants submitted billing in the name of Duhamel after his license to practice medicine was suspended by the Department of Health State Board for Professional Misconduct in March 2021.

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

562.    The Defendants have engaged in this scheme from April 2021 and up to the present and continuing and if the Court does not provide relief, the fraudulent enterprise will

continue to seek to submit and collect fraudulent claims.   Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.   This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

563.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

564.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional  functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

565.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.   During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Wilson the substantial claim amount of approximately $49,697.92.

566.    Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.   In addition to concealing the fraudulent nature of each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

567.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant Wilson which would not have otherwise been made but for the fraudulent activities.

## SEVENTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (Association In Fact Enterprise)

### (Against Defendants Wilson, Duhamel, John Doe 2 and ABC Corp. 2)

568.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 567 of this Complaint with the same force and effect as if set forth fully herein.

569.    At all times relevant to this Complaint, the Defendants Wilson, Duhamel, John Doe 2 and ABC Corp. 2 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise"). This enterprise was formed with the common purpose of engaging in fraudulent activities.

570.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

571.    The Defendants Wilson, Duhamel, John Doe 2 and ABC Corp. 2 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. Duhamel enabled the fraudulent use of his name and license and that of Wilson in order to submit billing to

ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Wilson which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Wilson for TCD and VNG tests. These services were not provided as billed and were not provided by Duhamel. Indeed, Duhamel was practicing illegally and had his license suspended in March 2021. He was incapable of providing the services that Wilson billed for. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Wilson, Duhamel and the John Doe 2 and ABC Corp. 2 Defendants. The Defendants Wilson, Duhamel, John Doe 2 and ABC Corp. 2 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

     (a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

     (b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Wilson had financial relationships with its referring providers, and did not disclose these relationships;

     (c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Wilson for services that were not

provided by Wilson and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Wilson had administered TCD and VNG tests to the patients when in fact no such tests had been administered;

(e)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Wilson billed for had been administered by employees of the Defendant Wilson when in fact the services were administered by independent contractors or had not been administered at all;

(g)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Wilson billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)    Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Wilson and Duhamel were properly licensed and operating within the scope of their licenses and that the Defendants Wilson and Duhamel administered the services billed under their names and licenses.  And these Defendants submitted billing in the name of Duhamel after his license to practice medicine was suspended by the Department of Health State Board for Professional Misconduct in March 2021.

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

572.    The Defendants have engaged in this scheme from April 2021 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims.  Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.  This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.  Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

573.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

574.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

575.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Wilson substantial claim amounts totaling at least $49,697.92.

576.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

577.    ALLSTATE was damaged by this scheme in that payments were made to, or others on behalf of, the Defendant Wilson which would not have otherwise been made but for the fraudulent activities.

### EIGHTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants Wilson, Duhamel, John Doe 2 and ABC Corp. 2)**

578.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 577 of this Complaint with the same force and effect as if set forth fully herein.

579.    The Defendants Wilson, Duhamel, John Doe 2 and ABC Corp. 2 have conspired with each other to violate 18 U.S.C. § 1962(c).

580.    The Defendants Wilson, Duhamel, John Doe 2 and ABC Corp. 2 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after

fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

581.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

582.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

583.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Wilson, Duhamel, John Doe 2 and ABC Corp. 2 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

584.    The Defendants Wilson, Duhamel, John Doe 2 and ABC Corp. 2 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

## NINTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (PC Enterprise)

### (Against Defendants BLK, Refuah, Sinai, Mammen, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3)

585.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 584 of this Complaint with the same force and effect as if set forth fully herein.

586.    At all times relevant to this Complaint, the Defendant Interventional constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

587.    At all times relevant to this Complaint, the Defendants Mammen, BLK, Refuah, Sinai, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3 were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c).

588.    The Defendants Mammen, BLK, Refuah, Sinai, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3 conducted or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).   These Defendants enabled and/or controlled the billing of the Defendant Interventional who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.  In addition, BLK, Refuah, and Sinai submitted more billing in their own names for services allegedly performed and/or interpreted by Interventional even though BLK, Refuah, or Sinai had no license as health providers.  Mammen enabled the fraudulent use of his name and license and that of Interventional in order to submit billing to ALLSTATE and other insurers.  All of these Defendants enabled and/or controlled the reports of Interventional which

288

regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. BLK, Refuah, and Sinai added fraudulent billing in their own names. Substantial billing was mailed to ALLSTATE on behalf of Interventional for SSR testings. These services were not provided as billed and were not provided by Mammen. Many of these tests were not administered at all. The SSR testing was, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine. This fraudulent billing was enabled by the Defendants Mammen, BLK, Refuah, Sinai, D. Bogatin, G. Bogatin, Khanatayev, Kofman, and the Joe Doe 3 and ABC Corp. 3 Defendants. The Defendants BLK, Refuah, and Sinai provided and directed many of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants. The Defendants Mammen, BLK, Refuah, Sinai, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed and some of which could have harmed the patients. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the

fact that the Defendant Interventional had financial relationships with its referring providers, and did not disclose these relationships;

(c)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Interventional for services that were not provided by Interventional and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Interventional had administered SSR tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Interventional billed for had been administered by employees of the Defendant Interventional when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Interventional billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendant Interventional and Mammen were properly licensed and operating within the scope of their licenses and that the Defendants Interventional and Mammen administered the services billed under their names and licenses.

(k)      For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

589.    The Defendants have engaged in this scheme from December 2020 and up to the present and continuing and if the Court does not provide relief, the fraudulent enterprise will continue to seek to submit and collect fraudulent claims.   Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.    This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

590.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

591.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

592.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorney'

fees.   During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Interventional the substantial claim amount of approximately $47,772.53.

593.    Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.   In addition to concealing the fraudulent nature of each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

594.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant Interventional which would not have otherwise been made but for the fraudulent activities.


### TENTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(Association In Fact Enterprise)**

**(Against Defendants Interventional, BLK, Refuah, Sinai, Mammen,**
**D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3)**

595.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 594 of this Complaint with the same force and effect as if set forth fully herein.

596.    At all times relevant to this Complaint, the Defendants Interventional, BLK, Refuah, Sinai, Mammen, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise").   This enterprise was formed with the common purpose of engaging in fraudulent activities.

597.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

598.    The Defendants Interventional, BLK, Refuah, Sinai, Mammen, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.  In addition to services billed in the name of Interventional, BLK, Refuah, and Sinai submitted more billing in their own names for services allegedly performed and/or interpreted by Interventional even though BLK, Refuah, or Sinai had no license as health providers.  Mammen enabled the fraudulent use of his name and license and that of Interventional in order to submit billing to ALLSTATE and other insurers.  All of these Defendants enabled and/or controlled the reports of Interventional, BLK, Refuah, and Sinai, which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided.  Substantial billing was mailed to ALLSTATE on behalf of Interventional, BLK, Refuah, and Sinai for SSR testing.  These services were not provided as billed and were not provided by Mammen.  Many of these tests were not administered at all.  The SSR testing was, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine.  This fraudulent billing was enabled by the Defendants Interventional, BLK, Refuah, Sinai, Mammen, D. Bogatin, G. Bogatin, Khanatayev, Kofman, and the John Doe 3 and ABC Corp. 3 Defendants.  The Defendants BLK, Refuah, and Sinai provided and directed many of the persons including laypersons who actually administered any purported health care

293

services that were provided by the Defendants.  The Defendants Interventional, BLK, Refuah, Sinai, Mammen, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services.  Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.  The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

   (a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

   (b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendants Interventional, BLK, Refuah, and Sinai had financial relationships with their referring providers, and did not disclose these relationships;

   (c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Interventional for services that were not provided by Interventional and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

   (d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Interventional, BLK, Refuah, and Sinai had administered SSR tests to the patients when in fact no such tests had been administered;

   (e)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

   (f)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Interventional billed for had been administered by employees

294

of the Defendant Interventional when in fact the services were administered by independent contractors or had not been administered at all;

(g)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Interventional billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)    Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Interventional and Mammen were properly licensed and operating within the scope of their licenses and that the Defendants Interventional and Mammen administered the services billed under their names and licenses; and

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

599.    The Defendants have engaged in this scheme from December 2020 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims.  Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.  This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.  Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

600.   The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

601.   The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

602.   By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendants Interventional substantial claim amounts totaling at least $47,772.53, to the Defendant BLK substantial claim amounts totaling about $8,638.05, to the Defendant Refuah substantial claim amounts totaling about $57,488.16, and to the Defendant Sinai substantial claim amounts totaling about $53,540.37.

603.   The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

604.    ALLSTATE was damaged by this scheme in that payments were made to, or to others on behalf of, the Defendants Interventional, BLK, Refuah, and Sinai which would not have otherwise been made but for the fraudulent activities.

### ELEVENTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants Interventional, BLK, Refuah, Sinai, Mammen,**
**D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3)**

605.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 604 of this Complaint with the same force and effect as if set forth fully herein.

606.    The Defendants Interventional, BLK, Refuah, Sinai, Mammen, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3 have conspired with each other to violate 18 U.S.C. § 1962(c).

607.    The Defendants Interventional, BLK, Refuah, Sinai, Mammen, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon  and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

608.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

609.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

610.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Interventional, BLK, Refuah, Sinai, Mammen, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

611.    The Defendants Interventional, BLK, Refuah, Sinai, Mammen, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 3 and ABC Corp. 3 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

**TWELFTH CLAIM FOR RELIEF**

**(Violation of 18 U.S.C. § 1962(c))**
**(PC Enterprise)**

**(Against Defendants Zhivotenko, Chai, Maimonides, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4)**

612.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 611 of this Complaint with the same force and effect as if set forth fully herein.

613.    At all times relevant to this Complaint, the Defendant Diag Neuro constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

614.    At all times relevant to this Complaint, the Defendants Zhivotenko, Chai, Maimonides, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4 were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c).

615.    The Defendants Zhivotenko, Chai, Maimonides, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4 conducted or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).   These Defendants enabled and/or controlled the billing of the Defendant Diag Neuro who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.  In addition, Chai and Maimonides submitted more billing in their own names for services allegedly performed and/or interpreted by Diag Neuro even though Chai or Maimonides had no license as health providers.  Zhivotenko enabled the fraudulent use of his name and license and that of Diag Neuro in order to submit billing to ALLSTATE and other insurers.  All of these Defendants enabled and/or controlled the reports of Diag Neuro which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided.  Chai and Maimonides added fraudulent billings in their own names.  Substantial billing was mailed to ALLSTATE on behalf of Diag Neuro for TCD and VNG testing.  These services were not provided as billed and were not provided by Zhivotenko.  Many of these tests were not administered at all.  The TCD and VNG tests were, to the extent any services were actually

provided, illegally performed by individuals who did not have license in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Zhivotenko, Chai, Maimonides, D. Bogatin, G. Bogatin, Khanatayev, Kofman, and the Joe Doe 4 and ABC Corp. 4 Defendants. The Defendants Chai and Maimonides provided and directed many of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants. The Defendants Zhivotenko, Chai, Maimonides, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed and some of which could have harmed the patients. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

     (a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

     (b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Diag Neuro had financial relationships with its referring providers, and did not disclose these relationships;

     (c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Diag Neuro for services that were not provided by Diag Neuro and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

     (d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that

Diag Neuro had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendants Diag Neuro billed for had been administered by employees of the Defendant Diag Neuro when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Diag Neuro billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Diag Neuro and Zhivotenko were properly licensed and operating within the scope of their licenses and that the Defendants Diag Neuro and Zhivotenko administered the services billed under their names and licenses.

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

616.    The Defendants have engaged in this scheme from January 2020 up to the

present and continuing and if the Court does not provide relief, the fraudulent enterprise will

continue to seek to submit and collect fraudulent claims.   Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.   This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

617.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

618.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional  functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

619.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorney' fees.   During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Diag Neuro the substantial claim amount of approximately $72,081.85.

620.    Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.   In addition to concealing the fraudulent nature of each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

621.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant Diag Neuro which would not have otherwise been made but for the fraudulent activities.

## THIRTEENTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(Association In Fact Enterprise)**

**(Against Defendants Diag Neuro, Chai, Maimonides, Zhivotenko, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4)**

622.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 621 of this Complaint with the same force and effect as if set forth fully herein.

623.    At all times relevant to this Complaint, the Defendants Diag Neuro, Chai, Maimonides, Zhivotenko, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise"). This enterprise was formed with the common purpose of engaging in fraudulent activities.

624.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

625.    The Defendants Diag Neuro, Chai, Maimonides, Zhivotenko, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). All of these Defendants regularly billed

for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. In addition to services billed in the name of Diag Neuro, Chai and Maimonides submitted more billing in their own names for services allegedly performed and/or interpreted by Diag Neuro even though Chai or Maimonides had no license as health providers. Zhivotenko enabled the fraudulent use of his name and license and that of Diag Neuro in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Diag Neuro, Chai, and Maimonides, which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Diag Neuro, Chai and Maimonides for TCD and VNG testings. These services were not provided as billed and were not provided by Zhivotenko. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine/audiology. This fraudulent billing was enabled by the Defendants Diag Neuro, Chai, Maimonides, Zhivotenko, D. Bogatin, G. Bogatin, Khanatayev, Kofman, and the John Doe 4 and ABC Corp. 4 Defendants. The Defendants Chai and Maimonides provided and directed many of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants. The Defendants Diag Neuro, Chai, Zhivotenko, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these

claims.  The acts alleged herein constitute a pattern of racketeering activity within the meaning of

18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)     Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendants Diag Neuro, Chai, and Maimonides had financial relationships with their referring providers, and did not disclose these relationships;

(c)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Diag Neuro for services that were not provided by Diag Neuro and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Diag Neuro, Chai, and Maimonides had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendants Diag Neuro billed for had been administered by employees of the Defendants Diag Neuro when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Diag Neurol billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the

health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Diag Neuro and Zhivotenko were properly licensed and operating within the scope of their licenses and that the Defendants Diag Neuro and Zhivotenko administered the services billed under their names and licenses; and

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

626.    The Defendants have engaged in this scheme from January 2020 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims.  Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.  This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers. Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

627.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

628.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the

staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

629.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Diag Neuro substantial claim amounts totaling at least $72,081.85, to the Defendant Chai substantial claim amounts totaling about $75,407.65, and to the Defendant Maimonides substantial claim amounts totaling about $50,700.27.

630.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

631.    ALLSTATE was damaged by this scheme in that payments were made to, or to others on behalf of, the Defendants Diag Neuro, Chai, and Maimonides which would not have otherwise been made but for the fraudulent activities.

## FOURTEENTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants Diag Neuro, Chai, Maimonides, Zhivotenko, D. Bogatin,**
**G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4)**

632. ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 631 of this Complaint with the same force and effect as if set forth fully herein.

633. The Defendants Diag Neuro, Chai, Maimonides, Zhivotenko, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4 have conspired with each other to violate 18 U.S.C. § 1962(c).

634. The Defendants Diag Neuro, Chai, Maimonides, Zhivotenko, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

635. The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents. Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

636.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

637.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Diag Neuro, Chai, Maimonides, Zhivotenko, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

638.    The Defendants Diag Neuro, Chai, Maimonides, Zhivotenko, D. Bogatin, G. Bogatin, Khanatayev, Kofman, John Doe 4 and ABC Corp. 4 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.


## FIFTEENTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (PC Enterprise)

### (Against Defendants Wizard, Pepeljugoski, John Doe 5 and ABC Corp. 5)

639.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 638 of this Complaint with the same force and effect as if set forth fully herein.

640.    At all times relevant to this Complaint, the Defendant Sanitas constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

641.    At all times relevant to this Complaint, the Defendants Wizard, Pepeljugoski, John Doe 5 and ABC Corp. 5 were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c).

642.    The Defendants Wizard, Pepeljugoski, John Doe 5 and ABC Corp. 5 conducted or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).   These Defendants enabled and/or controlled the billing of Sanitas who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.  In addition, Wizard submitted more billing in its own name for services allegedly performed and/or interpreted by Sanitas even though Wizard had no license as a health provider.  Wizard used a phony name on its corporate papers for its owner.  Pepeljugoski enabled the fraudulent use of her name and license and that of Sanitas in order to submit billing to ALLSTATE and other insurers.  All of these Defendants enabled and/or controlled the reports of Sanitas which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided.  Wizard added fraudulent billing in its own name. Substantial billing was mailed to ALLSTATE on behalf of Sanitas for TCD and VNG testing. These services were not provided as billed and were not provided by Pepeljugoski.  Many of these tests were not administered at all.  The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology.  This fraudulent billing was enabled by the Defendants Pepeljugoski, Wizard, John Doe 5, and ABC Corp. 5.  The Defendant Wizard provided and directed many of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants.  The Defendants Wizard, Pepeljugoski, John Doe 5 and ABC Corp. 5 made and/or

310

received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed and some of which could have harmed the patients. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

> (a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

> (b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Sanitas had financial relationships with its referring providers, and did not disclose these relationships;

> (c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Sanitas for services that were not provided by Sanitas and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

> (d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Sanitas had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

> (e)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

> (f)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Sanitas billed for had been administered by employees of the Defendant Sanitas when in fact the services were administered by independent contractors or had not been administered at all;

> (g)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that

the services that the Defendant Sanitas billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)    Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Sanitas and Pepeljugoski were properly licensed and operating within the scope of their licenses and that the Defendants Sanitas and Pepeljugoski administered the services billed under their names and licenses; and

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

643.    The Defendants have engaged in this scheme from September 2021 and up to the present and continuing, and if the Court does not provide relief, the fraudulent enterprise will continue to seek to submit and collect fraudulent claims.   Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.   This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

644.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

645.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many

312

professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

646.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.   During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Sanitas the substantial claim amount of approximately $96,377.90.

647.    Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.   In addition to concealing the fraudulent nature of each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

648.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant Sanitas which would not have otherwise been made but for the fraudulent activities.

## SIXTEENTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (Association In Fact Enterprise)

### (Against Defendants Sanitas, Wizard, Pepeljugoski, John Doe 5 and ABC Corp. 5)

649.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 648 of this Complaint with the same force and effect as if set forth fully herein.

650.    At all times relevant to this Complaint, the Defendants Sanitas, Wizard, Pepeljugoski, John Doe 5 and ABC Corp. 5 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise").  This enterprise was formed with the common purpose of engaging in fraudulent activities.

651.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

652.    The Defendants Sanitas, Wizard, Pepeljugoski, John Doe 5 and ABC Corp. 5 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.  In addition to services billed in the name of Sanitas, Wizard submitted more billing in its own name for services allegedly performed and/or interpreted by Sanitas even though Wizard had no license as a health provider.  Wizard used a phony name on its corporate papers for its owner.  Pepeljugoski enabled the fraudulent use of her name and license and that of Sanitas in order to submit billing to

314

ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Sanitas and Wizard which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Sanitas and Wizard for TCD and VNG tests. These services were not provided as billed and were not provided by Pepeljugoski. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Sanitas, Pepeljugoski, Wizard, and the John Doe 5 and ABC Corp. 5 Defendants. The Defendant Wizard provided and directed many of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants. The Defendants Sanitas, Wizard, Pepeljugoski, John Doe 5 and ABC Corp. 5 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendants Sanitas and Wizard had financial relationships with their referring providers, and did not disclose these relationships;

(c)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Sanitas for services that were not provided by Sanitas and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Sanitas and Wizard had administered TCD and VNG tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Sanitas billed for had been administered by employees of the Defendant Sanitas when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Sanitas billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Sanitas and Pepeljugoski were properly licensed and operating within the scope of their licenses and that the Defendants Sanitas and Pepeljugoski administered the services billed under their names and licenses; and

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

316

653. The Defendants have engaged in this scheme from September 2021 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers. Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

654. The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

655. The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

656. By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees. During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Sanitas substantial claim amounts totaling at least $96,377.90 and to the Defendant Wizard substantial claim amounts totaling about $30,670.13.

657.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

658.    ALLSTATE was damaged by this scheme in that payments were made to, or to others on behalf of, the Defendants Sanitas and Wizard which would not have otherwise been made but for the fraudulent activities.

<u>**SEVENTEENTH CLAIM FOR RELIEF**</u>

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants Sanitas, Wizard, Pepeljugoski, John Doe 5 and ABC Corp. 5)**

659.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 658 of this Complaint with the same force and effect as if set forth fully herein.

660.    The Defendants Sanitas, Wizard, Pepeljugoski, John Doe 5, and ABC Corp. 5 have conspired with each other to violate 18 U.S.C. § 1962(c).

661.    The Defendants Sanitas, Wizard, Pepeljugoski, John Doe 5 and ABC Corp. 5 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services

provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon  and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

662.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

663.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

664.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Sanitas, Wizard, Pepeljugoski, John Doe 5 and ABC Corp. 5 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

665.    The Defendants Sanitas, Wizard, Pepeljugoski, John Doe 5 and ABC Corp. 5 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

<u>EIGHTEENTH CLAIM FOR RELIEF</u>

**(Violation of 18 U.S.C. § 1962(c))**
**(PC Enterprise)**

**(Against Defendants Wizard, Carmili, John Doe 6 and ABC Corp. 6)**

666.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 665 of this Complaint with the same force and effect as if set forth fully herein.

667.    At all times relevant to this Complaint, the Defendant Seneca constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

668.    At all times relevant to this Complaint, the Defendants Wizard, Carmili, John Doe 6 and ABC Corp. 6 were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c).

669.    The Defendants Wizard, Carmili, John Doe 6 and ABC Corp. 6 conducted or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). These Defendants enabled and/or controlled the billing of the Seneca who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. In addition, Wizard submitted more billing in its own name for services allegedly performed and/or interpreted by Seneca even though Wizard had no license as a health provider. Wizard used a phony name on its corporate papers for its owner. Carmili enabled the fraudulent use of his name and license and that of Seneca in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Seneca which regularly set forth fictitious medical findings and/or set forth services and phony test results that

320

had not been provided.  Wizard added fraudulent billing in its own name.  Substantial billing was mailed to ALLSTATE on behalf of Seneca for TCD and VNG testing.  These services were not provided as billed and were not provided by Carmili.  Many of these tests were not administered at all.  The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology.  This fraudulent billing was enabled by the Defendants Carmili, Wizard, John Doe 6 and ABC Corp. 6.  The Defendant Wizard provided and directed many of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants.  The Defendants Wizard, Carmili, John Doe 6 and ABC Corp. 6 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services.  Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed and some of which could have harmed the patients.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.  The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Seneca had financial relationships with its referring providers, and did not disclose these relationships;

(c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Seneca for services that were not provided by Seneca and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

321

(d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Seneca had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Seneca billed for had been administered by employees of the Defendant Seneca when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Seneca billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Seneca and Carmili were properly licensed and operating within the scope of their licenses and that the Defendants Seneca and Carmili administered the services billed under their names and licenses.

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

670. The Defendants have engaged in this scheme from September 2021 and up to the present and continuing, and if the Court does not provide relief, the fraudulent enterprise will continue to seek to submit and collect fraudulent claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

671. The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

672. The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

673. By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees. During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Seneca the substantial claim amount of approximately $17,374.72.

674. Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions. In addition to concealing the fraudulent nature of

each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

675.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant Seneca which would not have otherwise been made but for the fraudulent activities.

## NINETEENTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (Association In Fact Enterprise)

**(Against Defendants Seneca, Wizard, Carmili, John Doe 6 and ABC Corp. 6)**

676.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 675 of this Complaint with the same force and effect as if set forth fully herein.

677.    At all times relevant to this Complaint, the Defendants Seneca, Wizard, Carmili, John Doe 6 and ABC Corp. 6 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise"). This enterprise was formed with the common purpose of engaging in fraudulent activities.

678.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

679.    The Defendants Seneca, Wizard, Carmili, John Doe 6 and ABC Corp. 6 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they

were not provided as billed and some of which could have harmed the patients. In addition to services billed in the name of Seneca, Wizard submitted more billing in its own name for services allegedly performed and/or interpreted by Seneca even though Wizard had no license as a health provider. Wizard used a phony name on its corporate papers for its owner. Carmili enabled the fraudulent use of his name and license and that of Seneca in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Seneca and Wizard which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Seneca and Wizard for TCD and VNG testing. These services were not provided as billed and were not provided by Carmili. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Seneca, Carmili and the John Doe 6 and ABC Corp. 6 Defendants. The Defendant Wizard provided and directed many of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants. The Defendants Seneca, Wizard, Carmili, John Doe 6 and ABC Corp. 6 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

325

(a)     Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendants Seneca and Wizard had financial relationships with their referring providers, and did not disclose these relationships;

(c)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Seneca for services that were not provided by Seneca and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Seneca and Wizard had administered TCD and VNG tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Seneca billed for had been administered by employees of the Defendant Seneca when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Seneca billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Seneca and Carmili were properly licensed and operating within the scope of their licenses and that the Defendants Seneca and Carmili administered the services billed under their names and licenses.

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

680.     The Defendants have engaged in this scheme from September 2021 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers. Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

681.     The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

682.     The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

683.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Seneca substantial claim amounts totaling at least $17,374.72, and to the Defendant Wizard substantial claim amounts totaling about $30,670.13.

684.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

685.    ALLSTATE was damaged by this scheme in that payments were made to, or to others on behalf of, the Defendants Senecas and Wizard which would not have otherwise been made but for the fraudulent activities.


### TWENTIETH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants Seneca, Wizard, Carmili, John Doe 6 and ABC Corp. 6)**

686.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 685 of this Complaint with the same force and effect as if set forth fully herein.

687.    The Defendants Seneca, Wizard, Carmili, John Doe 6, and ABC Corp. 6 have conspired with each other to violate 18 U.S.C. § 1962(c).

688.    The Defendants Seneca, Wizard, Carmili, John Doe 6 and ABC Corp. 6 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon  and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

689.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

690.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

691.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Seneca, Wizard, Carmili, John Doe 6 and ABC Corp. 6 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

692.    The Defendants Seneca, Wizard, Carmili, John Doe 6 and ABC Corp. 6 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through

their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or

asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

## TWENTY-FIRST CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (PC Enterprise)

### (Against Defendants Miller, Regal, Faivish, John Doe 7 and ABC Corp. 7)

693.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 692 of

this Complaint with the same force and effect as if set forth fully herein.

694.    At all times relevant to this Complaint, the Defendant Healthcare Med

constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is

engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

695.    At all times relevant to this Complaint, the Defendants Miller, Regal, Faivish,

John Doe 7 and ABC Corp. 7 were "persons" associated with an enterprise within the meaning

of 18 U.S.C. §§ 1961(3) and 1965(c).

696.    The Defendants Miller, Regal, Faivish, John Doe 7 and ABC Corp. 7 conducted

or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a

pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  These Defendants enabled

and/or controlled the billing of Healthcare Med who regularly billed for fraudulent charges

intended to maximize billing even though they were not provided as billed and some of which

could have harmed the patients.  In addition, Regal submitted more billing in its own name for

services allegedly performed and/or interpreted by Healthcare Med even though Regal had no

license as a health provider.  Miller enabled the fraudulent use of his name and license and that of

Healthcare Med in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Healthcare Med which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Regal added fraudulent billings in its own name. Substantial billing was mailed to ALLSTATE on behalf of Healthcare Med for TCD and VNG testing. These services were not provided as billed and were not provided by Miller. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Miller, Faivish, Regal, John Doe 7, and ABC Corp. 7. The Defendant Regal provided and directed many of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants. The Defendants Miller, Regal, Faivish, John Doe 7, and ABC Corp. 7 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed and some of which could have harmed the patients. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)     Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that

331

the Defendant Healthcare Med had financial relationships with its referring providers, and did not disclose these relationships;

(c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Healthcare Med for services that were not provided by Healthcare Med and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Healthcare Med had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

(e)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Healthcare Med billed for had been administered by employees of the Defendant Healthcare Med when in fact the services were administered by independent contractors or had not been administered at all;

(g)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Healthcare Med billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)    Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Healthcare Med and Miller were properly licensed and operating within the scope of their licenses and that the Defendants Healthcare Med and Miller administered the services billed under their names and licenses; and

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

697.    The Defendants have engaged in this scheme from February 2020 and up to the present and continuing and if the Court does not provide relief, the fraudulent enterprise will continue to seek to submit and collect fraudulent claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

698.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

699.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

700.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorney'

fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Healthcare Med the substantial claim amount of approximately $32,757.24.

701.    Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.   In addition to concealing the fraudulent nature of each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

702.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant Healthcare Med which would not have otherwise been made but for the fraudulent activities.


## TWENTY-SECOND CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (Association In Fact Enterprise)

**(Against Defendants Healthcare Med, Regal, Miller, Faivish, John Doe 7 and ABC Corp. 7)**

703.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 702 of this Complaint with the same force and effect as if set forth fully herein.

704.    At all times relevant to this Complaint, the Defendants Healthcare Med, Regal, Miller, Faivish, John Doe 7 and ABC Corp. 7 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise").  This enterprise was formed with the common purpose of engaging in fraudulent activities.

705.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

706.    The Defendants Healthcare Med, Regal, Miller, Faivish, John Doe 7 and ABC Corp. 7 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. In addition to services billed in the name of Healthcare Med, Regal submitted more billing in its own name for services allegedly performed and/or interpreted by Healthcare Med even though Regal had no license as a health provider. Miller enabled the fraudulent use of his name and license and that of Healthcare Med in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Healthcare Med and Regal which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Healthcare Med and Regal for TCD and VNG tests. These services were not provided as billed and were not provided by Miller. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Healthcare Med, Regal, Miller, Faivish, and the John Doe 7 and ABC Corp. 7 Defendants. The Defendant Regal provided and directed many of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants. The Defendants Healthcare Med, Regal, Miller, Faivish, John Doe 7 and ABC Corp. 7 made and/or

335

received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendants Healthcare Med and Regal had financial relationships with their referring providers, and did not disclose these relationships;

(c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Healthcare Med for services that were not provided by Healthcare Med and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Healthcare Med and Regal had administered TCD and VNG tests to the patients when in fact no such tests had been administered;

(e)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Healthcare Med billed for had been administered by employees of the Defendant Healthcare Med when in fact the services were administered by independent contractors or had not been administered at all;

(g)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the

336

services that the Defendant Healthcare Med billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)    Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Healthcare Med and Miller were properly licensed and operating within the scope of their licenses and that the Defendants Healthcare Med and Miller administered the services billed under their names and licenses; and

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

707.    The Defendants have engaged in this scheme from February 2020 and up to the present and continuing, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers. Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

708.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

709.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

710.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Healthcare Med substantial claim amounts totaling at least $32,757.24, and to the Defendant Regal substantial claim amounts totaling at least $9,780.56.

711.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

712.    ALLSTATE was damaged by this scheme in that payments were made to, or to others on behalf of, the Defendants Healthcare Med and Regal which would not have otherwise been made but for the fraudulent activities.

338

## TWENTY-THIRD CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants Healthcare Med, Regal, Miller, Faivish, John Doe 7 and ABC Corp. 7)**

713.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 712 of this Complaint with the same force and effect as if set forth fully herein.

714.    The Defendants Healthcare Med, Regal, Miller, Faivish, John Doe 7 and ABC Corp. 7 have conspired with each other to violate 18 U.S.C. § 1962(c).

715.    The Defendants Healthcare Med, Regal, Miller, Faivish, John Doe 7 and ABC Corp. 7 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

716.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

717.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

718.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Healthcare Med, Regal, Miller, Faivish, John Doe 7 and ABC Corp. 7 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

719.    The Defendants Healthcare Med, Regal, Miller, Faivish, John Doe 7 and ABC Corp. 7 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.


### TWENTY-FOURTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(PC Enterprise)**

**(Against Defendants Mallett, John Doe 8 and ABC Corp. 8)**

720.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 719 of this Complaint with the same force and effect as if set forth fully herein.

721.    At all times relevant to this Complaint, the Defendant 334 Grand constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

722.    At all times relevant to this Complaint, the Defendants Mallett, John Doe 8 and ABC Corp. 8 were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c).

723.    The Defendants Mallett, John Doe 8 and ABC Corp. 8 conducted or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).   These Defendants enabled and/or controlled the billing of 334 Grand who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.  Mallett enabled the fraudulent use of his name and license and that of 334 Grand in order to submit billing to ALLSTATE and other insurers.  All of these Defendants enabled and/or controlled the reports of 334 Grand which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided.  Substantial billing was mailed to ALLSTATE on behalf of 334 Grand for TCD, VNG, and SSR testing.  These services were not provided as billed and were not provided by Mallett.  Many of these tests were not administered at all.  The TCD, VNG, and SSR tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology.  This fraudulent billing was enabled by the Defendants Mallett, John Doe 8 and ABC Corp. 8.  The Defendants Mallett, John Doe 8 and ABC Corp. 8 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services.  Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed and some of which could have harmed the patients.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these

claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)     Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant 334 Grand had financial relationships with its referring providers, and did not disclose these relationships;

(c)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant 334 Grand for services that were not provided by 334 Grand and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that 334 Grand had administered VNG, TCD, and SSR tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant 334 Grand billed for had been administered by employees of the Defendant 334 Grand when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant 334 Grand billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

342

(i)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)    Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants 334 Grand and Mallett were properly licensed and operating within the scope of their licenses and that the Defendants 334 Grand and Mallett administered the services billed under their names and licenses.

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

724.    The Defendants have engaged in this scheme from June 2021 and up to the present and continuing and if the Court does not provide relief, the fraudulent enterprise will continue to seek to submit and collect fraudulent claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

725.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

726.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

727.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.   During the four years preceding this Complaint, ALLSTATE has paid to the Defendant 334 Grand the substantial claim amount of approximately $124,449.36.

728.    Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.   In addition to concealing the fraudulent nature of each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

729.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant 334 Grand which would not have otherwise been made but for the fraudulent activities.

## TWENTY-FIFTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(Association In Fact Enterprise)**

**(Against Defendants 334 Grand, Mallett, John Doe 8 and ABC Corp. 8)**

730.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 729 of this Complaint with the same force and effect as if set forth fully herein.

731.    At all times relevant to this Complaint, the Defendants 334 Grand, Mallett, John Doe 8 and ABC Corp. 8 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce

(the "Associated In Fact Enterprise"). This enterprise was formed with the common purpose of engaging in fraudulent activities.

732.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

733.    The Defendants 334 Grand, Mallett, John Doe 8 and ABC Corp. 8 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. Mallett enabled the fraudulent use of his name and license and that of 334 Grand in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of 334 Grand which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of 334 Grand for TCD, VNG, and SSR tests. These services were not provided as billed and were not provided by Mallett. Many of these tests were not administered at all. The TCD, VNG, and SSR tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants 334 Grand, Mallett and the John Doe 8 and ABC Corp. 8 Defendants. The Defendants 334 Grand, Mallett, John Doe 8 and ABC Corp. 8 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed. Each of these

345

Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant 334 Grand had financial relationships with its referring providers, and did not disclose these relationships;

(c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant 334 Grand for services that were not provided by 334 Grand and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that 334 Grand had administered VNG, TCD, and SSR tests to the patients when in fact no such tests had been administered;

(e)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant 334 Grand billed for had been administered by employees of the Defendant 334 Grand when in fact the services were administered by independent contractors or had not been administered at all;

(g)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant 334 Grand billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have

jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)    Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants 334 Grand and Mallett were properly licensed and operating within the scope of their licenses and that the Defendants 334 Grand and Mallett administered the services billed under their names and licenses.

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

734.    The Defendants have engaged in this scheme from June 2021 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims.  Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.  This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers. Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

735.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

736.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the

submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

737.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendant 334 Grand substantial claim amounts totaling at least $124,449.36.

738.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

739.    ALLSTATE was damaged by this scheme in that payments were made to, or others on behalf of, the Defendant 334 Grand which would not have otherwise been made but for the fraudulent activities.

### TWENTY-SIXTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants 334 Grand, Mallett, John Doe 8 and ABC Corp. 8)**

740.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 739 of this Complaint with the same force and effect as if set forth fully herein.

741.    The Defendants 334 Grand, Mallett, John Doe 8 and ABC Corp. 8 have conspired with each other to violate 18 U.S.C. § 1962(c).

742.    The Defendants 334 Grand, Mallett, John Doe 8 and ABC Corp. 8 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

743.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

744.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

745.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants 334 Grand, Mallett, John Doe 8 and ABC Corp. 8 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

746.    The Defendants 334 Grand, Mallett, John Doe 8 and ABC Corp. 8 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

## TWENTY-SEVENTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (PC Enterprise)

### (Against Defendants Onyema, John Doe 9 and ABC Corp. 9)

747.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 746 of this Complaint with the same force and effect as if set forth fully herein.

748.    At all times relevant to this Complaint, the Defendant Direct Med constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

749.    At all times relevant to this Complaint, the Defendants Onyema, John Doe 9 and ABC Corp. 9 were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c).

750.    The Defendants Onyema, John Doe 9 and ABC Corp. 9 conducted or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a

pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). These Defendants enabled and/or controlled the billing of Direct Med who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. Onyema enabled the fraudulent use of his name and license and that of Direct Med in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Direct Med which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Direct Med for TCD and VNG testing. These services were not provided as billed and were not provided by Onyema. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Onyema, Joe Doe 9 and ABC Corp. 9. The Defendants Onyema, John Doe 9 and ABC Corp. 9 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed and some of which could have harmed the patients. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

> (a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)      Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Direct Med had financial relationships with its referring providers, and did not disclose these relationships;

(c)      Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Direct Med for services that were not provided by Direct Med and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)      Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Direct Med had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

(e)      Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)      Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Direct Med billed for had been administered by employees of the Defendant Direct Med when in fact the services were administered by independent contractors or had not been administered at all;

(g)      Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Direct Med billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)      Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)      Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)      Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Direct Med and Onyema were properly licensed and operating within the scope of their licenses and that the Defendants Direct Med and Onyema administered the services billed under their names and licenses.

352

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

751.    The Defendants have engaged in this scheme from January 2021 and up to the present and continuing and if the Court does not provide relief, the fraudulent enterprise will continue to seek to submit and collect fraudulent claims.   Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.    This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

752.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

753.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

754.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys'

fees.   During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Direct Med the substantial claim amount of approximately $75,830.01.

755.    Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.   In addition to concealing the fraudulent nature of each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

756.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant Direct Med which would not have otherwise been made but for the fraudulent activities.

## TWENTY-EIGHTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(Association In Fact Enterprise)**

**(Against Defendants Direct Med, Onyema, John Doe 9 and ABC Corp. 9)**

757.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 756 of this Complaint with the same force and effect as if set forth fully herein.

758.    At all times relevant to this Complaint, the Defendants Direct Med, Onyema, John Doe 9 and ABC Corp. 9 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise").  This enterprise was formed with the common purpose of engaging in fraudulent activities.

759.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

760.    The Defendants Direct Med, Onyema, John Doe 9 and ABC Corp. 9 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.  Onyema enabled the fraudulent use of his name and license and that of Direct Med in order to submit billing to ALLSTATE and other insurers.  All of these Defendants enabled and/or controlled the reports of Direct Med which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided.  Substantial billing was mailed to ALLSTATE on behalf of Direct Med for TCD and VNG tests.  These services were not provided as billed and were not provided by Onyema.   Many of these tests were not administered at all.  The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology.  This fraudulent billing was enabled by the Defendants Direct Med, Onyema and the John Doe 9 and ABC Corp. 9 Defendants.  The Defendants Direct Med, Onyema, John Doe 9 and ABC Corp. 9 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services.  Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.  The acts alleged herein constitute a pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Direct Med had financial relationships with its referring providers, and did not disclose these relationships;

(c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Direct Med for services that were not provided by Direct Med and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Direct Med had administered TCD and VNG tests to the patients when in fact no such tests had been administered;

(e)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Direct Med billed for had been administered by employees of the Defendant Direct Med when in fact the services were administered by independent contractors or had not been administered at all;

(g)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Direct Med billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the

health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)    Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Direct Med and Onyema were properly licensed and operating within the scope of their licenses and that the Defendants Direct Med and Onyema administered the services billed under their names and licenses.

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

761.    The Defendants have engaged in this scheme from January 2021 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims.  Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.  This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.  Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

762.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

763.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the

staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

764.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Direct Med substantial claim amounts totaling at least $75,830.01.

765.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

766.    ALLSTATE was damaged by this scheme in that payments were made to, or to others on behalf of, the Defendant Direct Med which would not have otherwise been made but for the fraudulent activities.

## TWENTY-NINTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(d))
### (Conspiracy)

### (Against Defendants Direct Med, Onyema, John Doe 9 and ABC Corp. 9)

767.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 766 of this Complaint with the same force and effect as if set forth fully herein.

768.    The Defendants Direct Med, Onyema, John Doe 9 and ABC Corp. 9 have conspired with each other to violate 18 U.S.C. § 1962(c).

769.    The Defendants Direct Med, Onyema, John Doe 9 and ABC Corp. 9 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

770.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

771.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

772.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Direct Med, Onyema, John Doe 9 and ABC Corp. 9 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

773.    The Defendants Direct Med, Onyema, John Doe 9 and ABC Corp. 9 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their

misrepresentations and material omissions. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

**THIRTIETH CLAIM FOR RELIEF**

**(Violation of 18 U.S.C. § 1962(c))**
**(PC Enterprise)**

**(Against Defendants Khanna, John Doe 10 and ABC Corp. 10)**

774.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 773 of this Complaint with the same force and effect as if set forth fully herein.

775.    At all times relevant to this Complaint, the Defendant Emote constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

776.    At all times relevant to this Complaint, the Defendants Khanna, John Doe 10 and ABC Corp. 10 were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c).

777.    The Defendants Khanna, John Doe 10 and ABC Corp. 10 conducted or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). These Defendants enabled and/or controlled the billing of Emote who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. Khanna enabled the fraudulent use of his name and license and that of Emote in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Emote which regularly set forth fictitious medical findings and/or

set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Emote for VNG testing. These services were not provided as billed and were not provided by Khanna. Many of these tests were not administered at all. The VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Khanna, John Doe 10 and ABC Corp. 10 Defendants. The Defendants Khanna, John Doe 10 and ABC Corp. 10 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed and some of which could have harmed the patients. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

>   (a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

>   (b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Emote had financial relationships with its referring providers, and did not disclose these relationships;

>   (c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Emote for services that were not provided by Emote and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

>   (d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that

Emote had administered VNG tests to the patients when in fact no such tests had been administered;

(e)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Emote billed for had been administered by employees of the Defendant Emote when in fact the services were administered by independent contractors or had not been administered at all;

(g)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Emote billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)    Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Emote and Khanna were properly licensed and operating within the scope of their licenses and that the Defendants Emote and Khanna administered the services billed under their names and licenses;

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

778.    The Defendants have engaged in this scheme from June of 2021 and up to the

present and continuing and if the Court does not provide relief, the fraudulent enterprise will

continue to seek to submit and collect fraudulent claims.   Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.   This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

779.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

780.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

781.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.   During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Emote the substantial claim amount of approximately $132,413.55.

782.    Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.   In addition to concealing the fraudulent nature of each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

783.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant Emote which would not have otherwise been made but for the fraudulent activities.

## THIRTY-FIRST CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(Association In Fact Enterprise)**

**(Against Defendants Emote, Khanna, John Doe 10 and ABC Corp. 10)**

784.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 783 of this Complaint with the same force and effect as if set forth fully herein.

785.    At all times relevant to this Complaint, the Defendants Emote, Khanna, John Doe 10 and ABC Corp. 10 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise"). This enterprise was formed with the common purpose of engaging in fraudulent activities.

786.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

787.    The Defendants Emote, Khanna, John Doe 10 and ABC Corp. 10 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. Khanna enabled the fraudulent use of his name and license and that of Emote in order to submit billing to

ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Emote which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Emote for VNG tests. These services were not provided as billed and were not provided by Khanna. Many of these tests were not administered at all. The VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Emote, Khanna and the John Doe 10 and ABC Corp. 10 Defendants. The Defendants Emote, Khanna, John Doe 10 and ABC Corp. 10 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

    (a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

    (b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Emote had financial relationships with its referring providers, and did not disclose these relationships;

    (c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Emote for services that were not provided by Emote and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Emote had administered VNG tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Emote billed for had been administered by employees of the Defendant Emote when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Emote billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Emote and Khanna were properly licensed and operating within the scope of their licenses and that the Defendants Emote and Khanna administered the services billed under their names and licenses; and

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

788.     The Defendants have engaged in this scheme from June of 2021 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will

continue to seek to submit and collect fraudulent No-Fault claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers. Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

789.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

790.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

791.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees. During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Emote substantial claim amounts totaling at least $132,413.55.

792.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions. In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud.

This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

793.    ALLSTATE was damaged by this scheme in that payments were made to, or to others on behalf of, the Defendant Emote which would not have otherwise been made but for the fraudulent activities.

### THIRTY-SECOND CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants Emote, Khanna, John Doe 10 and ABC Corp. 10)**

794.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 793 of this Complaint with the same force and effect as if set forth fully herein.

795.    The Defendants Emote, Khanna, John Doe 10 and ABC Corp. 10 have conspired with each other to violate 18 U.S.C. § 1962(c).

796.    The Defendants Emote, Khanna, John Doe 10 and ABC Corp. 10 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

797.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

798.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

799.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Emote, Khanna, John Doe 10 and ABC Corp. 10 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

800.    The Defendants Emote, Khanna, John Doe 10 and ABC Corp. 10 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

### THIRTY-THIRD CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(PC Enterprise)**

**(Against Defendants Koutelos, John Doe 11 and ABC Corp. 11)**

801.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 800 of this Complaint with the same force and effect as if set forth fully herein.

802.    At all times relevant to this Complaint, the Defendant Green Power constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

803.    At all times relevant to this Complaint, the Defendants Koutelos, John Doe 11 and ABC Corp. 11 were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c).

804.    The Defendants Koutelos, John Doe 11 and ABC Corp. 11 conducted or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).   These Defendants enabled and/or controlled the billing of Green Power who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.   Koutelos enabled the fraudulent use of his name and license and that of Green Power in order to submit billing to ALLSTATE and other insurers.   All of these Defendants enabled and/or controlled the reports of Green Power which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided.   Substantial billing was mailed to ALLSTATE on behalf of Green Power for TCD and VNG testing.   These services were not provided as billed and were not provided by Koutelos.   Many of these tests were not administered at all.   The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology.   This fraudulent billing was enabled by the Defendant Koutelos and the John Doe 2 and ABC Corp. 11 Defendants.   The Defendants Koutelos, John Doe 11 and ABC Corp. 11 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services.   Each of these Defendants assisted

and/or submitted the fraudulent billing even though they were not provided as billed and some of which could have harmed the patients. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Green Power had financial relationships with its referring providers, and did not disclose these relationships;

(c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Green Power for services that were not provided by Green Power and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Green Power had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

(e)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Green Power billed for had been administered by employees of the Defendant Green Power when in fact the services were administered by independent contractors or had not been administered at all;

(g)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Green Power billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

371

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Green Power and Koutelos were properly licensed and operating within the scope of their licenses and that the Defendants Green Power and Koutelos administered the services billed under their names and licenses.

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

805.    The Defendants have engaged in this scheme from November 2021 and up to the present and continuing and if the Court does not provide relief, the fraudulent enterprise will continue to seek to submit and collect fraudulent claims.   Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.   This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

806.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

807.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing

a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

808.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Green Power the substantial claim amount of approximately $99,314.12.

809.    Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.   In addition to concealing the fraudulent nature of each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

810.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant Green Power which would not have otherwise been made but for the fraudulent activities.

## THIRTY-FOURTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(Association In Fact Enterprise)**

**(Against Defendants Green Power, Koutelos, John Doe 11 and ABC Corp. 11)**

811.   ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 810 of this Complaint with the same force and effect as if set forth fully herein.

812.   At all times relevant to this Complaint, the Defendants Green Power, Koutelos, John Doe 11 and ABC Corp. 11 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise").  This enterprise was formed with the common purpose of engaging in fraudulent activities.

813.   At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

814.   The Defendants Green Power, Koutelos, John Doe 11 and ABC Corp. 11 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.  Koutelos enabled the fraudulent use of his name and license and that of Green Power in order to submit billing to ALLSTATE and other insurers.  All of these Defendants enabled and/or controlled the reports of Green Power which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided.  Substantial billing was mailed to ALLSTATE on

behalf of Green Power for TCD and VNG tests. These services were not provided as billed and were not provided by Koutelos. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Green Power, Koutelos and the John Doe 11 and ABC Corp. 11 Defendants. The Defendants Green Power, Koutelos, John Doe 11 and ABC Corp. 11 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Green Power had financial relationships with its referring providers, and did not disclose these relationships;

(c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Green Power for services that were not provided by Green Power and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Green Power had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

375

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Green Power billed for had been administered by employees of the Defendant Green Power when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Green Power billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Green Power and Koutelos were properly licensed and operating within the scope of their licenses and that the Defendants Green Power and Koutelos administered the services billed under their names and licenses; and

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

815.    The Defendants have engaged in this scheme from November 2021 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims.  Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.  This is a continuing illegal

operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers. Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

816. The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

817. The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

818. By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees. During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Green Power substantial claim amounts totaling at least $99,314.12.

819. The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions. In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

820.    ALLSTATE was damaged by this scheme in that payments were made to, or to others on behalf of, the Defendant Green Power which would not have otherwise been made but for the fraudulent activities.

## THIRTY-FIFTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants Green Power, Koutelos, John Doe 11 and ABC Corp. 11)**

821.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 820 of this Complaint with the same force and effect as if set forth fully herein.

822.    The Defendants Green Power, Koutelos, John Doe 11 and ABC Corp. 11 have conspired with each other to violate 18 U.S.C. § 1962(c).

823.    The Defendants Green Power, Koutelos, John Doe 11 and ABC Corp. 11 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

824.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

825.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

826.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Green Power, Koutelos, John Doe 11 and ABC Corp. 11 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

827.    The Defendants Green Power, Koutelos, John Doe 11 and ABC Corp. 11 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.


### THIRTY-SIXTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(PC Enterprise)**

**(Against Defendants Khanna, John Doe 12 and ABC Corp. 12)**

828.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 827 of this Complaint with the same force and effect as if set forth fully herein.

829.    At all times relevant to this Complaint, the Defendant Pitch constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

830.    At all times relevant to this Complaint, the Defendants Khanna, John Doe 12 and ABC Corp. 12 were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c).

831.    The Defendants Khanna, John Doe 12 and ABC Corp. 12 conducted or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). These Defendants enabled and/or controlled the billing of Pitch who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. Khanna enabled the fraudulent use of his name and license and that of Pitch in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Pitch which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Pitch for TCD and VNG testing. These services were not provided as billed and were not provided by Khanna. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendant Khanna and the John Doe 12 and ABC Corp. 12 Defendants. The Defendants Khanna, John Doe 12 and ABC Corp. 12 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing

even though they were not provided as billed and some of which could have harmed the patients. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Pitch had financial relationships with its referring providers, and did not disclose these relationships;

(c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Pitch for services that were not provided by Pitch and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Pitch had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

(e)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Pitch billed for had been administered by employees of the Defendant Pitch when in fact the services were administered by independent contractors or had not been administered at all;

(g)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Pitch billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)    Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Pitch and Khanna were properly licensed and operating within the scope of their licenses and that the Defendants Pitch and Khanna administered the services billed under their names and licenses;

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

832.    The Defendants have engaged in this scheme from April 2022 and up to the present and continuing and if the Court does not provide relief, the fraudulent enterprise will continue to seek to submit and collect fraudulent claims.  Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.   This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

833.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

834.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional  functions beyond the acts of mail fraud (i.e., the

submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

835.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.   During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Pitch the substantial claim amount of approximately $145,146.30.

836.    Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.    In addition to concealing the fraudulent nature of each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

837.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant Pitch which would not have otherwise been made but for the fraudulent activities.

### THIRTY-SEVENTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(Association In Fact Enterprise)**

**(Against Defendants Pitch, Khanna, John Doe 12 and ABC Corp. 12)**

838.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 837 of this Complaint with the same force and effect as if set forth fully herein.

839.    At all times relevant to this Complaint, the Defendants Pitch, Khanna, John Doe 12 and ABC Corp. 12 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise").  This enterprise was formed with the common purpose of engaging in fraudulent activities.

840.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

841.    The Defendants Pitch, Khanna, John Doe 12 and ABC Corp. 12 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients.  Khanna enabled the fraudulent use of his name and license and that of Pitch in order to submit billing to ALLSTATE and other insurers.  All of these Defendants enabled and/or controlled the reports of Pitch which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided.  Substantial billing was mailed to ALLSTATE on behalf of Pitch for TCD and VNG tests.  These services were not provided as billed and were not provided by Khanna.   Many of these tests were not administered at all.  The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology.  This fraudulent billing was enabled by the Defendants Pitch, Khanna and the John Doe 12 and ABC Corp. 12 Defendants.  The Defendants Pitch, Khanna, John Doe 12 and ABC Corp. 12 made and/or received improper referrals to and from

financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Pitch had financial relationships with its referring providers, and did not disclose these relationships;

(c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Pitch for services that were not provided by Pitch and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Pitch had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

(e)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Pitch billed for had been administered by employees of the Defendant Pitch when in fact the services were administered by independent contractors or had not been administered at all;

(g)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Pitch billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Pitch and Khanna were properly licensed and operating within the scope of their licenses and that the Defendants Pitch and Khanna administered the services billed under their names and licenses.

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

842.    The Defendants have engaged in this scheme from April 2022 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers. Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

843.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

844.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a

variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

845.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Pitch substantial claim amounts totaling at least $145,146.30.

846.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

847.    ALLSTATE was damaged by this scheme in that payments were made to, or to others on behalf of, the Defendant Pitch which would not have otherwise been made but for the fraudulent activities.

## THIRTY-EIGHTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(d))
### (Conspiracy)

### (Against Defendants Pitch, Khanna, John Doe 12 and ABC Corp. 12)

848.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 847 of this Complaint with the same force and effect as if set forth fully herein.

849.    The Defendants Pitch, Khanna, John Doe 12 and ABC Corp. 12 have conspired with each other to violate 18 U.S.C. § 1962(c).

850.    The Defendants Pitch, Khanna, John Doe 12 and ABC Corp. 12 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

851.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents. Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

852.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

853.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Pitch, Khanna, John Doe 12 and ABC Corp. 12 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

854.    The Defendants Pitch, Khanna, John Doe 12 and ABC Corp. 12 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.


## THIRTY-NINTH CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (PC Enterprise)

### (Against Defendants Dorsten, John Doe 13 and ABC Corp. 13)

855.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 854 of this Complaint with the same force and effect as if set forth fully herein.

856.    At all times relevant to this Complaint, the Defendant Lifeline constituted a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "PC Enterprise").

857.    At all times relevant to this Complaint, the Defendants Dorsten, John Doe 13 and ABC Corp. 13 were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c).

858.    The Defendants Dorsten, John Doe 13 and ABC Corp. 13 conducted or participated, directly or indirectly, in the conduct of the PC Enterprise's affairs through a pattern of racketeering

activity in violation of 18 U.S.C. § 1962(c). These Defendants enabled and/or controlled the billing of Lifeline who regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. Dorsten enabled the fraudulent use of his name and license and that of Lifeline in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Lifeline which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Lifeline for TCD and VNG testing. These services were not provided as billed and were not provided by Dorsten. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendant Dorsten and the John Doe 13 and ABC Corp. 13 Defendants. The Defendants Dorsten, John Doe 13 and ABC Corp. 13 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed and some of which could have harmed the patients. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

> (a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Lifeline had financial relationships with its referring providers, and did not disclose these relationships;

(c)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Lifeline for services that were not provided by Lifeline and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Lifeline had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Lifeline billed for had been administered by employees of the Defendant Lifeline when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Lifeline billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Lifeline and Dorsten were properly licensed and operating within the scope of their licenses and that the Defendants Lifeline and Dorsten administered the services billed under their names and licenses.

(k)     For the purpose of executing this scheme and artifice to defraud, such

Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

859.    The Defendants have engaged in this scheme from August 2020 and up to the present and continuing and if the Court does not provide relief, the fraudulent enterprise will continue to seek to submit and collect fraudulent claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

860.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

861.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

862.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees. During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Lifeline the substantial claim amount of approximately $199,071.72.

863.    Such Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, such Defendants also concealed the existence of the overall scheme to defraud.

864.    ALLSTATE was damaged by this scheme in that payments were made to the Defendant Lifeline which would not have otherwise been made but for the fraudulent activities.

### FORTIETH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(Association In Fact Enterprise)**

**(Against Defendants Lifeline, Dorsten, John Doe 13 and ABC Corp. 13)**

865.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 864 of this Complaint with the same force and effect as if set forth fully herein.

866.    At all times relevant to this Complaint, the Defendants Lifeline, Dorsten, John Doe 13 and ABC Corp. 13 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise").  This enterprise was formed with the common purpose of engaging in fraudulent activities.

867.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

868.    The Defendants Lifeline, Dorsten, John Doe 13 and ABC Corp. 13 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  All of these

393

Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. Dorsten enabled the fraudulent use of his name and license and that of Lifeline in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Lifeline which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Lifeline for TCD and VNG tests. These services were not provided as billed and were not provided by Dorsten. Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Lifeline, Dorsten and the John Doe 13 and ABC Corp. 13 Defendants. The Defendants Lifeline, Dorsten, John Doe 13 and ABC Corp. 13 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)     Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Lifeline had financial relationships with its referring providers, and did not disclose these relationships;

(c)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Lifeline for services that were not provided by Lifeline and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Lifeline had administered VNG and TCD tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Lifeline billed for had been administered by employees of the Defendant Lifeline when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Lifeline billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendants Lifeline and Dorsten were properly licensed and operating within the scope of their licenses and that the Defendants Lifeline and Dorsten administered the services billed under their names and licenses.

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

869.    The Defendants have engaged in this scheme from August 2020 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims.  Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.  This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers. Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

870.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

871.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

872.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Lifeline substantial claim amounts totaling at least $199,071.72.

873.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

874.    ALLSTATE was damaged by this scheme in that payments were made to, or others on behalf of, the Defendant Lifeline which would not have otherwise been made but for the fraudulent activities.

**FORTY-FIRST CLAIM FOR RELIEF**

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants Lifeline, Dorsten, John Doe 13 and ABC Corp. 13)**

875.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 874 of this Complaint with the same force and effect as if set forth fully herein.

876.    The Defendants Lifeline, Dorsten, John Doe 13 and ABC Corp. 13 have conspired with each other to violate 18 U.S.C. § 1962(c).

877.    The Defendants Lifeline, Dorsten, John Doe 13 and ABC Corp. 13 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the PC Enterprise and/or the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after

397

fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

878.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

879.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

880.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Lifeline, Dorsten, John Doe 13 and ABC Corp. 13 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

881.    The Defendants Lifeline, Dorsten, John Doe 13 and ABC Corp. 13 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

## FORTY-SECOND CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))
### (Association In Fact Enterprise)

### (Against Defendants Central Park, John Doe 14 and ABC Corp. 14)

882.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 881 of this Complaint with the same force and effect as if set forth fully herein.

883.    At all times relevant to this Complaint, the Defendants Central Park, John Doe 14 and ABC Corp. 14 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise"). This enterprise was formed with the common purpose of engaging in fraudulent activities.

884.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

885.    The Defendants Central Park, John Doe 14 and ABC Corp. 14 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. All of these Defendants enabled and/or controlled the reports of Central Park which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Central Park for TCD and VNG tests. These services were not provided as billed and were not provided by a medical doctor.

399

Many of these tests were not administered at all. The TCD and VNG tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Central Park, John Doe 14 and ABC Corp. 14. The Defendants Central Park, John Doe 14 and ABC Corp. 14 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)     Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendant Central Park had financial relationships with its referring providers, and did not disclose these relationships;

(c)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Central Park for services that were not provided by Central Park and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Central Park had administered TCD and VNG tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Central Park billed for had been administered by employees of the Defendant Central Park when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Central Park billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendant Central Park was properly licensed and operating within the scope of its licenses and that the Defendant Central Park administered the services billed under their names and licenses; and

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

886.     The Defendants have engaged in this scheme from June 2020 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims.  Every single claim submitted by the Defendants associated with this enterprise has been fraudulent.  This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers.

Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

887. The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

888. The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

889. By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees. During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Central Park substantial claim amounts totaling at least $31,421.97.

890. The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions. In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

891.    ALLSTATE was damaged by this scheme in that payments were made to, or to others on behalf of, the Defendant Central Park which would not have otherwise been made but for the fraudulent activities.

### FORTY-THIRD CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants Central Park, John Doe 14 and ABC Corp. 14)**

892.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 891 of this Complaint with the same force and effect as if set forth fully herein.

893.    The Defendants Central Park, John Doe 14 and ABC Corp. 14 have conspired with each other to violate 18 U.S.C. § 1962(c).

894.    The Defendants Central Park,  John Doe 14 and ABC Corp. 14 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of  the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

895.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

896.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

897.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Central Park, John Doe 14 and ABC Corp. 13 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

898.    The Defendants Central Park, John Doe 14 and ABC Corp. 14 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

## FORTY-FOURTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(Association In Fact Enterprise)**

**(Against Defendants Greenwood, Regal, Faivish, John Doe 15 and ABC Corp. 15)**

899.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 898 of this Complaint with the same force and effect as if set forth fully herein.

900.    At all times relevant to this Complaint, the Defendants Greenwood, Regal, Faivish, John Doe 15 and ABC Corp. 15 constituted a separate associated in fact enterprise within the

meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise"). This enterprise was formed with the common purpose of engaging in fraudulent activities.

901.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

902.    The Defendants Greenwood, Regal, Faivish, John Doe 15 and ABC Corp. 15 conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). All of these Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. In addition to services billed in the name of Greenwood, Regal submitted more billing in its own name for services allegedly performed and/or interpreted by Greenwood even though Regal had no license as a health provider. Greenwood enabled the fraudulent use of his name and license in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of Greenwood and Regal which regularly set forth fictitious medical findings and/or set forth services and phony test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of Greenwood and Regal for VNG and SSR tests. These services were not provided as billed and were not provided by Greenwood. Many of these tests were not administered at all. The VNG and SSR tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine and/or audiology. This fraudulent billing was enabled by the Defendants Greenwood, Regal, Faivish, and the John Doe 15 and ABC Corp. 15 Defendants. The Defendant Regal provided and directed many

of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants.  The Defendants Greenwood, Regal, Faivish, John Doe 15 and ABC Corp. 15 made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services.  Each of these Defendants assisted and/or submitted the fraudulent billing even though they were not provided as billed.  Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.  The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

(a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

(b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Defendants Greenwood and Regal had financial relationships with its referring providers, and did not disclose these relationships;

(c)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the name of the Defendant Greenwood for services that were not provided by Greenwood and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that Greenwood and Regal had administered VNG and SSR tests to the patients when in fact no such tests had been administered;

(e)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Greenwood billed for had been administered by employees of

the Defendant Greenwood when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendant Greenwood billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)     Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Defendant Greenwood was properly licensed and operating within the scope of his license and that the Defendant Greenwood administered the services billed under his name and license.

(k)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

903.    The Defendants have engaged in this scheme from February 2020 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers. Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

904.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

905.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records, and by negotiating and executing various lease agreements.

906.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendant Greenwood substantial claim amounts totaling at least $5,840.76, and to the Defendant Regal substantial claim amounts totaling at least $9,780.56.

907.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

908.    ALLSTATE was damaged by this scheme in that payments were made to, or to others on behalf of, the Defendants Greenwood and Regal which would not have otherwise been made but for the fraudulent activities.

## FORTY-FIFTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against Defendants Greenwood, Regal, Faivish, John Doe 15 and ABC Corp. 15)**

909.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 908 of this Complaint with the same force and effect as if set forth fully herein.

910.    The Defendants Greenwood, Regal, Faivish, John Doe 15 and ABC Corp. 15 have conspired with each other to violate 18 U.S.C. § 1962(c).

911.    The Defendants Greenwood, Regal, Faivish, John Doe 15 and ABC Corp. 15 each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

912.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

913.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

914.    By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Greenwood, Regal, Faivish, John Doe 15 and ABC Corp. 15 are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

915.    The Defendants Greenwood, Regal, Faivish, John Doe 15 and ABC Corp. 15 concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.


### FORTY-SIXTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(c))**
**(Association In Fact Enterprise)**

**(Against All Defendants)**

916.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 915 of this Complaint with the same force and effect as if set forth fully herein.

917.    At all times relevant to this Complaint, all Defendants constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise"). This enterprise was formed with the common purpose of engaging in fraudulent activities.

918.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

919.    All Defendants conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). All of the Defendants regularly billed for fraudulent charges intended to maximize billing even though they were not provided as billed and some of which could have harmed the patients. In addition to services billed in the names of the Licensed Defendant providers, the Unlicensed Defendant entities BLK, Chai, Green Power, Maimonides, Refuah, Regal, Sinai, and Wizard submitted more billing in their own names for services allegedly performed and/or interpreted by the Licensed Defendant providers even though the Unlicensed Defendant entities BLK, Chai, Green Power, Maimonides, Refuah, Regal, Sinai, or Wizard had no license as health providers. The licensed individual Defendants Carmili, Duhamel, Greenwood, Khanna, Koutelos, Mallett, Mammen, Miller, Onyema, Pepeljugoski, and Zhivotenko enabled the fraudulent use of their names and licenses and that of the Licensed Defendant providers 334 Grand, Central Park, Sanitas, Diag Neuro, Direct Med, Emote, Greenwood, Healthcare Med, Hillside, Interventional, Lifeline, Pitch, Seneca, and Wilson in order to submit billing to ALLSTATE and other insurers. All of these Defendants enabled and/or controlled the reports of the licensed billing Defendant which regularly set forth fictitious medical findings and/or set forth services and phony

411

test results that had not been provided. Substantial billing was mailed to ALLSTATE on behalf of the licensed billing Defendants for TCD, VNG, and SSR tests. These services were not provided as billed and were not provided by the licensed individual Defendants Carmili, Duhamel, Greenwood, Khanna, Koutelos, Mallett, Mammen, Miller, Onyema, Pepeljugoski, and Zhivotenko. Many of these tests were not administered at all. The TCD, VNG and SSR tests were, to the extent any services were actually provided, illegally performed by individuals who did not have licenses in medicine/audiology. This fraudulent billing was enabled by all Defendants. The Unlicensed Defendant entities BLK, Chai, Green Power, Maimonides, Refuah, Regal, Sinai, and Wizard provided and directed many of the persons including laypersons who actually administered any purported health care services that were provided by the Defendants. All Defendants made and/or received improper referrals to and from financially related entities which is how they obtained patients which they used to bill the fraudulent services. The Defendants were interrelated and worked in concert to defraud the Plaintiffs. Each of these Defendants assisted and/or submitted the fraudulent billing even though the services were not provided as billed. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims. The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

> (a)    Such Defendants devised and executed a scheme and artifice to defraud ALLSTATE of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

> (b)    Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants concealed the fact that the Licensed Defendants had financial relationships with their referring providers, and did not disclose these relationships;

(c)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims in the names of the Licensed Defendant providers 334 Grand, Central Park, Sanitas, Diag Neuro, Direct Med, Emote, Greenwood, Healthcare Med, Hillside, Interventional, Lifeline, Pitch, Seneca, and Wilson for services that were not provided by the Licensed Defendant providers 334 Grand, Central Park, Greenwood, Sanitas, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Interventional, Lifeline, Pitch, Seneca, and Wilson and concealed the fact that the services billed for were illegal self-referrals from providers that these Defendants had financial relationships with;

(d)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the billing Defendants administered TCD, VNG and SSR tests to the patients when in fact no such tests had been administered;

(e)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the testing they administered and other services they provided were medically necessary for the care of the patients;

(f)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Licensed Defendant entity providers 334 Grand, Central Park, Sanitas, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Interventional, Lifeline, Pitch, Seneca, and Wilson and the licensed individual Defendants Carmili, Duhamel, Greenwood, Khanna, Koutelos, Mallett, Mammen, Miller, Onyema, Pepeljugoski, and Zhivotenko billed for had been administered by employees of the Licensed Defendant providers 334 Grand, Central Park, Greenwood, Sanitas, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Interventional, Lifeline, Pitch, Seneca, and Wilson when in fact the services were administered by independent contractors or had not been administered at all;

(g)     Pursuant to the scheme, such Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the services that the Licensed Defendant entity providers 334 Grand, Central Park, Sanitas, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Interventional, Lifeline, Pitch, Seneca, and Wilson and the licensed individual Defendants Carmili, Duhamel, Greenwood, Khanna, Koutelos, Mallett, Mammen, Miller, Onyema, Pepeljugoski, and Zhivotenko billed for had been administered by doctors when in fact the services were administered by lay persons or had not been administered at all;

(h)     Pursuant to the scheme, the Defendants submitted to ALLSTATE false and fraudulent claims that included fictitious diagnoses some of which could have jeopardized the well being of the patients if true and would have required medical attention which the Defendants did not provide;

(i)     Pursuant to the scheme, the Defendants submitted to ALLSTATE false and fraudulent claims and information in that such Defendants falsely represented that the

413

health provider Defendants had provided necessary services administered by licensed health provider employees that were for injuries arising solely out of covered automobile accidents and which injuries the patients had never had before;

(j)    Pursuant to the scheme, such Defendants misrepresented to ALLSTATE that the Licensed Defendants were properly licensed and operating within the scope of their licenses and that the Licensed Defendants administered the services billed under their names and licenses; and

(k)    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to ALLSTATE and others by use of the mail and interstate wire facilities and caused ALLSTATE to make payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of these Defendants was aware that these claims would be sent to ALLSTATE through the use of the mails and authorized the use of the mails to submit these claims.

920.    The Defendants have engaged in this scheme from 2019 and continuing to the present day, and absent the requested relief from the Court, the fraudulent enterprise will continue to seek to submit and collect fraudulent No-Fault claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to ALLSTATE and other insurers. Efforts continue to be made by the fraudulent enterprise to collect the illegal billing submitted to ALLSTATE.

921.    The Defendants have mailed substantial claims to ALLSTATE, and a representative sample of such mailings is set forth in the factual section of this Complaint.

922.    The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to ALLSTATE and other insurers), by providing benefits for the

staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

923.    By reason of such Defendants' violation of 18 U.S.C. § 1962(c), ALLSTATE was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants, jointly and severally, three times the damages sustained by ALLSTATE and the costs of this suit, including reasonable attorneys' fees.  During the four years preceding this Complaint, ALLSTATE has paid to the Defendants substantial claim amounts totaling at least $1,593,214.89.

924.    The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

925.    ALLSTATE was damaged by this scheme in that payments were made to, or to others on behalf of the billing Defendants which would not have otherwise been made but for the fraudulent activities.

**FORTY-SEVENTH CLAIM FOR RELIEF**

**(Violation of 18 U.S.C. § 1962(d))**
**(Conspiracy)**

**(Against All Defendants)**

926.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 925 of this Complaint with the same force and effect as if set forth fully herein.

927.    The all Defendants have conspired with each other to violate 18 U.S.C. § 1962(c).

928.    All Defendants each agreed to participate in a conspiracy to commit the RICO violation by agreeing to conduct the affairs of the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to ALLSTATE including billing services that were not provided with fictitious test results, unnecessary services provided after fraudulent referrals from related entities and other services with false diagnoses which could have injured the patients if relied upon and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to ALLSTATE.

929.    The purpose of the conspiracy was to obtain No-Fault payments from ALLSTATE based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

930.    ALLSTATE has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

931.    By virtue of this violation of 18 U.S.C. § 1962(d), All Defendants are jointly and severally liable to ALLSTATE for three times the damages that ALLSTATE has sustained, plus the costs of this suit, including reasonable attorneys' fees.

932.    All Defendants concealed their conspiratorial conduct, as well as their overall scheme to defraud, from ALLSTATE through their misrepresentations and material omissions.  This prevented ALLSTATE from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to ALLSTATE.

## FORTY-EIGHTH CLAIM FOR RELIEF

### (New York Public Health Law § 238-a)

### (Against Defendants 334 Grand, Central Park, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Lifeline, Pitch, Sanitas, Seneca, Wilson, John Does 4-6, and ABC Corps. 4-6)

933.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 932 of this Complaint with the same force and effect as if set forth fully herein.

934.    Section 238-a of the New York Public Health Law provides, in relevant part:

(1)(a)    A practitioner authorized to order clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or xray or imaging services may not make a referral for such services to a health care provider authorized to provide such services where such practitioner or immediate family member of such practitioner has a financial relationship with such health care provider.

(b) A health care provider or a referring practitioner may not present or cause to be presented to any individual or third party payor, or other entity a claim, bill, or other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services furnished pursuant to a referral prohibited by this subdivision.

*      *      *

(7)    If a referring practitioner or a health care provider furnishing clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or xray or imaging services or any other person or entity, collects any amounts that were billed in violation of this section, such referring practitioner and health care provider and other person or entity shall be jointly and severally liable to the payor for any amounts so collected.

935.    The Defendants John Does 4-6 and ABC Corps. 4-6 are practitioners as that term is defined under Section 238(11) of the New York Public Health Law.

936.    The Defendants John Does 4-6 and ABC Corps. 4-6 regularly made referrals to the Defendants 334 Grand, Central Park, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Lifeline, Pitch, Sanitas, Seneca, and Wilson, with which they had financial relationships, including referrals for x-ray or imaging services.

937.    The 334 Grand, Central Park, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Lifeline, Pitch, Sanitas, Seneca, and Wilson are "health care providers" as that term is defined under Section 238(6) of the New York Public Health Law.

938.    The Defendants 334 Grand, Central Park, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Lifeline, Pitch, Sanitas, Seneca, and Wilson had a "financial relationship" with the Defendants John Does 4-6 and ABC Corps. 4-6 as that term is defined under Section 238(3) of the New York Public Health Law, and routine referrals for x-ray or imaging services were made to the Defendants 334 Grand, Central Park, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Lifeline, Pitch, Sanitas, Seneca, and Wilson for patients allegedly treated by John Does 4-6 and ABC Corps. 4-6.

939.    The referrals by the Defendants John Does 4-6 and ABC Corps. 4-6 violate Section 238-a(1) and (9) of the New York Public Health Law.

940.    In violation of Section 238a(1)(b) of the New York Public Health Law, the Defendants 334 Grand, Central Park, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Lifeline, Pitch, Sanitas, Seneca, and Wilson have presented or caused to be presented to ALLSTATE claims for payment for x-ray or imaging services furnished pursuant to a prohibited referral.

941.    ALLSTATE has paid substantial amounts to the Defendants 334 Grand, Central Park, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Lifeline, Pitch, Sanitas, Seneca,

and Wilson totaling at least $397,528.24 for TCD ultrasound services billed in violation of Section 238-a of the Public Health Law and, pursuant to Section 238-a(7) of the Public Health Law, is entitled to recover such amounts from Defendants John Does 4-6, ABC Corps. 4-6, 334 Grand, Central Park, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Lifeline, Pitch, Sanitas, Seneca, and Wilson which, as practitioners and as health care providers respectively, are jointly and severally liable to ALLSTATE for the amounts received in violation of New York Public Health Law § 238-a.  ALLSTATE is also entitled to an order declaring all amounts billed as violative of New York Public Health Law § 238-a and not eligible for payment.

## FORTY-NINTH CLAIM FOR RELIEF

### (Declaratory Judgment)

### (Against All Defendants)

942.    ALLSTATE repeats and realleges the allegations of paragraphs 1 through 941 of this Complaint with the same force and effect as if fully set forth herein.

943.    All of the Defendants made and/or received referrals from providers they had financial relationships with and did not properly disclose these relationships to the patients in violation of New York statutes.

944.    Bills were mailed to ALLSTATE on behalf of the Defendant providers 334 Grand, BLK, Central Park, Chai, Diag Neuro, Direct Med, Emote, Green Power, Greenwood, Healthcare Med, Hillside, Interventional, Lifeline, Maimonides, Pitch, Refuah, Regal, Sanitas, Seneca, Sinai, Wilson, and Wizard for TCD, VNG, and/or SSR testing services when no such fees should have been recoverable because the services were not performed as billed or were not performed at all.

945.    The Defendant providers Central Park, Chai, Direct Med, Green Power, Greenwood, Hillside, Lifeline, Regal, Sanitas, Seneca, Wilson, and Wizard failed to verify their claims and to provide proper proof of claim in violation of the policies and the No-Fault regulations.

946.    The Defendant providers Central Park, Direct Med, Hillside, Sanitas, and Seneca failed to appear for an examination under oath (EUO) as requested by ALLSTATE in violation of the policies and the No-Fault regulations.

947.    Billing was mailed to ALLSTATE on behalf of the Defendant providers 334 Grand, BLK, Central Park, Chai, Diag Neuro, Direct Med, Emote, Green Power, Greenwood, Healthcare Med, Hillside, Interventional, Lifeline, Maimonides, Pitch, Refuah, Regal, Sanitas, Seneca, Sinai, Wilson, and Wizard for the services of independent contractors, in violation of the No-Fault regulations.

948.    The Defendant providers 334 Grand, Central Park, Chai, Diag Neuro, Direct Med, Emote, Green Power, Greenwood, Healthcare Med, Hillside, Lifeline, Maimonides, Pitch, Regal, Sanitas, Seneca, Wilson, and Wizard billed for VNG testing services that should have been but were not performed by a physician or audiologist.

949.    Each of the Defendants conspired to bill for services that were not provided as billed.

950.    The Licensed Defendant providers 334 Grand, Central Park, Diag Neuro, Direct Med, Emote, Greenwood, Healthcare Med, Hillside, Interventional, Lifeline, Pitch, Sanitas, Seneca, and Wilson have billed ALLSTATE for TCD, VNG, and/or SSR testing services that were not provided by the physicians named on their bills.

951.    The Licensed Defendant providers 334 Grand, Central Park, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Interventional, Lifeline, Pitch, Sanitas, Seneca, and Wilson are sham professional entities secretly controlled by the Defendants John Does 1-15 and ABC Corps. 1-15, and they are not in fact owned and controlled by the doctors who are their nominal owners on paper.  The individual practice of the Licensed Defendant provider Greenwood is also secretly controlled by the Defendants John Does 1-15 and ABC Corps. 1-15.

952.    The Unlicensed Defendant providers BLK, Chai, Green Power, Maimonides, Refuah, Regal, Sinai, and Wizard are not professional entities and are not entitled to reimbursement under the No-Fault law for the TCD, VNG and/or SSR testing for which they have billed ALLSTATE, and no other person, including the Licensed Defendant providers, may bill for any such services rendered by these Unlicensed Defendants.

953.    The Unlicensed Defendants are not entitled to payment under the No Fault Law and Regulations, and no other entity or provider is entitled to be paid for their services.

954.    The Defendant providers 334 Grand, BLK, Central Park, Chai, Diag Neuro, Direct Med, Emote, Green Power, Greenwood, Healthcare Med, Hillside, Interventional, Lifeline, Maimonides, Pitch, Refuah, Regal, Sanitas, Seneca, Sinai, Wilson, and Wizard, and others on their behalf, continue to submit bills to ALLSTATE, and to seek to collect on assigned No-Fault claims for the fraudulent services and billing described herein.

955.    ALLSTATE has and will be prejudiced without a judicial declaration that the Defendants are not entitled to payment of assigned first-party No-Fault benefits in any claims from ALLSTATE due to:  (1) the Defendants' financial relationship with their referring providers in violation of Public Health Law §§ 238-a and/or 238-d; (2) the Defendants' failure to disclose their financial relationship with their referring providers to their patients pursuant to Public Health Law

§238-d; (3) the billing by or on behalf of the Licensed Defendant providers 334 Grand, Central Park, Diag Neuro, Direct Med, Emote, Greenwood, Healthcare Med, Hillside, Interventional, Lifeline, Pitch, Sanitas, Seneca, and Wilson for medical services that were not provided by the physicians named on their bills; (4) the billing for VNG testing services by or on behalf of 334 Grand, Central Park, Chai, Diag Neuro, Direct Med, Emote, Green Power, Greenwood, Healthcare Med, Hillside, Lifeline, Maimonides, Pitch, Regal, Sanitas, Seneca, Wilson, and Wizard that were required to be performed but were not performed by doctors or audiologists; (5) the failure of Defendant providers Central Park, Chai, Direct Med, Green Power, Greenwood, Hillside, Lifeline, Regal, Sanitas, Seneca, Wilson, and Wizard to verify their claims and provide proper proof of claim in accordance with the policy and the No Fault Regulations; (6) the failure of Defendant providers Central Park, Direct Med, Hillside, Sanitas, and Seneca to appear for examinations under oath (EUOs) requested by ALLSTATE; (7) the billing for healthcare services by or on behalf of the Licensed Defendant providers 334 Grand, Central Park, Diag Neuro, Direct Med, Emote, Healthcare Med, Hillside, Interventional, Lifeline, Pitch, Sanitas, Seneca, and Wilson when they are sham professional entities secretly owned and controlled by laypersons; (8) the billing for healthcare services by or on behalf of the individual practice of Licensed Defendant provider Greenwood when it is secretly owned and controlled by laypersons; (9) the billing for healthcare services by or on behalf of the Unlicensed Defendant providers BLK, Chai, Green Power, Maimonides, Refuah, Regal, Sinai, and Wizard when they are not professional entities and are not entitled to reimbursement under the No-Fault law; and (10) the billing for medical services by or on behalf of the Defendant providers 334 Grand, BLK, Central Park, Chai, Diag Neuro, Direct Med, Emote, Green Power, Greenwood, Healthcare Med, Hillside, Interventional, Lifeline, Maimonides, Pitch, Refuah, Regal, Sanitas, Seneca, Sinai, Wilson, and

Wizard when the services were provided, if at all, by independent contractors.

956.    There exists a real, actual and justiciable controversy between ALLSTATE and the Defendants.

957.    ALLSTATE has no adequate remedy at law.

## FIFTIETH CLAIM FOR RELIEF

### (Permanent Injunctive Relief)

### (Against All Defendants)

958.    ALLSTATE repeats and realleges the allegations set forth in paragraphs 1 through 957 of this Complaint with the same force and effect as if set forth fully herein.

959.    This is an actual case and controversy between the Defendants and ALLSTATE regarding at least $1,592,659.64 in unpaid billing for the fraudulent insurance claims that have been submitted to ALLSTATE.

960.    All of the Defendants who have billed ALLSTATE for these insurance claims have no right to receive payment from ALLSTATE on the unpaid billing because of the fraudulent and unlawful billing detailed herein.

961.    Accordingly, ALLSTATE requests that the Court permanently enjoin the Defendants from seeking payment for any pending bills in the name of the Defendants 334 Grand, BLK, Central Park, Chai, Diag Neuro, Direct Med, Emote, Green Power, Greenwood, Healthcare Med, Hillside, Interventional, Lifeline, Maimonides, Pitch, Refuah, Regal, Sanitas, Seneca, Sinai, Wilson, and Wizard submitted to ALLSTATE.

WHEREFORE, ALLSTATE demands Judgments against the Defendants named in each Claim for Relief, jointly and severally except for the Second Claim for Relief for unjust enrichment, the Forty-Ninth Claim for Relief for a declaratory judgment, and the Fiftieth Claim for Relief for a permanent injunction, as follows:

(a)    On ALLSTATE's First Claim For Relief for fraud, the damages that Plaintiffs have sustained as a result of the Defendants' conduct which are in excess of $1,668,862.73, the exact amount to be determined at trial, plus one million dollars ($1,000,00.00) punitive damages, plus a declaratory judgment decreeing that ALLSTATE has no obligation to pay pending No-Fault claims submitted by the Defendants;

(b)    On ALLSTATE's Second Claim For Relief for unjust enrichment, the amount by which the Defendants were unjustly enriched, the exact amount to be determined at trial;

(c)    On ALLSTATE's Third through Fifth Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $135,992.81, or $407,978.43, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(d)    On ALLSTATE's Sixth through Eighth Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $49,697.92, or $149,093.76, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(e)    On ALLSTATE's Ninth through Eleventh Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $167,439.11, or $502,317.33, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(f)    On ALLSTATE's Twelfth through Fourteenth Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $198,492.68, or $595,478.04, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(g)    On ALLSTATE's Fifteenth through Seventeenth Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $127,048.03, or $381,144.09, the exact

amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(h)    On ALLSTATE's Eighteenth through Twentieth Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which is in excess of $48,044.85, or $144,134.55, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(i)    On ALLSTATE's Twenty-First through Twenty-Third Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $43,030.95, or $129,092.84, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(j)    On ALLSTATE's Twenty-Fourth through Twenty-Sixth Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $124,449.36, or $373,348.08, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(k)    On ALLSTATE's Twenty-Seventh through Twenty-Ninth Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $75,830.01, or $227,490.03, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(l)    On ALLSTATE's Thirtieth through Thirty-Second Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $132,413.55, or $397,240.65, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(m)    On ALLSTATE's Thirty-Third through Thirty-Fifth Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $99,314.12, or $297,942.36, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(n)    On ALLSTATE's Thirty-Sixth through Thirty-Eighth Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $145,146.30, or $435,438.90, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(o)    On ALLSTATE's Thirty-Ninth through Forty-First Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $199,071.72, or $597,215.16, the

425

exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(p)    On ALLSTATE's Forty-Second and Forty-Third Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $31,421.97, or $94,265.91, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(q)    On ALLSTATE's Forty-Fourth and Forty-Fifth Claims For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $15,621.32, or $46,863.95, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(r)    On ALLSTATE's Forty-Sixth and Forty-Seventh Claim For Relief under RICO, three (3) times the damages that ALLSTATE has sustained as a result of the improper conduct which are in excess of $1,592,439.67 or $4,779,644.67, the exact amount to be determined at trial, plus ALLSTATE's costs in this suit, including reasonable attorneys' fees;

(s)    On ALLSTATE's Forty-Eighth Claim For Relief, under Section 238-a of the New York Public Health Law, the damages that Plaintiffs have sustained as a result of the Defendants' conduct which are in excess of $397,528.24, the exact amount to be determined at trial;

(t)    On ALLSTATE's Forty-Ninth Claim For Relief, a declaratory judgment decreeing that ALLSTATE has no obligation to pay pending or future No-Fault claims submitted by the Defendants; and

(u)    On ALLSTATE's Fiftieth Claim For Relief, a permanent injunction decreeing that ALLSTATE has no obligation to pay pending No-Fault bills submitted by the Defendants, and permanently enjoining the Defendants from seeking payment on such claims.

Dated:  September 5, 2024
        New York, New York

                                        **SHORT & BILLY, P.C.**

By: _____

                                        Andrew S. Midgett
                                        Seok Ho (Richard) Kang
                                        Skip Short
                                        217 Broadway Suite 300
                                        New York, New York 10007
                                        (212) 732-3320


                                        *Attorneys for Allstate*

427